UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
Case No. 6:15-cv-1698

. . . . . . . . . . . . . . . .
SHIRLEY JN JOHNSON, :
:
Plaintiff, : Orlando, Florida
: May 9, 2018
v. : 9:01 a.m.
:
NEW DESTINY CHRISTIAN CENTER:
CHURCH, INC., :
:
Defendants. :
. . . . . . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL, VOLUME I
BEFORE THE HONORABLE ROY B. DALTON, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

Counsel for Plaintiff: Pro Se

Counsel for Defendant: Clay H. Coward

Krista N. Cammack

Court Reporter: Amie R. First, RDR, CRR, CRC, CPE
Federal Official Court Reporter
401 West Central Boulevard, Suite 4600
Orlando, Florida 32801
AmieFirst.CourtReporter@gmail.com

Proceedings recorded by mechanical stenography.

Transcript produced by Computer-Aided Transcription.

# INDEX OF PROCEEDINGS


Opening Statement Plaintiff .................... 4
Opening Statement Defense ..................... 8
Rule 50 Motion ................................ 202


## PLAINTIFF WITNESSES



| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| PAULA WHITE-CAIN | 32 | 91 | 109 | |
| SHIRLEY JOHNSON | 113 | 145 | 191 | |



## DEFENDANT WITNESSES



| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| JEFFREY HARDIN | 206 | 218 | 222 | |



## EXHIBITS



| | ADMITTED |
|---|---|
| Joint Exhibits 1-91 | 11 |
| Plaintiff's Exhibit 9-E | 47 |
| Plaintiff's Exhibit 9-F | 53 |
| Plaintiff's Exhibit 9-D | 58 |
| Plaintiff's Exhibit 9-G | 65 |
| Defendant's Exhibit B-79 | 96 |
| Plaintiff's Exhibit 3 | 141 |

P R O C E E D I N G S

*****

THE DEPUTY CLERK: Case Number 6:15-cv-1698-Orl-37TBS, Shirley Johnson versus New Destiny Christian Center Church, Incorporated, et al.

Counsel and Ms. Johnson, will you please state your appearance for the record. We'll start with the plaintiffs.

MS. JOHNSON: My name is Shirley Jn Johnson. I'm the plaintiff in this action.

THE COURT: Good morning, Ms. Johnson.

Are you ready to proceed?

MS. JOHNSON: Yes.

MR. WAUGH: Your Honor, I'm Christian Waugh, court-appointed standby counsel for Ms. Johnson.

THE COURT: Good morning, Mr. Waugh.

You can have a seat, Ms. Johnson. I'll be back with you in just a minute.

MR. COWARD: Good morning, Your Honor. I'm Clay Coward here with my associate, Krista Cammack. We represent the defendants, New Destiny Christian Center, Paula White, and Paula White Ministries.

THE COURT: Are you ready to proceed?

MR. COWARD: Yes, sir, Your Honor.

THE COURT: All right. We're here for a nonjury

trial in this matter on the issue of damages and items related to damages.

So, Ms. Johnson, do you want to make a preliminary, brief opening statement?

MS. JOHNSON: Yes.

THE COURT: All right. Would you come to the podium, please, ma'am.

When you arrive there, if you'll adjust that microphone so that you're speaking directly into it and I can hear you clearly. Also, on the side there's a button there that will lower the podium or raise the podium if you want to adjust the height.

MS. JOHNSON: I think I'm good.

Good morning, Your Honor.

THE COURT: Good morning.

**OPENING STATEMENT BY THE PLAINTIFF**

MS. JOHNSON: My name is Shirley Jn Johnson. I'm the plaintiff in this malicious prosecution action.

And this action stems from an underlying copyright infringement complaint that the defendants filed against me on March 27th, 2014. That copyright action was a SLAPP lawsuit which was filed in retaliation as a personal vendetta of Paula White.

As you know, Your Honor, SLAPP lawsuits are filed by wealthy individuals and powerful individuals and

corporations against just ordinary individuals like myself.

And the purpose of those SLAPP lawsuits is to intimidate, to punish, to harass, and to attempt to suppress speech. And especially the person that's been outspoken against the person, they will file these lawsuits.

As one court put it, they filed the lawsuits, the SLAPP lawsuits, in order to bring the victim to their knees emotionally.

Now, the defendants in this case, New Destiny Christian Center Church, Incorporated, is a well-known mega church who does business under the fictitious name Paula White Ministries. And it has a global reach.

Paula Michelle White is the senior pastor of New Destiny Christian Center Church. She's also a director on the board of New Destiny Christian Center Church. She's also the president of the board and president of the corporation itself. Ms. White is also an author. She's a public speaker and a television personality.

Now, in the copyright complaint, the defendants falsely claim that I illegally copied, modified, and sold their copyrighted -- their copyrighted videos and profited from the sale of those videos.

Each allegation in that complaint was false. And the complaint itself was duplicated from another copyright

infringement complaint.

So I filed -- in that action, I submitted videos to the Court to make a determination of copyright infringement.

The defendants did not produce any evidence at all. They did not produce any videos or just any evidence at all.

The Court eventually made a decision to dismiss the case with prejudice. And the Court added res judicata to that order.

I filed a motion for summary judgment. And 17 days later, the defendants filed a -- they abandoned their claims and filed a motion to dismiss the complaint without prejudice.

But the Court denied that motion and directed the defendants to either answer the motion for summary judgment or dismiss the case with prejudice. They chose to dismiss with prejudice.

And the Court also directed me to say that if I wished to seek affirmative relief, I could file a malicious prosecution action against the defendants. And I did that. And that's why I'm here today, Your Honor.

I filed the initial complaint on October the 8th, 2015. And I filed a third amended complaint on August the 18th, 2016, which is the operative complaint

as it stands now.

I'm asking the Court to exact punitive damages against the defendants for maliciously prosecuting the copyright infringement complaint.

And this is not the first time, Your Honor, that this has happened. Ms. White has filed other false complaints against other individuals. And this type of behavior needs to stop.

And so I'm asking the Court to exact punitive damages against the defendants.

Also, on January the 2nd, 2018, the Court entered a default judgment against New Destiny Christian Center Church, Incorporated; Paula Michelle Ministries, Incorporated; and Paula Michelle White.

At the pretrial meeting on August the 19th, Your Honor, you see that this is a damages-only trial. And you also permitted the defendants to argue to a limited extent the issue of malice.

Therefore, I will be presenting evidence showing that the defendants did, indeed, act with malice when they filed a copyright infringement complaint against me.

And also because the defendants did not fully comply with the Court's order in producing the discovery documents which would reflect their net worth or their -- and their financial condition, I will be presenting video

evidence of Paula White, her son, and a couple of fellow pastors attesting to Paula White's wealth.

I will also be presenting four photographs. And I will be presenting the defendant's answers to admissions and interrogatories.

After I've presented my information and my evidence, Your Honor, I pray that the Court will come to the same conclusion, that the defendants did act with malice when they filed the copyright infringement complaint against me.

And I'm praying that the Court will exact the appropriate amount of punitive damages that will punish the defendants or at least deter them from engaging in this type of behavior in the future against me or anyone else.

And I just pray that the Court will do justice in this case.

Thank you.

THE COURT: Thank you, Ms. Johnson.

Mr. Coward?

MR. COWARD: May it please the Court.

THE COURT: Yes, sir.

**OPENING STATEMENT BY THE DEFENSE**

MR. COWARD: Your Honor, it's my honor in this case to represent New Destiny Christian Center, Paula Michelle Ministries, and Paula Michelle White.

106, the plaintiff in this case posted 106 videos which she stole from Paula Michelle, from Paula White Ministries on her video channel and published it on YouTube and on a website where people could download it and do whatever they wanted with it.

The defense in this case, Judge, will be based on facts and on evidence.

You were right when you said this case won't take long to try because the facts and the direct evidence in this case are uncomplicated and straightforward.

There's two aspects to this case: plaintiff's actual damages and the punitive damages aspect of it.

Let me start with the actual damages, Your Honor.

The actual damages consist of plaintiff's economic damages as a result of defending the underlying copyright infringement case and plaintiff's claim for noneconomic damages.

Plaintiff's economic damages are the monetary damages that she sustained as a result of defending the underlying copyright action.

And if I could use the ELMO for just a second, Your Honor.

The parties in this case have agreed to a number of facts, Judge. It's in the pretrial statement that we filed with the Court.

This is the first page of the agreed and undisputed facts which the Court can take into account.

This is the second page. And you can see there, Your Honor, at paragraph 20, the parties have stipulated that the plaintiff's economic damages in this case are $1,207.93.

Moving on to the noneconomic damages case, Your Honor, in determining whether to award these, the Court needs to evaluate the plaintiff's credibility. She has no witnesses in support of these damages other than herself. She has no documents, no medical records to support these claims.

She has two separate types of noneconomic damages claims, Your Honor.

The first, she claims an injury to her character and integrity, which if you read the case law on malicious prosecution, it essentially says that an injury to character and integrity are the hallmark of a malicious prosecution case.

Her second claim is for mental pain and anguish.

Let's talk about the first one, injury to her character and integrity. The plaintiff has contended under oath in this case that she suffered injury to her character and integrity.

Russ, if you'll show page --

Oh, Your Honor, actually, could we move into evidence the stipulated exhibits?

THE COURT: If those are exhibits about which there's no objection, then those can be received.

MR. COWARD: Yes, sir.

MR. WAUGH: There's no objection to that, Your Honor.

THE COURT: Can you identify them for the record, please, Mr. Coward.

MR. COWARD: Yes, sir. We have four binders of exhibits, Your Honor.

May I approach?

THE COURT: Yes.

MR. COWARD: So there are four binders of exhibits, which are joint exhibits that the parties have agreed to, from Exhibit Number 1 through Exhibit Number 91.

THE COURT: All right. Thank you.

Joint Exhibits 1 through 91 will be received without objection by stipulation.

(Joint Exhibits 1 through 91 were received in evidence.)

THE COURT: Do you agree with that, Ms. Johnson?

MS. JOHNSON: Yes.

THE COURT: Yes. Thank you.

MR. COWARD: And so with that, Your Honor, during

this opening statement, I will make reference and show the Court some of the exhibits that have been stipulated to and entered into evidence, as the Court just did.

First is the third amended complaint.

Mr. Wills, if you can show us page 1688, please.

This is the first page of the plaintiff's third amended complaint in this case, the operative complaint.

If you could go to page 1702, please.

You can see there in paragraph 83, Your Honor, the plaintiff has claimed an injury to her character and integrity in this case.

And if you could go to page 1704, Mr. Wills.

The plaintiff verified and signed this complaint under oath, verifying to the truthfulness of it.

You can take that down.

In support of that claim of damage to character and integrity, she has no witnesses in support of her sworn testimony to this Court that she suffered injury to her character and integrity.

The underlying copyright infringement case was venued in this court, the U.S. District Court for the Middle District of Florida, in Orlando, Florida.

The plaintiff lives in Seattle, Washington. Her evidence in support of this claim that she supported -- that she suffered injury to her character and integrity is

that she overheard people in a grocery store, a library, and a department store saying that she was the one being sued by Paula White for copyright infringement.

When the Court evaluates her credibility with regard to all her claims in this case, it needs to take into account that she has told the Court and prayed to this Court under oath for damage to character and integrity with absolutely no support for it.

Let's talk about the second claim, claim for mental pain and anguish.

Let me ask you to show page 1702, again, please, Russ.

You can see there, Your Honor, the plaintiff has contended under oath that due to the criminal nature of the claims, had Defendant White's wicked scheme succeeded, plaintiff would potentially face five years in prison for criminal copyright infringement.

You can take that off.

The copyright infringement case in the underlying case never requested criminal penalties, Your Honor.

Let me ask you to go to page 2, please, Russ.

This is the underlying copyright infringement complaint.

Go to page 8 and 9, please. 8 -- I'm sorry. Page 8.

You can see the prayer for relief there, Your Honor. It asks for statutory damages, conjunctive relief.

Go to page 9.

Attorneys' fees and costs.

You can take that down.

There is no private right of action for criminal copyright infringement, Your Honor. There is no evidence at all in this case that Paula White Ministries ever threatened the plaintiff with criminal copyright infringement. Again, credibility the Court will need to take into account.

Then let's talk about her last claim, her claim for mental pain and anguish as a result of the monetary demand in the complaint.

She contends she had trouble sleeping, experienced mental confusion, bouts of short-term memory loss, and forgetfulness.

She has no before-and-after witnesses to testify in support of this. She didn't seek any medical treatment for these conditions whatsoever. She didn't incur any medical bills.

Her testimony in this case is that her claim for mental anguish involves the, quote, garden variety emotional injury she sustained during the time frame of the

underlying copyright action.

We sought an IME in this case, Your Honor, which was denied on the basis that the plaintiff filed an affidavit -- objection to it, basically stating that she no longer had any mental distress injuries and that her mental distress was limited to the time frame of the underlying case, which lasted approximately nine months.

Again, the Court must weigh the plaintiff's credibility in evaluating her claim of -- mental claim of pain and anguish.

Let me ask you to go to page 1702, Russ.

This is the plaintiff's complaint in this case again, Your Honor.

Paragraph 86, the plaintiff contends that she worried even more because Defendant White stated that the fight had been fixed and that she had never lost anything in her jurisdiction, increasing the fear and anxiety.

The plaintiff will attempt to take a clip of a sermon that Pastor Paula White was preaching and show this statement, and she contends it was talking about her, that Pastor Paula White was talking specifically about the plaintiff.

The Court will need to determine the credibility of the plaintiff's allegation that when Pastor Paula White said the fight was fixed, she was talking about the

underlying copyright infringement case.

Interestingly, Judge, the plaintiff has taken absolutely no depositions in this case. She has not sought to depose Pastor Paula White and ask her if that's what she was talking about.

Instead, she has taken clips of Pastor Paula White, which she has developed for purposes of this case to try to convince the Court, based on speculation, that that's what she was talking about.

Let's move on to the punitive damages aspect of the case, Your Honor.

The default which the Court entered according to the law establishes an entitlement to punitive damages. But the finder of fact, whether it was a jury or the Court as the finder of fact, does not have to award them.

The inquiry, therefore, is, first, whether punitive damages should be awarded; and, second, if so, the amount of same.

I still have my notes from when I was standing up here during the pretrial conference a few weeks ago, Your Honor. And the Court set forth the scope of the inquiry with regard to the punitive damages.

What was the motive for the underlying lawsuit? Was the defendant reckless or indifferent to the plaintiff's rights? Did they act maliciously in filing the

underlying lawsuit?

If the answer to those questions is no, punitive damages should not be awarded.

Even if the answer is yes, then an evaluation must be made as to the degree of maliciousness or the egregious nature of the defendant's conduct.

I do want to point out, Your Honor, that the plaintiff in the underlying case was Paula White Ministries, an entity, a fictitious name.

Paula White individually was not a plaintiff in the underlying case. And the plaintiff contends in this case that Paula White has a habit of trying to sue people to cow them and prevent them from engaging in free speech.

The plaintiff has no evidence whatsoever that Paula White has filed a lawsuit against anyone in that manner. Any other cases that she refers to, none of which are copyright infringement cases, were brought in her name.

We can deal with that as we go along, Your Honor. But the Court should also note that the plaintiff in this case brought a claim for infringement of her First Amendment rights. It was dismissed by the Court.

The plaintiff also contends that this is -- that the underlying copyright infringement case was a SLAPP suit. Of course, if it was a SLAPP suit, as the defendant in that case, she would have been able to try to bring a

motion to get it thrown out very early on on the basis that it was a SLAPP suit.

But even that wouldn't have worked back in the 2013-2014 time frame, Your Honor, because the SLAPP suit statute at that point in time related to governmental entities only. A governmental entity was not in that case. So her claim that it was a SLAPP suit is specious.

Let's go back to the issues with regard to the punitive damages. What was the motive for the underlying copyright infringement case?

Paula White Ministries was acting on advice of their counsel to protect their rights and intellectual property and copyrighted materials.

Paula White gives sermons at her church, New Destiny Christian Center, and also all around the country and, in fact, all around the world.

Paula White Ministries records those sermons when she gives them at churches and other venues throughout the United States.

Paula White Ministries has a website which they put those recordings on. They also had a YouTube channel which they put those recordings on, to help increase their ministry. They accept donations from them to help run their ministries.

The plaintiff has a website and a YouTube channel

on which she showed portions of Paula White's sermons. The plaintiff apparently is under the impression that you have to take the entire sermon in order for it to be copyright infringement. You do not. If you take derivative works from someone's intellectual property, that is copyright infringement.

In early February of 2012, when we tracked the stipulated facts in the case, Your Honor, in early February of 2012, Paula White Ministries sent a takedown notification to YouTube regarding the plaintiff's videos and other videos.

They did that because they had the right under what's called the DMCA, the Digital Millennium Copyright Act, to basically send a form to YouTube and ask that their property be taken down. You don't have to have registration and copyright, at least at that time, in order to do that.

You also didn't have to engage in a fair use analysis at that time in order to do that, although that's not really the focus of this case, but it is important historical information.

The plaintiff, through YouTube's process, filed a counter-notification citing fair use. It's an important fact in this case. It's a thread that is going to run through this case, Your Honor.

The plaintiff filed a counter-notification citing fair use, and YouTube put her videos back up. This was in the winter and spring of 2012.

A few months later, in June of 2012, Paula White Ministries applied for copyright for all of Paula White's sermons in the years 2010 and 2011.

Let me see page 76, please. Can you flip it?

This is an exhibit from the plaintiff's motion for summary judgment in the underlying case, Your Honor. This is a copy of the registration for the videos.

You can see that that copyright registration was obtained on June 22nd, 2012, for Paula White Ministries' sermons, 2010 and 2011. And they received copyright registration number PAU003653787.

They sent in -- under the description, you can see they sent in 177 video disks regarding these sermons over this two-year time frame.

Therefore, they received a copy registration of that intellectual property for that two-year time frame.

You can take that down.

Paula White Ministries took no further action with regard to the plaintiff for more than a year. Plaintiff had posted portions of over a hundred videos of Paula White giving sermons in this case.

The vast majority of those, Your Honor, were

critical of Paula White, designed by the plaintiff specifically, by her own admission, to get people to stop following Paula White.

The fair use analysis is a very complex case-by-case, fact-by-fact analysis.

But one of the factors, factor four, the effect of the use upon the potential market or value of the copyrighted work, will be important as this case proceeds.

Plaintiff never requested permission from Paula White Ministries to use those videos. She never received permission from Paula White Ministries to use those videos.

In mid-to-late 2013, Paula White Ministries hired the NeJame law firm, Mark NeJame's law firm. Interestingly, every time I go back to my office from coming to the courthouse here, I go by Mark NeJame's gigantic billboard. Obviously, one of the best-known law firms in town.

They hired that law firm to evaluate this issue with regard to videos. The NeJame law firm assigned an attorney named Thomas Sadaka to represent Paula White Ministries in that endeavor.

I'm going to go down to Joint Exhibit 10, page 116.

THE COURT: Mr. Coward, I'm going to have to ask you to move along with a little bit more pace because I'm

-- I don't want to cut you off, but this is not a closing argument opportunity.

Tell me what it is you expect the evidence to be and how it relates to the issues in the case. And I'm very conversant of the facts.

MR. COWARD: Yes, sir. Okay. I'll move it along.

So, Your Honor, this is Mr. Sadaka's affidavit which he's given in this case.

Go to paragraph 7, please.

THE COURT: Just so you know, I've carefully read Mr. Sadaka's affidavit, and I've also read your expert's Rule 26 report.

MR. COWARD: Okay. All right. Well, then we'll just not worry about that.

But as you know, then, Your Honor, from reviewing Mr. Sadaka's affidavit, he indicated that Paula White Ministries came to him because they felt that the plaintiff's use of these works negatively affected the value of the copyrighted works.

You'll hear from Brad Knight from Paula White Ministries about that. He confirmed that they created the videos, that they have the copyright registration. And he also believed that Ms. Johnson had an agenda to destroy the market.

He basically conducted a prefiling investigation.

The clients, the defendants in this case, relied on him to do that.

Before filing the action, he tried to resolve the dispute. As you know, if you read his affidavit, he sent a letter and basically tried to say, will you please stop doing this?

The plaintiff replied, refused, again citing the doctrine of fair use.

He then filed a copyright infringement action. As I said, the plaintiff was Paula White Ministries, not Paula White, individual.

As the case went along -- without much discovery, frankly. In October of 2014, Mr. Sadaka had a telephone conference with Ms. Johnson, by her own admission, in which he indicated that the case could be resolved if she agreed to remove her videos.

She refused.

Going forward from that, she did file a motion for summary judgment. Mr. Sadaka filed a motion to dismiss without prejudice. She opposed it. He then filed a motion to dismiss with prejudice.

Mr. Sadaka's affidavit is clear that the defendants in this case, the plaintiff in the previous case, Paula White Ministries, wished not to pursue that action any further on economic grounds.

So the question for the Court is going to be, with all these facts, were the defendants reckless or indifferent to the plaintiff's rights?

They hold the copyright registration. By her own admission, she put 106 videos on her channel. The plaintiff -- the defendant in this case, the plaintiff in the underlying case, can make out a prima facie case of copyright infringement.

All you have to show is that you own the copyright registration and that there has been copying. That alone should be enough to defeat a claim of malicious conduct, Your Honor. Over and above that, they hired a lawyer to evaluate the claim. He did evaluate the claim.

The plaintiff in this case contends that the videos were not infringing because they are fair use.

This is where the testimony of our copyright expert, Mr. Lewis, will come into play. Fair use is an affirmative defense. Fair use is an affirmative defense.

There are -- I'm sure the Court is well aware that there are multiple copyright infringement cases, one as recently as within the last month involving Oracle, where the fair use defense is so difficult that a district court rules one way, an appellate court rules a different way, the Supreme Court rules a different way.

To say that a defendant should not have filed a

case based on fair use and that is malicious prosecution just does not carry the day, Your Honor. It's a very complex analysis.

The Court knows who the witnesses are in this case. Obviously the plaintiff will testify about her damages and the other things she talked about.

Pastor Paula White will discuss the limited nature of her involvement in the underlying lawsuits; the work, the blood and the sweat that she puts into creating her sermons. She'll rebut the plaintiff's allegations, if necessary, that she targeted her. And she'll also talk about her net worth.

Doug Shackelford is the general manager of Paula White Ministries.

And obviously, Your Honor, I guess I didn't get a chance to introduce my client. This is Pastor Paula White. And this is Doug Shackelford, the general manager of New Destiny Christian Center.

Mr. Shackelford will talk about the copyright registration. He'll talk about the mission of Paula White Ministries, as will Pastor Paula White. He'll also discuss generally New Destiny's net worth.

And, again, Judge, I have to say I found it interesting that the plaintiff has said we didn't try to provide any information regarding net worth in this case.

So the Court is well familiar with the background of discovery issues.

However, as all the discovery is in evidence already, the record will show that the defendant did, indeed, provide the financial statements for years that were required for 2014, provided Paula White's tax returns.

The plaintiff never sought to take any depositions, to ask any questions about this, to ask anything with regard to net worth.

As the Court well knows, a defendant facing punitive damages is allowed to put on evidence of its net worth.

About halfway through last year, New Destiny Christian Center hired outside accountants, RSM, the old McGladrey accounting firm. And they prepared a financial statement at the end of the year.

One of their accountants, Jeff Hardin, who worked on that, will be here to discuss that and just discuss the numbers with the Court and how that was put together.

And, also, for purposes of this case, the financial statement for Paula White was prepared specifically for purposes of this case. She had never prepared one before in her life.

Brad Knight will also testify. He's Paula White's son and a pastor at NDCC.

Given his young age, Your Honor -- he's in his 30s, I believe, a lot younger than all of us -- he has extensive knowledge of Paul White Ministries' use of YouTube to promote Paula White Ministries' message. And he'll testify about the basis for the lawsuit and the protection of Paula White Ministries' intellectual property.

Finally, you'll hear from our expert, Sam Lewis, our copyright expert, who will testify about copyright law. And his evaluation was that there was -- certainly Mr. Sadaka felt there was a reasonable basis to bring the underlying lawsuit.

Paula White Ministries relied on him. He also felt there was a prima facie case and a reasonable basis for the lawsuit.

So, Your Honor -- I'm finishing up here.

Obviously, the economic damages are clear: $1200. She doesn't have any basis for a claim for injury to character or reputation. Her claim for mental pain and suffering regarding being a defendant in the case has to be evaluated in light of her other claims, such as the claims of criminal copyright infringement.

At the end of the day, Your Honor, we hope the Court will find that Paula White Ministries acted no differently than any other litigant who feels their

intellectual property is being stolen and the market for them diminished.

By seeking counsel to advise them of those rights and relying on those rights, Paula White Ministries did not act maliciously toward the plaintiff with reckless indifference to her rights.

They tried to resolve the dispute without litigation. They hired a lawyer to advise them regarding the validity of the claim. They tried to resolve the dispute after the case was filed. The case was dismissed for economic reasons.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Coward.

Let me just remind the parties of the parameters of the claim. Because of the nature of the damages claim, I'm concerned that you all may not be properly appreciating what the boundaries are. I want to make sure that the ground rules are well understood.

We're not going to relitigate the merits of the underlying claim. That claim has already been dismissed with prejudice. So that issue has been adjudicated.

We're not going to relitigate the issue of liability in this case because that's already been determined as a result of the Court's default judgment.

We're here to determine whether or not the claim

was filed with a motive that warrants the imposition of punitive damages or not and the question of Ms. Johnson's special damages, in addition to whatever intangible damages she may be able to prove, as well as punitive damages, if any.

I'm not sure what all the documents are, Mr. Coward and Ms. Johnson.

But I do want to make sure that the defense is aware that you're not going to be able to admit or rely on any documents that should have been produced previously in response to the Court's orders that were not produced.

I don't know if those are in by stipulation or what. I don't know what the documents are that are in evidence.

But the Court ordered financial information to be produced. Those orders were not complied with. That resulted in a default judgment. We're not going to introduce those documents now.

MR. COWARD: May I address that?

THE COURT: Briefly. Very briefly, yes.

MR. COWARD: Yes, sir. Your Honor, all the discovery is in those notebooks, stipulated in.

THE COURT: Okay.

MR. COWARD: The only additional financial documents are two, which are stipulated in, which are the

most recent financial statements for New Destiny Christian Center and Paula White as of year-end 2017.

Those were not available at the time. Those were not requested at the time. The scope of the Court's order, as narrowed by Judge Kelly during the discovery phase of the case, was to produce financial statements in 2014 --

THE COURT: Okay.

MR. COWARD: -- the time frame of the case.

THE COURT: I don't want to reargue the merits of that. I'll give you an opportunity to tell me at the end of the case whether or not -- at the end of the evidence whether or not these documents are appropriate for me to consider in connection with my deliberations on the outcome of the case.

But I just want you to know, that I want to make sure that the record reflects that to the extent that there's evidence that's in the record, whether it's in there by stipulation or not, that was -- that should have been produced previously that was not. If you're telling me that's not the case, that's fine. I accept your representation that that is so.

But if it is otherwise, I'm not going to consider that evidence in my deliberations.

MR. COWARD: Yes, sir. I understand. It's only those two documents.

THE COURT: Fair enough.

All right. Ms. Johnson, call your first witness.

MS. JOHNSON: Your Honor, I have no witnesses on my behalf. But I would like to question the defendant's witnesses.

THE COURT: Who do you want to call?

MS. JOHNSON: I want to call Paula White to the stand.

THE COURT: All right. Ms. White, would you come forward and be sworn, please, ma'am.

(Witness sworn.)

THE DEPUTY CLERK: If you'll state your first and last name and spell your first and last name for the record.

THE WITNESS: Paula White, P-A-U-L-A, W-H-I-T-E, also known as Paula White-Cain.

THE COURT: How do you spell Cain?

THE WITNESS: C-A-I-N.

THE COURT: Thank you.

You may inquire, Ms. Johnson.

MS. JOHNSON: Your Honor, I want to go directly into the malice aspect of this action, if I may. And so I want to present -- to publish some videos, and I want Ms. White to identify these videos.

And so may I publish a video?

THE COURT: If they're in evidence, then you may. If they're not in evidence, then you may not.

MS. JOHNSON: They are.

MR. COWARD: They are not in evidence, Your Honor.

MS. JOHNSON: Well, okay. He opposed the --

THE COURT: Okay. Then you're going to need to lay the foundation, and I'll see whether or not they are appropriate to be received in evidence.

THE WITNESS: Your Honor, I'm sorry. I left my glasses. May I get my glasses?

THE COURT: Yes. Mr. Coward will get those for you.

THE WITNESS: Thank you.

MS. JOHNSON: The first video that I want to introduce is Ms. White claims that when she preaches her sermons, that when she uses the terms --

THE COURT: Let me just help you out here on the outset. So it's your witness. You need to talk -- ask the witness questions, and the witness will answer questions. So don't --

MS. JOHNSON: Okay.

THE COURT: I'm not involved in this process unless there's an objection.

MS. JOHNSON: Okay.

**DIRECT EXAMINATION**

BY MS. JOHNSON:

Q Ms. White, when you're preaching your sermons and you use the term "enemy," who are you speaking of?

A Satan, the devil.

Q You mean the character, the Biblical character?

A I'm talking about -- he's not a character -- Satan.

Q Well --

MR. COWARD: Wait, Your Honor. May she be allowed to answer the question, please?

MS. JOHNSON: Oh, I'm sorry.

THE COURT: Let me just put some ground rules down here early on. We're going to have a question.

And, Ms. White, wait until the question is completely asked.

THE WITNESS: Yes, sir.

THE COURT: And then we're going to have an answer. And, Ms. Johnson, you wait until the answer is completely finished.

If the witness is not being responsive to the question, you can ask me to ask her to be responsive to the question.

But we're going to make sure that we have a distinct question, a distinct answer, because the court reporter can't take it down if you all talk on top of one another.

Now, let's have a new question, and we'll start again.

BY MS. JOHNSON:

Q So you say you're speaking of Satan when you use that term "enemy"?

A When I am preaching in my sermons and I use the term "enemy," I am referring to Satan in the Bible.

Q Okay. When you use the term just "Satan" alone, you're still referring to the Bible?

A When I use the term "Satan," I'm referring to the Bible.

Q Okay. When you use the term "devil," you're referring to Satan in the Bible?

A Yes.

Q Is there ever a time when you would refer to a person as the devil?

A No.

Q When you're preaching, you wouldn't refer to a person, such as myself or anyone in this room, as the devil?

A No.

Q Would you refer to them as the enemy?

A No.

Q So you would never refer to a person as Satan, the devil, or the enemy?

A No. I use Biblical, according to the Word of God.

And there are many Scriptures to back that up, such as I Peter, Chapter 4, Verse 8, where --

THE COURT: I'm going to stop you now, Ms. White. You've answered the questions.

MS. JOHNSON: Okay. Your Honor, I would like to publish a video. This video is a clip of Paula White preaching a sermon. In that sermon, she is making an analogy, and she's comparing an incident that happened to her.

And she is speaking of how she had this encounter, I guess, with the devil. But she's referring to a person.

And I would like to publish this video and authenticate it through Ms. White. And I would like to ask her some questions about this video clip.

May I --

THE COURT: What exhibit number is it?

MS. JOHNSON: It's exhibit number -- well, this is one of the disputed exhibits. It's in the plaintiff's binder. And it is Exhibit No. 8 in the plaintiff's binder -- Exhibit No. 9. Clip 8, but Exhibit No. 9-H.

MR. COWARD: 9-H?

MS. JOHNSON: In the plaintiff's binder, yes.

THE COURT: My 9-H sheet says that this is clip 8, Paula White provoking fight at airport, arrested.

Is that the right one?

MS. JOHNSON: That's correct.

MR. COWARD: Your Honor, I object on the basis of foundation and the rule of completeness and relevancy.

THE COURT: Well, your relevancy objection is overruled if it, in fact, is what Ms. Johnson represents it to be.

I don't know whether or not she can authenticate it with this witness or not. But I'll give her the opportunity to ask some foundational questions.

As it relates to the rule of completeness, Mr. Coward, obviously, you'll have a right to publish any portions that you think the Court ought to consider if any part of it is received.

We can talk about whether or not that's going to be done during the direct testimony or whether you want to do it on your cross-examination. So we'll try to figure out an official way to do it if any of these clips are to be admitted.

MR. COWARD: Yes, sir.

(Playing video exhibit.)

THE COURT: First thing you do is -- stop the tape, please.

So I don't know. Do you want to consult briefly with Mr. Waugh?

But Federal Rule 901 requires that you demonstrate

through testimony of the witness or some other source that the document that you seek to introduce is what it purports to be.

You've told me what the document purports to be, but what we don't have is whether or not the witness is familiar with it or can authenticate it or if you have some other source that you want to rely upon to demonstrate that this clip is what it purports to be.

So if you want to consult briefly with Mr. Waugh, I'll give you the opportunity to do that.

BY MS. JOHNSON:

Q Ms. White, were you ever at the airport on October the 9th, 2004?

A I'm at the airport quite often.

Q Do you recall being there on October the 9th?

A I've never been asked to research that, so --

Q Do you recall getting into an altercation with one of the airport workers there?

A There are many times that people --

THE COURT: Just answer the question, Ms. White.

Do you recall getting involved in an altercation with the airport workers there?

THE WITNESS: I recall an airport worker that got quite aggressive with me.

BY MS. JOHNSON:

Q Do you recall telling -- repeating that story to your congregation?
A I do.
Q And you would say that it was you in that video, that it was you and the airport worker that were in this altercation together?
A I would recall it would be me in the video I just saw.

MS. JOHNSON: Okay. So, Your Honor, may I publish the video?

THE COURT: I'm going to permit you to use the clip for impeachment purposes at the moment. I'll reserve ruling on whether or not I'm going to admit it as extrinsic evidence.

I'll give Mr. Coward an opportunity on cross-examination to determine if he wants to publish some other portions of it. We'll see how it can be received.

You can play the clip.

MS. JOHNSON: Also, Your Honor, on the completeness rule, I --

THE COURT: You don't need to be concerned about that at the moment. I'll take that up later.

The rule of completeness gives Mr. -- gives any party the opportunity to publish any other portion of an exhibit if it needs to be seen in the interest of fairness.

So that's what the rule of completeness is.

MS. JOHNSON: Okay. So I can --

THE COURT: In other words, if there are ten pictures and you show two of them, the rule of completeness would give the other side the ability to show the other eight if, in fairness, those other eight ought to be viewed. That's sort of a rough explanation of what the rule of completeness is.

MS. JOHNSON: So may I?

THE COURT: Yes, you can roll the clip.

(Playing video exhibit.)

THE COURT: Let's stop for a minute and figure out why it's not showing.

(Playing video exhibit.)

BY MS. JOHNSON:

Q So, Ms. White, when you were preaching that, telling your story there, when you said, "Devil, you are a liar," who were you speaking to?

A That's just a phrase common in Christianity, like that you'd say, "Devil, you are a liar."

Q But were you speaking to the worker at the airport when you made that statement?

A No.

Q But on the clip you said she was right in your face and you told her, "Devil, you are a liar."

A No, I didn't say that.

What I said very specifically was this woman was in my face, and it was irritating to me. And in context of the whole message, I was irritated by a person who had gotten in my face.

And then in preaching, you say -- I said, "The devil is a liar." It's like a pause phrase.

Q But you aren't preaching. You are speaking to an individual.

A I was preaching to my congregation.

Q When you said, "Devil, you are a liar," you were at the airport speaking to an individual --

A No, ma'am. I never said that.

THE COURT: Let's wait until the question is completed before you start your answer.

THE WITNESS: Yes, sir.

BY MS. JOHNSON:

Q So when you told your congregation you have to know how to deal with the devil, were you comparing this person to the devil?

A I -- when I said -- I would have to watch the entire sermon. When I said, "You have to know how to deal with the devil," meaning that you have to know how to deal with spiritual warfare.

Q So then if you, if you are likening that woman to the devil, then you're saying she was the devil? That's who

you were dealing with?

A No. I was saying that, being agitated, frustrated, losing your peace are things that are opposite of fruit of the spirit.

Q Do you recall preaching a sermon on March 21st of 2012? You were at, I believe, New Destiny Christian Center -- I'm sorry. You were at Without Walls International Church at that time.

You were teaching your congregation and listing to the audience how to defeat the enemy.

Do you recall preaching that sermon?

A I preach sermons several times a week.

Q This particular sermon, you were telling them that they need to study the enemy's tapes in order to know how to deal with the opponent and the devil?

A I'm -- I can't say that on that day at Without Walls I recall it exactly. But I preach on studying the enemy, the devil. I preach on spiritual warfare.

Q So when you study the devil's tapes, again, you said to study the enemy's tapes. And you said whenever you use that term, "enemy," you're not speaking -- you're speaking of Satan?

A You're saying "study the enemy's tapes." There's no tapes to study of the enemy. You would study through the Word of God.

Q Well, in this clip you said that's how you would defeat the enemy is by studying your tapes.

You made an analogy of a football team. And you are stating that when one team plays against another team, then when the game is over, whatever team loses, I guess, they will go into the locker room and they'll study the opponent's tapes.

And you said that's how you have to defeat your enemy. You need to know your enemy by studying their tapes.

A Okay. So if I was preaching in comparison, it's like Jesus using parables. He would use natural things to bring about spiritual truths.

So if I was dressed in a football jersey, which we do on Super Bowl Sunday, I would use a natural analogy to show a spiritual truth.

So just like a football team would study their opponent, we would go to the Word of God to study how Satan operates.

Q But you said to study the enemy's tape. But you said you don't ever refer to a person as the enemy. Only Satan.

A Satan does not have tapes.

Q I think --

A I think he has. There is the Word of God. So this similar type of preaching as Jesus would use parables, natural things, to bring spiritual truths is the way that

most preachers would preach.

It is not a literal -- Satan does not come to people and give them tapes.

Q So the enemy's tapes you're studying, then, has to be a person's tapes, right?

A No.

Q Well, whose tapes would they be?

A No.

Q Satan doesn't have tapes.

A I am using a parable, just like Jesus would use a parable in the Bible. And it would be -- again, Ms. Johnson, with all due respect, this is being taken way out of context.

I would say that we're doing it and I'm looking and using a sports team and how a sports team would defeat their opponent.

I'm saying as believers and Christians, how are we to be overcomers? How are we to be victorious and live for God? Well, we study God's word.

And so the reference, if I used the word "tapes" would be the same way that we study God's word to understand who God is and who the enemy is.

Q Let me ask you -- let me change gears for a minute.

Do you care about the work you put your name on?

A Yes.

Q Do you care about your sermons?
A Yes.
Q Your messages?
A Yes.
Q Do you personally craft your sermons and messages?
A Yes.
Q You don't purchase them online?
A No.
Q You don't have others writing your sermons for you?
A No.
Q Okay. Is it important to you that sermons and messages that come in are in your name?
A Please repeat.
Q Is it important to you that the sermons and messages are in your name?
A That I write my own sermons and messages?
Q Okay. It's important to you that the sermons and messages that come in your name are authentically yours?
A Yes.
Q Okay. Do you think that I hate you?
A I don't know.
Q Do you think that I want your money?
A I don't know.
Q You stated a lot of things about the church. Do you think that I want to harm your church?

A I don't know, Ms. Johnson.
Q Do you think that anyone wants to harm your church?
A I'm sure that there are people that don't believe in what I believe in and that have been vocal about not particular liking it. That's part of being a public minister.
Q Okay. Do you think that I'm antagonistic to you?
A I've only -- I have not -- to be -- quite honestly, I didn't review your stuff or see anything until this case proceeded until this point. So I can't judge you.
Q And so you've never listened to my tapes? You've never studied my tapes?
A I've only seen them recently.
Q So do you think I seek to injure you?
A I don't know.
Q In 2013, around October 13th, 2013, you were preaching at New Destiny Christian Center Church. And you stated that you were in a battle and this battle had been fixed.
Do you recall preaching that message?
A I've recently seen the video.
Q But do you recall preaching that message?
A Because of the video, yes.
Q The battle, what battle were you referring to?
A One as a Christian believer. When I say the battle

has been fixed, we believe as Christians -- or I believe as a Christian that Jesus Christ died, was resurrected, and according to I Corinthians 15:57, he's given us victory through Christ Jesus.

So as an overall concept, we believe that, when you say the fight is fixed, that we're overcomers in life eternal.

Q So when you state, "If you come against this church or attempt to do anything to this church, I will take you down or I will get somebody to do it," who are you speaking to?

A I think you would need to show that video so I would be able to address that properly. Because it is not as you just stated Ms. Johnson.

MS. JOHNSON: Your Honor, may I publish that video?

THE COURT: Which exhibit number is this, Ms. Johnson?

MS. JOHNSON: That's Exhibit 9-E.

THE COURT: Objection, Mr. Coward?

MS. JOHNSON: Pardon?

THE COURT: I'm asking Mr. Coward if he has an objection to 9-E.

MS. JOHNSON: Oh.

MR. COWARD: Just objection on the basis of relevancy, Your Honor.

THE COURT: Objection is overruled.

You can show 9-E.

9-E will be received over objection.

(Plaintiff's Exhibit 9-E was received in evidence.)

(Playing video exhibit.)

MR. COWARD: Judge --

(Playing video exhibit.)

THE COURT: This is a different clip, so let's stop this.

MS. JOHNSON: Sometimes there are two or more clips on one video. I'm sorry.

BY MS. JOHNSON:

Q So, Ms. White, who are you speaking to when you said, "The enemy doesn't care about you until you become a threat to them"?

A I was preaching from the Book of Nehemiah. And I talk about the principles of Nehemiah. And we were teaching on building, how Nehemiah rebuilt in 52 days what the Jewish people under the leadership of Ezra could not do in 90 years.

When they began to strengthen their hands and build, the Bible says that Tobiah, Sanballat, and Geshem came against them. Sanballat is representative of the moon god, Satan; Geshem, of the world system; and Tobiah, of

religious.

And so in context of the full sermon, I was teaching on the principles of how you build for God, because Nehemiah asked the two most important questions: How are God's people and how is God's place?

And I was dealing with the principles of building God's place. And the Bible says "and they threatened." So each word that you hear here is out of that context, out of the book of Nehemiah.

Q So when you stated, "I intend to be a menace to you," who is "you"?

A I was at the end of the sermon, bringing the conclusion, speaking as if it were like Nehemiah, speaking as if it were the people of God saying, We are going to be a menace, or personally I would be a menace. It's not a literal. It is a conjectural when you are preaching.

Q And who are you speaking of when you said, "You have come against my reputation"?

A I was -- again, it's in context to the sermon of Nehemiah, because it came against the reputation. The Bible saying that they brought shame and they brought reproach. And they came against the reputation of God's people.

Q But you are speaking personally. You said, "I am in this battle, and I am going to win this battle." You are

going to be a menace to the enemy, whoever the enemy may be.

But since you claim that when you use the term "enemy," so you're going to be a threat to Satan?

A Ms. Johnson, you're saying that I'm using it in a personal. But in the context of a sermon, I am speaking on behalf of us, the body of Christ. I include myself in that.

Q But you're speaking in the first person. You're saying, "I am going to be a menace to you. I am in this battle. I am going to win this battle. I am going to be a menace to you. I am going to be a threat to the enemy."

So who is the enemy?

A In the context of this sermon, the enemy is Tobiah, Geshem, and Sanballat.

Q So how would you be a threat to --

A Because Tobiah, Geshem, and Sanballat are representative of Satan, the world system, and Tobiah was representative of religion, religious system.

So it is a conjectural; it's a style of preaching.

Q So, then, you're saying you're going to be a threat to Satan?

A I'm saying that I am on -- in the context of the sermon, I am saying I am on God's side and that it is my intention to be a light in the world and to be salt in the

earth. And if that is threatening to the enemy to advance God's kingdom, then yes.

Q Again, on October the -- I believe it was 13, 2013, you were, once again, preaching a sermon -- again, get personal with this.

And when you state that you're going to get somebody to take this person or entity or whoever down, you would take them down or you would get somebody to take them down for you, who are you attempting to take down in this video?

A Again, I would need to review the video. But I would go back to saying in the context of what I am preaching, if it is -- there are many sermons.

If I was preaching on the Syrophoenician woman, it would have been her daughter was grievously vexed. And she pressed through hardship to get a miracle for her daughter.

And so we can look at it -- and I would be glad to describe the entire -- because the style of preaching is that I'm never preaching on a personal policy. I don't preach on a personal directing something.

Q So when you preach, you are never justifying something that you've done or that you intend to do? And you're not just using the Scriptures to justify you?

A I use the Scriptures to bring forth God's word.

Q Didn't you preach recently -- I guess it was a couple of weeks ago that you said that we all can look in this

book, the Bible, and find a Scripture that will justify anything that we do.

And you almost said, I'm good at doing that, finding these Scriptures to justify whatever situation that you're in.

So when you're preaching, you're never justifying something that you've done or that you intend to do?

A No, ma'am, I did not say that.

THE COURT: Hang on a minute.

MR. COWARD: Stop, stop. Objection, Your Honor. This is evidence that has not been produced in this case, a sermon two weeks ago.

THE COURT: It's effectively cross-examination. I'm going to permit it, Mr. Coward.

BY MS. JOHNSON:

Q Okay.

A No. In fact, I do not remember two weeks ago specifically. But I very well know that I teach that all Scripture must be backed by two to three other to bear witness.

And, therefore, if you or anyone else takes any one word, sentence out of context of the entire sermon -- so I -- specifically I know I teach this, that people can become very -- take a Scripture and utilize that for themselves.

And I teach quite contrary to that, that you are to take the Scripture in the fullness of its context. And every Scripture bears witness by two or three other Scriptures.

Q Okay. So just a few moments ago you said you would have to see the video to make sure that's what you stated? You would have to see it first?

A Sure.

MS. JOHNSON: So, Your Honor, may I publish that video so that she can see what I'm speaking about?

THE COURT: Which one is it, Ms. Johnson?

MS. JOHNSON: That one is 9-F.

THE COURT: Same objection, Mr. Coward?

MR. COWARD: No. Hold on, Your Honor. I have to figure out which one it is.

THE COURT: 9-F, as in foxtrot.

MR. COWARD: I'm sorry, Your Honor. I'm going to need some clarification from Ms. Johnson as to whether this is a clip of a sermon played two weeks ago. If it is, that's not been produced in this case.

MS. JOHNSON: No.

THE COURT: She's offering 9-F, as in foxtrot, which is identified as clip 6, threatening to take down plaintiff or getting someone to do it.

MR. COWARD: Yes, sir, Your Honor. No objection.

I think that one was a joint exhibit actually.

THE COURT: You can proceed to show 9-F.

9-F will be received.

(Plaintiff's Exhibit 9-F was received in evidence.)

(Playing video exhibit.)

BY MS. JOHNSON:

Q So on that clip, Ms. White, you started out saying that Satan is not hiding his agenda.

Then you begin to speak to one of your members. And you asked him -- you put yourself in the place of Satan or a person saying, If I came to you to harm your wife, what would you do?

And his response, I think he said something like, It's not going to happen, or I'll beat him up, or whatever he said on that tape.

So now were you speaking -- when you asked this man and you put yourself in the place of Satan, so now you're speaking of a person, right?

A So what I am doing is teaching on John 10:10, that the thief, which is one of the words for Satan, or the enemy, as you, I think, well know in the Bible says that he comes to steal, kill, and destroy.

Again, I'm using something like what we would use as a parable. And I would say I was teaching on what it is to

steal, what it is to kill, and what it is to destroy, which means to utterly abolish purpose.

Steal means to have a spiritual transaction of stolen goods. It was backed up by Scriptures. When I say "stolen goods," children of the light, children of God are living things. And to kill means to -- literally when it says murder, the etymology of that is to make bitter.

So I'm teaching in the context of that. And I'm saying, yes, if the enemy came to steal, kill, or destroy, I -- don't let this fool you. Like I am going to fight spiritually, fight spiritually.

I've never in my life been in any natural fistfight. I've never in my life ordered somebody to do something. I've never in my life ever had anything.

I'm talking very clearly about spiritual warfare.

Q Okay. When you state -- when you stated, "You look at me wrong," who are you speaking of, if Satan looks at you wrong?

A Yeah. It's probably a hyped-up moment in preaching. I mean, it's just -- you get excited in preaching. And there's sometimes that -- over 33 years of ministering God's word, if I sit here and even pretend to say like I've said absolutely everything right, I mean, you get hyped up and caught up in the moment.

Q Again, when you state, "If you mess with one of the

sheep in here or if you look like you want to mess with them, I'll knock you out."

Who are you knocking out?

A I'm talking in spiritual terms, spiritual warfare. I'm talking about we pray. We fast. I'm not talking about I would physically go knock someone out.

Q Well, and you also stated that you would take whoever this entity or being or whatever, you'll get somebody to take them -- you will take them down or you will get somebody to do it for you.

A Okay. I have never ever been in a fight, physically. I have never had someone get in a fight physically.

I am talking about in spiritual terms, that we believe in prayer and that we believe in protecting our loved ones. We believe in praying for salvation of others.

So an instance would be if the enemy, Satan, would be attacking our children or something, we would pray. And that's -- that's the comparison, the parable.

You use natural examples for spiritual. It's called parables, as I'm sure you're well aware of, Ms. Johnson.

Q Right. But wouldn't you then have stated it as if you were speaking to Satan? You would say, If you come against this church or come against me, I will get someone to stop you, Satan, or I'll bring you down, Satan.

You speak as if you're speaking to an individual: I

will get someone to take you down.

How would you -- how would anyone, anyway, take Satan down? What would they do?

A Through prayer. Through fasting. Through believing. Through standing in faith. Through walking in love. Through obeying God's word. There are many ways that we practice our faith.

Ms. Johnson, in 33 years of preaching, I probably said some things that I look back that are silly or that you go -- you get caught up in a moment.

But was I directing that at a person? So let's look.

Have I ever been in physical fight? No, ma'am.

Have I ever gotten someone to fight someone? No.

Have I ever asked anyone to do harm? No.

Q Ms. White, are you aware that your church may lose money as a result of this lawsuit?

A I'm aware of everything that my attorneys have informed me of.

MR. COWARD: Don't talk about what we've talked about, attorney-client privilege.

THE COURT: She hadn't offered any yet. I won't let that happen.

MR. COWARD: I'm sorry, Your Honor.

THE COURT: That's all right.

BY MS. JOHNSON:

Q Ms. White, have you ever referred to me as the media witch?

A No, I have not.

Q Have you ever prayed to have my head chopped off?

A No, I have not.

Q On -- this is pretty far back. In 2005, I noticed you used to be on a TV ad. You used to preach, I guess, when they had their telethons or whatever. You used to preach there.

In 2005, do you recall preaching a sermon there and you were speaking of how someone had been coming against all your sermons and criticizing you and that you were going to -- how to deal with the enemy and their criticism?

A I would have to see that. I am not recalling. But in 2005, Ms. Johnson, I had no awareness of who you were.

Q Well, I've been criticizing your tapes and your preaching since probably about 2001.

A I was not aware of that.

Q So then when you speak of the enemy there, then, if you weren't aware of me, then who was that enemy then --

A I don't know.

Q -- that would criticize you? How would Satan criticize you?

A Can we look at the tape?

Q Yes.

THE COURT: Yes. Which one is this?

MS. JOHNSON: This is -- that's 9-D. 9-D.

THE COURT: All right. 9-B (sic). I'm going to conditionally admit 9-B (sic) over objection and reserve ruling on the relevance.

I'm hard-pressed to understand how a clip from 2005 is relevant to the motive for instituting the underlying claim that gives rise to this one, but I'm going to permit the playing of the tape with that reservation.

Yes, Mr. Coward?

MR. COWARD: Yes. Just for the record, Your Honor, maybe it's my ears or my age. I don't know if you said 9-B. I think she's on 9-D.

MS. JOHNSON: It's David.

THE COURT: Oh, David. I'm sorry. I misspoke. So thank you for bringing that to my attention.

9-D, as in delta.

You can show the tape. You can show 9-D.

It's conditionally admitted.

(Plaintiff's Exhibit 9-D was received in evidence.)

(Playing video exhibit.)

THE COURT: What's on my screen shows -- stop that.

(Playing video exhibit.)

BY MS. JOHNSON:

Q So, Ms. White, you said you can't stop what other people do to you.

Now, we know what "people" means?

A Yeah.

Q And you said you have to see your enemies as your teacher. So now here you're speaking of enemies. You're speaking of a person or persons, right?

A Let's go back to the very beginning of that clip that says the challenges I've been through.

And so I believe that the Bible says we're made overcomers by the blood of the Lamb and the word of our testimony, which means evidence.

At that time in my life, I was going through quite a bit, quite a bit of family, quite a bit of things that I'm going through. And so I was sharing my testimony very openly.

In sharing your testimony openly, there are people and situations that, you know -- you know, usually it's edifying and helps people, et cetera.

So at the very end when it says -- it's, again, kind of the wrap-up of preaching, of saying that --

What was the exact statement, Ms. Johnson?

Q You can't stop what other people do to you. And you

start seeing your enemies as your teachers.

A Okay. Again, so in the context of -- talking about this particular context of preaching, et cetera, you can't -- my statement is always, I can't control what other people do or how -- what they do but how you respond to that.

And so I was talking about we learn through life lessons. We learn through different situations. And I was probably particularly talking about a very personal, intimate relationship that I was walking through.

Q So now if you -- you stated that you never referred to -- when you use the term "enemy" or "enemies," you are never referring to a person but only to Satan?

A I didn't say the "enemy."

Q Yes.

A I said "enemies." Right?

Q On here? Okay. Enemy. Enemies, plural --

A Big difference.

Q -- more than one. But still the base word is "enemy," right?

So your see your enemies as your teachers?

A Again, I'm going to go back to saying what I've said over and over.

I honestly don't recollect from 2005, sir, exactly what I was preaching on.

THE COURT: Let's take our break here, Ms. Johnson. Let's take a break and come back and resume at 10:45.

Ms. White, it's not appropriate for you to discuss the substance of your testimony while you're in the midst of it.

THE WITNESS: Yes, sir.

THE COURT: You can certainly confer with your lawyers, but you can't talk about the substance of your testimony.

THE WITNESS: Yes, sir.

THE COURT: We'll be in recess until 10:45.

(Recess at 10:34 a.m. to 10:48 a.m.)

THE COURT: All right. We're back on the record in Johnson versus New Destiny, et al, 6:15-civil-1698.

Court notes all parties and counsel are present.

You may inquire, Ms. Johnson.

BY MS. JOHNSON:

Q Ms. White, again, in 2012, you state -- I believe it was February maybe 2012. The date is on the clip. I want you to view the clip.

You were again preaching a message. And you stated that -- in the message you usually stop. And you just go into telling stories, for whatever reason. I do the same thing when I preach. I'll get off on a tangent and start

talking about a story. And then I'll come back to topic again.

So you were speaking of yourself. And you said that you were considered a public figure and that you felt that you had been persecuted and that you had been written about and talked about.

And you stated that --

MS. JOHNSON: There are two clips on there, Your Honor. They run together. I put these clips on there like that because they are consistent with each other. I mean, it's telling the same story. So there's two clips on there.

THE COURT: Okay. I'm going to assume Mr. Coward has the same objections.

What are the exhibit numbers here?

MS. JOHNSON: It's the same exhibit number, 9-G. But there are two -- sometimes there may even be three short clips on some of these videos.

THE COURT: 9-G and what else?

MS. JOHNSON: It's the same one. It's on 9-G, but they're all on the same -- in the same video. There are just like three or four short clips, but they make up one --

THE COURT: Okay. I'm going to overrule Mr. Coward's objections. I'll note them for the record.

I'm going to permit you to play 9-G.

I do want to give you a little unsolicited advice, Ms. Johnson. We've got a limited amount of time.

MS. JOHNSON: Okay.

THE COURT: You're going to have to demonstrate at some point that these clips that you're showing have some connection to you as opposed to some unidentified person or people.

I take your point. But I want to stress to you that with respect to relevance, you're going to have to demonstrate at some point that you have clips that are probative. That means that prove that there was some sort of animus or malice on the part of Ms. White or entities that she controls directed to you, not to the world at large.

Okay?

MS. JOHNSON: Right. Well, that's the point I'm making. These videos -- I mean, maybe the outside -- people that aren't in the know or in that circle, they may not know who she's speaking of. But those who are in her church, those who watch regularly, they do know who she's speaking of.

THE COURT: Well, okay. And I don't mean to cut you off. What I'm telling you is that you may be -- you may be able to tie this up and show me at some point before

the case is over that these comments are directed to you.

I'm just telling you that -- I'm just giving you some unsolicited advice with respect to time management --

MS. JOHNSON: Okay.

THE COURT: -- that you need to -- you need to try to show me the most relevant evidence that you have before we run out of time. That's all.

MR. COWARD: Your Honor --

THE COURT: Yes.

MR. COWARD: -- on this 9-G -- because, as Ms. Johnson said, I believe there may be three together. I just want to make sure as each one is played, we get the date of them down there. Because they show on the video, but I want to make sure it's on the record because the time of the video may be important.

THE COURT: Okay. Why don't you make a note to write them down when the dates come by. And then you can indicate for the record what the dates were that were shown. And I'll try to do the same.

But let's also bear in mind it's a bench trial. We don't have a jury to worry about. So in order for me to rule on the admissibility of the evidence, I have to look at it. So once I've looked at it, really, you know, seems somewhat of a moot point to talk about whether or not it's admissible per se.

When the case is over and whenever I reach an opinion about it, I'll let you know what evidence I found to be admissible and reliable and what evidence I'm not considering.

So I say that in the interest of time. I'm not asking you to abandon your objections. I'm simply telling you that I will note your objections. I'm probably going to receive the evidence, regardless of your objection. And I may or may not consider it with respect to my ultimate decision.

MR. COWARD: Yes, sir. Thank you.

THE COURT: Yes, sir.

All right. Ms. Johnson, you may proceed.

MS. JOHNSON: Okay.

THE COURT: 9-G will be received.

(Plaintiff's Exhibit 9-G was received in evidence.)

THE COURT: I noted February 7, 2016; April 28, 2016; and May 1, 2016. Those are the clips that were shown as far as 9-G is involved.

MR. COWARD: Yes, sir. Thank you.

BY MS. JOHNSON:

Q Ms. White, on the second clip, you stated that someone was persecuting you, that had been persecuting you.

And you said you took it to a legal situation and you

should have just said, Just let it go.

What legal situation were you speaking of? And who was this person that was persecuting you, that you felt was persecuting you?

A When I look at those tapes, there were many people persecuting me. It's very possible that in my thoughts, I was thinking of you at this point. I don't know that.

And I -- with regret, I regret that we're sitting here today.

And I was speaking, in context, if you look at the sermon in its entirety, on the power of love. And so I was talking about how Jesus talks to us to love. And as you can clearly see, that I call out people without any problem.

And I'm talking in the context of those times that as humans, as people who have feelings, we walk through things. And we are to love. It's not always easy. The Bible says that we are to crucify our flesh to pick up our cross daily.

And so I said I've had to love through this situation. I've had to love through this situation. I've had to love through this situation.

So clearly you can see I never ever reference you, Ms. Johnson.

Q But you did allude to the fact that you were in a

lawsuit. And that was May 1st, 2016.

What other lawsuits were you involved in on that date? Do you recall? Other than with me.

A We had come out of some other situations that were not lawsuits. So I -- my -- was I alluding to you? I could have been.

But I'm not -- I'm saying that I was doing it in the context of love, as you can see, clearly.

THE COURT: I'm going to stop you, ma'am. The question was, what other lawsuits were you involved in on that date, if you recall, other than me?

THE WITNESS: Nothing ever went to trial, sir. No lawsuits.

THE COURT: Were you involved in any other lawsuits at that time other than the one with Ms. Johnson? That's the question.

THE WITNESS: I --

MR. COWARD: Could we just explain to the witness what a lawsuit is as opposed to perhaps a claim by someone?

THE COURT: Well, so the question is, were you involved in any other lawsuits?

A lawsuit is a legal claim that's been filed against you or some entity that you control.

THE WITNESS: I was not involved in a lawsuit.

BY MS. JOHNSON:

Q I didn't hear you.

A I was not involved in a lawsuit.

THE COURT: No. Were you involved in a lawsuit with Ms. Johnson at the time the statement was made?

THE WITNESS: Yes, I was.

THE COURT: The question is, any other lawsuits?

THE WITNESS: No, sir.

THE COURT: Thank you.

BY MS. JOHNSON:

Q So then you were, then, referring to the lawsuit that you were in with me, the person who was persecuting you that you couldn't recall the name of? That would have been me, right?

A It could have been.

Q Or there -- if there were no other lawsuits at that time, then it had to have been me, right?

MR. COWARD: Objection, Your Honor. That mixes the two videos together.

THE WITNESS: Yeah.

MR. COWARD: One says "a legal situation." The second -- the third one says "a lawsuit." Those are different.

THE COURT: I'll sustain the objection to the extent the question is confusing.

You can reask the question, Ms. Johnson.

BY MS. JOHNSON:

Q Okay. The legal situation that you're speaking of, can you explain that legal situation?

A We've been in different legal situations. That sometimes you have to walk in love and forgiveness and different things. So they have never gone -- nothing has ever gone into a trial except for this.

Q But you said that you took it to -- okay, the second video, then, on May 1st is the one I'm speaking of.

You said you were in a present lawsuit.

A Yes, I was.

MR. COWARD: Objection. It said "legal situation," the second one.

THE COURT: I'm going to overrule the objection. I think the witness understands the question.

You can answer the question.

MR. COWARD: And, Your Honor, I guess I don't need to approach the bench, but I do need to interpose an issue because I'm aware there was a claim made against the church.

THE COURT: I'm not interested in what you know, Mr. Coward. And I say that respectfully.

The question is to the witness.

MR. COWARD: Yes, sir.

THE COURT: The witness is either aware or she's

not aware.

So the question to Ms. White is, as I understand the question that was posed, are you aware of any other -- she's already answered the question that she's not aware of any other lawsuits.

MR. COWARD: Yes, sir.

THE COURT: So the question now, as I understand from Ms. Johnson is, if you weren't aware of any other lawsuits, then you must have been speaking about me.

So that's the question, although I have rephrased it.

MR. COWARD: Well, I'm sorry, Your Honor. The third clip talks about lawsuits. Ms. Johnson is questioning her on the second one, which deals with a legal situation which can be broader than a lawsuit.

And the only thing I wanted to bring to the Court's attention and the witness is that there's --

THE COURT: That's what I don't want you to do is bring it to the witness' attention because that's not appropriate.

MR. COWARD: Yes, sir. I'm only trying to -- there's a confidentiality agreement.

THE COURT: Why don't you come to the sidebar.

Ms. Johnson.

(Discussion at sidebar on the record.)

THE COURT: Yes, sir.

MR. COWARD: So, Your Honor, I apologize. I'm not trying to coach the witness. I'm aware that there was, I believe, a claim of a sexual nature made against the church around that time that my partner, Mr. Ford, was involved in handling. And it resolved before it was -- before suit was filed.

And there's a confidentiality agreement. So I just want to make sure the confidentiality agreement isn't breached in terms of names or anything like that.

THE COURT: Okay.

MR. COWARD: And that's all.

THE COURT: Okay. So here's what we'll do, Ms. Johnson.

You can ask the witness the question about whether there were other legal claims or situations, but I'm not going to allow you to inquire into the substance of them other than to ask whether they involved you. Okay?

MS. JOHNSON: Right. And I wanted to say -- when you say the other claim about the sexual matter or whatever, now are you speaking of the second video that was made?

MR. COWARD: Yes. Because you're using the term "legal situation" there, which is broader than "lawsuit."

You already got the answer to the lawsuit

question, as Judge Dalton pointed out, on -- clip three, is it?

MS. JOHNSON: I believe, if I remember correctly, their answers to interrogatories, there were no other lawsuits going on at that time.

MR. COWARD: That's true.

MS. JOHNSON: The one had ended in March. I think it was March 16th. The only thing that was left going was with me in May.

THE COURT: Okay. Mr. Coward's point is that the question you've asked now is, are you aware of any other legal situations? "Legal situation" is a very broad term. It can encompass a lot of things.

And so I'm not telling you you can't ask that question. But ultimately, what you're trying to determine is whether there's any other legal situation that she might have been referring to in her sermon other than you.

Correct?

So you can ask that question.

MS. JOHNSON: That's what I was --

THE COURT: Hear me out. You can ask that question, but you can't ask her to tell you what the details were of these other legal situations.

The only thing you can ask her is whether they had anything to do with you. Okay?

If they did not, then you've made your point. I don't know what the witness will say. But you can ask her that.

MS. JOHNSON: Okay.

MR. COWARD: Thank you, Judge.

(End of discussion at sidebar.)

BY MS. JOHNSON:

Q So I'll rephrase my question.

So on May 1, on that video clip that was taken May 1, you stated that you were in a legal situation. And you said --

A Is May 1 the first, second, or third one?

Q The first one, I think, is February 7th.

THE COURT: The first one is February 7. The second one is April 28. The third one is May 1.

THE WITNESS: Yes, sir.

MR. COWARD: I apologize again, Your Honor. But May 1, the third one, is the one where the term "lawsuit" was used.

The second one, April 28th, is the one where the term "legal situation" is used.

THE COURT: Okay. Thank you.

MS. JOHNSON: Okay. So now we got that straight.

BY MS. JOHNSON:

Q So the legal situation that you're speaking of you

said you got yourself into -- you got yourself into a legal situation.

I take that to mean that -- and you said you should have just let it go.

I take that to mean that you were -- you instigated some type of a legal situation that you regretted having instigated; is that correct?

A I don't recall what I was referencing. But by looking at the video, Ms. Johnson, I obviously may be authentic to my feelings to say that whatever I was referencing I did regret.

Q And did that have anything to do with the lawsuit between you and I?

A To my knowledge, no, ma'am. That's not what I was referencing at the time. But I'm not saying -- I mean, I'm looking, going --

Q Were you speaking of the underlying copyright infringement complaint, that you regretted having filed that complaint against me? Is that what you were referring to?

A It's possible. But I don't have recollection of saying this is -- I mean, I don't recall saying this is what I was thinking when I made that statement.

Q Okay. So you also stated, "I can't call one out."

You were naming names.

A Yes.

Q And you said, "I can't call one out because I'm in a present case right now."

I think that one is May.

MS. JOHNSON: Is it, Mr. Coward?

MR. COWARD: It is. That is the May 1.

BY MS. JOHNSON:

Q Okay. Now we go to May 1.

A Yes, ma'am.

Q So you're in a present case. And you couldn't call that person's name.

A Yes.

Q Do you -- do you know that person's name?

A I would assume -- and that's a big word -- that maybe I was talking about you. And I was talking about it in the context of walking in love.

Q Okay.

A And I was using many different areas that have been difficult, and I very clearly name names. And I never named your name, Ms. Johnson.

Q No, you didn't. That's what I'm saying. That's what I'm asking you.

Do you -- you didn't call the name. So I'm assuming you did know the person's name; you just refused to call it because you were in a present lawsuit?

A No. That's not how I think. It would have been -- it would have been because I was saying very clearly in the context of the entire sermon.

THE COURT: So I'm going to interrupt you, Ms. White, because the question is not a context in which you were mentioning it.

The question is that Ms. Johnson is trying to ask you is, were you referring to her when you made the statement that you had gotten yourself into a legal situation?

THE WITNESS: It is a possibility I was referring to you in that one video clip.

MS. JOHNSON: Okay. Your Honor, I'd like to introduce an email. This email, I believe, is relevant. And I believe that it falls within the exception to the hearsay rule.

THE COURT: What's the exhibit number?

MS. JOHNSON: It's Exhibit No. A-5.

THE COURT: So for the record, I'm looking at Exhibit A-5. The subject, "Inside NDCC," from somebody named Club Kid with an address of clubkid4life@att.net.

Am I on the right document?

MS. JOHNSON: That's correct.

THE COURT: Okay. And this is an exception to the hearsay rule why?

MS. JOHNSON: I believe so because, number one -- first of all, let me just say that I don't know if the young man is in the courtroom today. I've never met him. I don't know what he looks like.

But I just wanted to say that I am deeply, deeply sorry for having to have entered this email into evidence. If I had known that, just by me redacting this, that, you know, it would have protected this individual, I would never have introduced his email.

But since we've already crossed that bridge, I need to go ahead and speak about this email.

But I think it's time --

THE COURT: You offered the document in evidence. My copy is not redacted at all. I'm simply identifying what it is we're talking about.

So right now before you talk about the email, we need to -- I need you to answer my question as to why should this be admitted over a hearsay objection.

MS. JOHNSON: Okay. Because this person was also deposed, I think, on February the 17th, 2017.

He acknowledged that he did write this email. He stated -- that would be in a court setting that he did write this email.

Also, there's -- can I --

THE COURT: So hearsay is an out-of-court

statement. That means a statement that's not made in court that is offered for the purpose of, offered for the purpose of proving the truth of the matters that are contained in the document.

So it's clearly an out-of-court statement --

MS. JOHNSON: Right.

THE COURT: -- from somebody who's not here. So what is it being offered for?

MS. JOHNSON: This was proving malice. And that -- to show that Ms. White did have a personal vendetta against me.

THE COURT: Okay.

MS. JOHNSON: The reason I state that this is not hearsay is because Ms. White is on video and she is basically proving this young man's statement on the video. He is saying in this video that she's --

THE COURT: The hearsay objection is sustained.

So document A-5 will not be received.

MS. JOHNSON: Okay.

THE COURT: It's classic hearsay.

MS. JOHNSON: All right. Well, I'm going to move on to the damages section.

The defendants didn't fully comply with your order to produce the documents to prove their net worth. So I have a video of certain people attesting to the wealth of

Paula White.

So I figure this will be -- at least give the Court some idea as to the lifestyle that she leads that would give you some idea of what her actual net worth is.

Because some of the documents that I have viewed, specifically the last financial statement that Mr. Coward was speaking of where they entered that in, it's unaudited. It's unsigned. It's unsworn to. There's disclaimers on there that they don't know if the documents --

THE COURT: So let me interrupt you with respect to whoever it is on your video. How would Mr. Coward be able to determine whether or not what they say is reliable or whether the information they relied upon was accurate or whether they were in a position to actually know the matters about which they speak?

The reason I ask you those questions is, that's the reason that the hearsay rule exists.

MS. JOHNSON: Well, the people that are speaking on these videos, they are fellow pastors that were preaching from her pulpit. And Ms. White was sitting there in the pulpit hearing them make these statements. She didn't object to them. She didn't correct them.

THE COURT: So I'm going to interrupt you and tell you, so that's a statement that's made out of court by somebody who's not available for cross-examination. And

you're seeking to introduce that to prove the issue of net worth.

It's classic hearsay. It's not admissible.

MS. JOHNSON: Okay.

THE COURT: You had the -- and I say this not as a criticism but just so that you understand. You had the opportunity to subpoena those individuals and require them to come to court and to ask them whether or not they made these statements and to try to get the videos in that way.

But your adversary has a right to stand on the hearsay rule, because that allows him to have the opportunity to cross-examine these individuals to actually test the information that they are providing to see whether or not it is reliable.

MS. JOHNSON: Okay.

BY MS. JOHNSON:

Q So I would like to ask you a question, Ms. White.

Can you tell me what your net worth is?

MR. COWARD: Your Honor, my only -- excuse me.

I object from the standpoint the Court has entered some confidentiality orders with regards to these net worth statements. So I'm just concerned about it coming out on a public record. The documents are sealed.

Obviously I don't mind the answer.

THE COURT: All right. Is that information

contained in the record somewhere?

MR. COWARD: It is, Your Honor.

THE COURT: Tell me where it's contained in the record. And then we'll see if Ms. Johnson is satisfied with that. Otherwise, I'll need to clear the courtroom.

MR. COWARD: Yes, Your Honor.

It's Joint Exhibit 42, Your Honor.

THE COURT: And are you representing, Mr. Coward, that the witness' response to the question would be the number that's reflected on Exhibit 42?

MR. COWARD: Yes, sir.

THE COURT: Ms. Johnson, are you satisfied with that in terms of making your record?

MS. JOHNSON: What was the -- his answer?

THE COURT: He said "yes."

MR. COWARD: Yes.

THE COURT: Mr. Waugh, could you help Ms. Johnson out and direct her attention to Exhibit No. 43, specifically page 3 of Exhibit 43.

MR. WAUGH: Yes.

(Pause in proceedings.)

MR. COWARD: What I'm representing to the Court is that Joint Exhibit 42, the statement --

THE COURT: I said 43. I meant 42. I'm sorry.

MR. COWARD: Yes, sir.

Paula White's financial condition reported as of December 31, 2017, and the net worth line would be the appropriate one.

THE COURT: Okay. Are you satisfied with that figure? Or do you want to examine the witness about --

MS. JOHNSON: I do want to examine her about it.

THE COURT: All right. Well, then, you need to stop because I'm going to need to clear the courtroom.

MS. JOHNSON: No. I mean, I just want to ask a simple question. I just want to ask her if that figure is accurate.

MR. COWARD: Your Honor, could we give the witness the exhibit?

THE COURT: Yes. Yes.

MR. COWARD: Can I approach?

THE COURT: Yes.

MS. JOHNSON: You don't have to give me any numbers.

THE COURT: All right. For the record, counsel is showing the witness Joint Exhibit 42.

MR. COWARD: She's asking about the net worth line.

THE COURT: Do you have a question, Ms. Johnson?

BY MS. JOHNSON:

Q I just want to know if that's accurate, that figure

that you gave them.

THE COURT: The net worth figure that's reflected in that document, is that accurate?

THE WITNESS: Yes, sir, it is.

THE COURT: As of the date of submission?

THE WITNESS: Yes, sir. As of December 31st, 2017.

THE COURT: Thank you.

BY MS. JOHNSON:

Q So have you provided all the relevant information, financial documents that the Court needs to determine your net worth --

A Absolutely.

Q -- with the files?

You've provided all of them?

A Yes, I have.

Q Did you provide bank statements?

A Yes, I did.

Q For you, for yourself?

A Yes.

Q Can you tell me what exhibit that is? I don't recall seeing bank statements from you.

A You're asking if I provided everything to my accountants?

Q Is it in the court record? No.

Are those documents that the Court ordered you to produce? Did you produce them? And are they in the court record?

MR. COWARD: I object, Your Honor. That's a misrepresentation of the record. The order was for 2014 financials. This is the end of 2017. She said she gave it all to her accountant.

THE COURT: Well, again, I don't understand what we're doing here other than being inefficient.

So the question is, did you provide all the records that the Court needs to determine what your financial condition was as of what date, Ms. Johnson? Today?

MS. JOHNSON: Well, yeah. Yes, I guess.

THE WITNESS: Yes, sir, I did.

BY MS. JOHNSON:

Q Can you tell me the names of the corporate entities that you own or manage?

A I could. I would need to have my phone with me.

MR. COWARD: Your Honor, may we allow -- instruct the witness she can look through the document?

THE COURT: No.

Here's what you do: If you know the answer to the question, answer the question. If you don't know, then your answer is, "I don't know." If something would help

you refresh your recollection, Ms. Johnson can pursue that with you.

I'm not going to do the lawyering here. I gave -- I gave you every opportunity to be represented by counsel. I'm not going to -- I'm not going to continue to conduct a legal primer in here in terms of how the examination goes.

So ask the witness the question, follow up the questions appropriately, and get to your point or move to the next one.

THE WITNESS: Could you please ask me which corporations that are ones that I know I oversee, such as Paula White Enterprise?

I believe I have a 50 percent share with Prayer Glory, my husband.

And I believe 50 percent with Identity Records with my husband.

But you would have to ask me the rest.

BY MS. JOHNSON:

Q I noticed that you didn't disclose another entity. I believe it's called Bralla (phonetic.) Is that how it's pronounced?

A Bralla is -- was disclosed to my accountants with everything. It is inactive. There's no assets. There's no bank transitions. There's nothing. It was set up and never used.

Q You were attesting to your wealth when you were preaching your sermon. I don't know how you got off on the subject of your wealth.

But you stated that you were so wealthy that you don't even have to ever work another day in your life. You just work just because it's your calling. But you don't need the money.

Is that true?

MR. COWARD: Objection.

THE WITNESS: Is that on video?

MS. JOHNSON: Yes.

MR. COWARD: Objection. Vague as to time.

THE COURT: Objection is overruled.

THE WITNESS: Is there a video, sir?

THE COURT: No, ma'am. The question is, you stated that you were so wealthy you don't have to work; because it's your calling, but you don't need the money.

Is that true?

THE WITNESS: I stated that. And I also stated that I would have to drastically lower my lifestyle; that I have lived in a trailer before. And I would also -- if I managed my money at an average lifestyle.

BY MS. JOHNSON:

Q Do you own any aircraft?

A No, I do not.

Q You don't own a jet?
A No, I don't.
Q Or a helicopter?
A No, I do not.
Q Did you have easy access to one?
A No, I do not.
Q When you give your conferences, you hold your conferences, you do provide private jets and you fly in guest speakers from South Africa and then here within the United States?
A No, I do not.
Q Do you recall making that statement on your -- when you gave your conference, I believe it was June of 2015 you made that statement?
A No, I did not. You're referencing a video that the judge has said is inadmissible of another pastor making a statement. And he was making it by faith.
Q No.
A Because it's --

THE COURT: So stop.

Ms. White, it's not your place to evaluate my rulings on evidence.

THE WITNESS: Yes, sir.

THE COURT: Your place is to listen to the question and answer the question.

THE WITNESS: Yes, sir.

THE COURT: So the question is, do you recall making that statement when you gave your conference in June of 2015?

So you don't need to concern yourself with evidence or where it may have appeared or whether it's in a video that's admissible or not admissible.

The question is, do you recall making that statement? You either do or you don't.

THE WITNESS: No, I do not fly people in private jets.

THE COURT: Okay. That actually was not the question. The question was whether you recall making that statement.

THE WITNESS: Can you ask me the statement again please, Ms. Johnson?

BY MS. JOHNSON:

Q Do you recall stating that you, for your conferences, your Paula White Ministry conferences, that you fly in guest speakers from South Africa and other countries to come to the -- to speak at your conferences?

A No, I do not recall that.

Q Do you recall stating to your congregation that you owned several properties all around the world?

A No, I do not recall that. I recall saying I've owned

several properties.

Q Do you own a horse ranch?

A I own a home in Apopka that is in Bluegrass Estates, approximately three acres. And the backyard has a barn and like a white fence for horses.

Q But you referred to it as a horse ranch. Is that what it is?

A We call it that lovingly because my husband has horses. And it is, to him, his hobby and something he loves to do. So just like we name our cars or something.

Q I notice, too, that you stated that you are a huge advocate of prenuptials.

Do you recall making that statement?

A I might have made that statement.

Q Can you tell me why, as a female, you would be a huge advocate of prenuptials?

A Because I went through a very bad divorce.

Q And?

A I believe that it is best to understand when everything is good and when two people are in love, have a clear understanding should anything go wrong. Because going through a divorce is not easy.

Q So you're not a huge advocate of prenuptials because you are protecting your own wealth?

A No. I have no prenuptial with my husband, my current

husband.

MS. JOHNSON: Your Honor, may I confer with my --

THE COURT: Yes, you may.

(Pause in proceedings.)

MS. JOHNSON: Your Honor, I have no more questions for Ms. White.

THE COURT: All right. Thank you, ma'am.

Mr. Coward, cross-examination?

And what I'd like you to do is confine your cross-examination to those matters that were raised in direct. If you want to pursue other topics with Ms. White, you can return her to the stand during the presentation of your case.

MR. COWARD: Yes, sir, Your Honor. Thank you.

THE COURT: For the lawyers' benefit, I need to break about 11:50. I have a noon meeting upstairs by video conference that I need to get upstairs and attend to.

So we're going to break for lunch from 11:50 to about 1:15. But you can certainly get underway and use the time between now and 11:50.

MR. COWARD: I'll do my best to wrap it up before then, Your Honor.

THE COURT: Okay. I just wanted to give you a heads-up so you know I'm going to need to break about 11:50.

MR. COWARD: Yes, sir.

Your Honor, I provided the witness book back to Ms. White.

THE COURT: Yes.

**CROSS EXAMINATION**

BY MR. COWARD:

Q Pastor White, let me start with the last topic that you were asked about there on your finances.

Joint Exhibit 42, if you look at the first page of that.

A Yes, sir.

Q It says "Paula Michelle White Financial Condition Report."

Did you work with the accountants from RSM --

A Yes.

Q -- to help them prepare it?

A Yes, sir, I did.

Q Did you answer the questions they asked regarding your finances?

A Yes, sir, I did.

Q They were aware that this was being produced for this lawsuit, correct?

A Yes. That is correct.

Q And let's look at the last page of the document, please.

A (Complying.)

Yes.

Q There is a section, note two, that says "jointly held property," refers to your marriage?

A Yes, sir.

Q And so those assets that you hold with your husband were disclosed, and the accountant's took them into account in preparing this statement of financial condition?

A Yes, sir. My husband bought the home, but I am on the deed. So they put them on my asset sheet.

Q The note one, "investments and closely held businesses," those are the three corporations that you have interest in at the present time and actually are worth anything?

A Yes, sir.

Q Do you have other corporations that you might be named as an officer or director of that are out there?

A Not that have any activity, any open bank accounts or anything.

Q Right. But you might have some out there, but they don't have any assets?

A Yes, sir.

Q All right. Your real estate that you own around the country, you own some property or condominiums in some other states besides Florida?

A Yes, sir.

Q Were those disclosed to your accountants?

A Yes, sir, they were.

Q Those were taken into account on this financial statement?

A Yes, sir.

Q Let's go back to the statement of financial conditions. It's actually the fourth page of the document, the "net worth" line.

A Okay.

Q This only goes up to page 3.

Start at the first page where it says "Paula Michelle White" and then go back to the fourth page, please.

A Yes, sir. The statement of financial condition?

Q Yes, ma'am. The net worth line there, is that accurate?

A Yes, sir.

Q I'll take that away from you.

If you had owned a helicopter, would you have disclosed that to your accountants?

A Absolutely.

Q Have you ever taken a helicopter ride with your husband?

A I have.

Q Tell us about that.

A It was his birthday. He was turning -- he's a musician. So he brought me out to meet him for his birthday. And we took a typical helicopter tour over the island. It was about -- I don't know how many it seats. Like six people or so.
Q And where was that?
A That was in Hawaii.
Q Were other people on the helicopter with you?
A There were other people.
Q Tourist helicopter?
A It's a tourist helicopter that you see the island.
Q The underlying copyright infringement case, were you the named plaintiff in that case?
A Yes.
Q It was brought on behalf of Paula White Ministries, right?
A Yes, sir.
Q Your name was not on it, right?
A No, it was not. The original one filed.
Q You are a named defendant in this case, right?
A Yes, I am.
Q If -- may we talk about the video clips Ms. Johnson played as Exhibit 9-G, the one where you were talking about being in a present lawsuit with someone.
That was in May of 2016?

A    Yes, sir.
Q    The copyright infringement lawsuit had already been dismissed --
A    Correct.
Q    -- in January of 2015?
Ms. Johnson had since then sued you, correct?
A    Yes.

MR. COWARD: And so the May 1, 2016, video, Your Honor, that is an issue on the rule of completeness. We have the full sermon. It's quite long. It's almost an hour.

What I would like to do with the Court's permission is play some small snippets of it, and then we can submit it into evidence for the Court to review later if the Court so desires.

I'm just trying to get the context of the sermon.

THE COURT: That would be fine. You can do that.

So you understand, Ms. Johnson, he's going to show clips of this. The entire sermon is going to be admitted into evidence under the rule of completeness. I'll review that if I think it's necessary for me to review it.

But if there are any portions of it you think Mr. Coward does not show that you think I should see now, you'll have a right to have me look at those under the rule of completeness.

Or you can ask me to look at the entire thing when I retire from here, which I'm also happy to do.

MR. COWARD: So, Your Honor, this is on the defendant's exhibit list as B-79.

THE COURT: All right. B-79, I believe this is -- these are clips from the entire sermon.

Where is the entire sermon?

MR. COWARD: This is the entire sermon --

THE COURT: Oh, yes.

MR. COWARD: -- of May 1st, 2016.

THE COURT: So B-79 will be received.

(Defendant's Exhibit B-79 was received in evidence.)

THE COURT: The Court will review it to see if there are any additional relevant portions other than these that are being shown by Mr. Coward, assuming that the lawyers want me to do that.

MR. COWARD: Yes, sir. And so I would just like to start out and play the first few minutes of it and we can cut it off.

THE COURT: Okay.

The lawyers and Ms. Johnson, I should say.

(Playing video exhibit.)

MR. COWARD: Can you start it over, please.

(Playing video exhibit.)

THE COURT: I'm really straining to hear that, Mr. Coward. I don't know if you can turn it up a little bit.

MR. COWARD: Yes, sir.

THE COURT: Are we maxed out with our volume?

MR. COWARD: Yes, sir. It appears it's only coming out of the mic back here instead of feeding through your system. This is the issue.

THE DEPUTY CLERK: May I go assist?

THE COURT: Yes.

MR. COWARD: So, Your Honor, it's a couple of minutes before you said you wanted to leave. I'm wondering if maybe we should just break for lunch and try to deal with this technical issue.

I don't think I'm going to be that much longer with the witness after that. But -- or I'll go up to 11:50, if the Court wants me to, on another topic, and we can work at that at lunch.

THE COURT: Let's do that because I'm concerned about -- I'm concerned about our time.

MR. COWARD: Yes, sir. No problem.

BY MR. COWARD:

Q So, Pastor White, do you personally craft your sermons?

A Yes, sir, I do.

Q Tell us how you do that, please.

A First, I start with the Bible in study and thoughts. I've done this since I was 18 years old in pastoring.

And I take my Scriptures, my studies, and I write them in journals. I put down study notes, usually topically, et cetera.

Then when I get ready to prepare a sermon, I go back both to my Bible where I've written a lot of notes and to my journals. And then also to what I categorize as study. So if I'm studying on something topically like prayer or -- it would be topical.

Then I compile that information. I then start writing out my thoughts for what is the relevancy of what I would call the "so what would be the conclusion?"

And then I start typing them out. Or used to handwrite them out. Now I type them out on my computer.

And I compile them. And then I send them in to my department at the church that will use the Scriptures for reference for the congregation to follow along.

Q And about how long do those sermons end up being as far as the number of pages?

A Boy, they can range -- well, now I use font 26 because I'm -- I have a more difficult time seeing. But -- so they can range from 40 to 64 pages, not that I ever preach that much, but I study that much.

Handwritten, back in the day, they could have been 12 to 25 pages.

Q Did the sermons contain your independent thoughts on the interpretation of the Bible?

A Absolutely.

Q Is this a creative process on your part?

A It's a very extensive creative process that I take serious and go into the Word. Again, this has been an ongoing study since I was 18 years old. So you build kind of layer after layer after layer.

Q And the referenced Scriptures that you are preaching on a particular day, is that presented to your sermon?

A Yes, they are.

Q And how is that accomplished?

A The Scriptures I include in my sermon -- and I always reference back to the Scripture so -- of whatever the point is being made. And then they are presented up on large screens for people to see.

Q Can you explain to us what spiritual warfare is?

A Spiritual warfare to me as a Christian and the majority of Christians and believers is that Satan, the enemy, who is also known as Beelzebub, the thief, is a created being by God.

Ephesians Chapter 6, Verse 12, says, "We wrestle not against flesh and blood but against principalities, powers,

wickedness, and darkness."

We understand that Christ gave us ultimate victory both here on earth and in eternity. Eternity is our great crown of victory.

And that there has been this opposition. And it really boils down to rebellion started in heaven. Sin started in heaven. When Satan rebelled against God, he was cast to the earth.

And our -- the Word of God basically saying, as a child of God, that Satan's greatest enemy or I'd say greatest hatred is towards us, the children of God.

Q In your church, do you refer to the Father, the Son, and the Holy Ghost?

A Yes, absolutely. God, the Father; God, the Son; and God, the Holy Spirit.

Q In that same way, you use the term "enemy" to refer to Satan?

A Absolutely.

Q Does the Bible have a basis for referring to Satan as the enemy?

A Many, many Scriptures. Many Scriptures refer to him.

I'll start with Peter, Matthew, the Gospels do. The many Scriptures throughout the Word they call Satan the enemy.

THE COURT: Mr. Coward, I'm going to need to take

our lunch recess now.

Ms. White, I'll remind you what I told you at our earlier break. It's not appropriate for you to discuss the substance of your testimony while you're in the midst of it.

THE WITNESS: Yes, sir.

THE COURT: We'll be in recess until 1:15.

(Luncheon recess at 11:51 a.m. to 1:17 p.m.)

THE COURT: All right. Good afternoon.

We're back on the record in Johnson versus New Destiny, et al, Case Number 6:15-civil-1698.

The Court notes all parties and counsel are present.

Ms. White is back in the witness stand.

Counsel, you may inquire.

MR. COWARD: Thank you, Your Honor.

I think we got the technical issue resolved --

THE COURT: Good.

MR. COWARD: -- so we'll be able to work on that.

BY MR. COWARD:

Q Pastor White, good afternoon.

A Hello, sir.

Q When we left off, you were speaking about your use of the term "the enemy."

How often in your sermons do you refer to the enemy?

A Quite often.
Q Is that a common practice for you?
A It's very common for not only me but most Christian preachers and ministers.
Q Why is that?
A Because it is very clear throughout the Word of God that there is God, the Father; God, the Son; God, the Holy Spirit.

And then there is Satan, also referred to as the enemy, the thief, Beelzebub. And God shows us our weapons are warfare, not carnal, but they are mighty to the pulling down of strongholds.

So in teaching the Word of God, just like Jesus did through parables, was to bring them down to the very practical, everyday living. It's a common reference to say.

And I believe if you pull up on YouTube or something, it's -- like if you type in "the enemy and devil," it's over a million times it comes up.

MR. COWARD: Thank you.

So let's now go back to that sermon that we had some technical difficulty with, the May 1st, 2016 sermon, which was after the copyright infringement case was over but Ms. Johnson had already sued you and your church by that time.

Let's watch a few minutes of that. And then I'm going to jump ahead to another short section.

So we'll get Russ to call this up at this time, and hopefully it will work.

THE WITNESS: Yes, sir.

(Playing video exhibit.)

BY MR. COWARD:

Q Pastor Paula, do you have the context of this sermon?

A Yes, sir.

MR. COWARD: Okay. And, Russ, if you could just jump ahead to about the 16-minute mark, and we'll maybe watch one more minute.

(Playing video exhibit.)

BY MR. COWARD:

Q Do you have the context of that, Pastor Paula?

A Yes, sir, I do.

Q Okay. So in that sermon, I think you're talking about John, Chapter 13, Verse 34 and 35.

Could you explain to us what the point of that sermon was?

A The point of it is, during difficult times, that as Christian and believers, we have to rise above what we call our flesh.

And we have to choose to love the Holy Spirit, to walk in love even though, you know, sometimes we feel like that

and sometimes we make mistakes. But that is, that is our goal, to be Christ-like.

Q In the clip that Ms. Johnson played earlier, you were talking about during the course of that sermon people who write on the internet about you.

Are there people who write bad things about you on the internet?

A There are a lot of people that write a lot of bad things. And I don't typically pay -- read them or stuff. They're just not good for my spirit.

Q And you also mentioned a woman there named Riva Tims as well?

A Correct.

Q Is that someone who sued you?

A She served a lawsuit and dropped it the next day.

Q Okay.

A Yes, she did.

Q Right. And so from the standpoint of the context of that lawsuit and in referring to someone that you were in a present lawsuit with, the only person that was, was Ms. Johnson, who had sued your church and you, right?

A Yes.

Q And the context of that sermon was about loving one another, people who had done things that you don't like?

A Absolutely.

Q You did not mean anything by preaching that sermon or referring to Ms. Johnson not by name in a way that was malicious towards her in that sermon, was it?
A No, sir, not in any way.
Q Let me jump back to some of the other clips that Ms. Johnson showed.
Let's go all the way back to 2005. Different hairstyle then, I guess.
A Yes, sir.
Q Were you referring to Shirley Johnson when you were commenting back in 2005?
A No, sir, not at all.
Q In October of 2013, you were talking about a fixed fight. What were you talking about?
A I was talking about how we, as believers, ultimately overcome.
Philippians 1:6 says that we can be confident in this one thing, that the same God who started a good work in our life is the same God who will finish it for our good and execute it, meaning our faith doesn't prevent life. It carries us through.
So in eternal life, we are made overcomers. The Bible specifically says we are overcomers.
It's very common language as a minister, a Christian, to say we're in a fixed fight, meaning Jesus has already

won the battle for us.

What we're talking about is not a battle against each other. We're talking about a battle that started way before we ever entered into this earth. And it ends in the book of Revelations that says if we serve God faithfully, we're made overcomers.

And that's what fixed fight --

Q And when you're talking about fixed fight, you mean because of the resurrection of Christ, people who accept that will be saved?

A Yes, sir.

Q In the end?

A Jesus Christ, the Bible says, not only was crucified, but he died and conquered death, hell, and the grave. And those are the three components that brought sin-strickenness into the world. And he conquered those on our behalf.

And because of that covenant that we have with God through his son, Jesus Christ, we remain conquerors and overcomers. And it is because of his resurrection.

Q On that clip that Ms. Johnson showed, she put over the top of it a caption which said that October 2013, the particular date of that month, was six days after the lawyer that was hired to represent Paula White Ministries with regard to the potential copyright issues sent a

cease-and-desist letter to her, which we'll see as evidence in this case.

Were you talking about the dispute with Ms. Johnson at all when you were discussing a fixed fight?

A No, sir, not at all.

Q And in that regard, do you -- as the head pastor in your church and as an officer of the church, did you delegate the issues with regard to copyright infringement to others in your ministry?

A Yes, sir. And this is very important, in my opinion, because I generally know the concept and the vision of ministry and the overall big picture.

But I do not do the details of dealing with attorneys or dealing with the day-to-day operations or dealing with the day-to-day management.

MS. JOHNSON: Objection.

THE COURT: I'm sorry?

MS. JOHNSON: I object.

THE COURT: You need to stand so I can hear you.

And tell me, what's the basis of your objection?

MS. JOHNSON: They are outside the scope of the questioning. They're attempting to relitigate the copyright infringement issue. That has been settled. And so they're outside the scope.

THE COURT: Okay. I'm going to overrule the

objection based on scope.

You know, the legal issue of whether or not Ms. White is or is not responsible as a matter of law for the activities at her various organizations is something that's particularly within my province.

So I'll note your objection. And we'll take that up or address it as it becomes important later on.

You can proceed, Mr. Coward.

MR. COWARD: Thank you, Your Honor.

BY MR. COWARD:

Q With regard to issues dealing with YouTube and the presentation of Paula White Ministries, any of those on YouTube, who did you delegate that category to?

A That would have been delegated to my son, who served as operations manager of Paula White Ministry, along with Doug Shackelford, who is the general manager.

Q What is your son's name?

A Brad Knight.

MR. COWARD: Nothing else, Your Honor. Thank you.

THE COURT: Thank you.

Any redirect?

Ms. Johnson, do you have any redirect? Any questions in follow-up to the cross-examination?

MS. JOHNSON: Yes, I have further questions.

THE COURT: Okay.

**REDIRECT EXAMINATION**

BY MS. JOHNSON:

Q Are you the -- Ms. White, are you the president of NDCC, New Destiny Christian Center?

A I am presently the president of New Destiny Christian Center.

Q Do you have complete authority or complete control as president of New Destiny Christian Center?

A New Destiny Christian Center is a not-for-profit that is run -- as I am the president, but it has a board. So there is no complete control when decisions are made. It's run by its bylaws.

Q As I recall, you made the statement when you were preaching once that the bylaws give you complete control.

A I was preaching -- and if you'd like to show the video. I was preaching, again, in context of a parable talking about when a person is in a position of authority.

And that meaning like I was talking in spiritual terms, that all authority, both in heaven and in earth, has been given to us and to exercise that authority.

Q Also, I read the bylaws. And the bylaws themselves state that the directors can only do their jobs and make decisions only with your -- unless you consent to it.

They can -- they can do their job as directors, but everything has to go through you. You have to agree to it?

A The bylaws, from my understanding, Ms. Johnson, when I came on -- I was not president of New Destiny Christian Center when I took -- came on as senior pastor in 2012. I believe that it was about 2014 that I became president of New Destiny Christian Center.

And the bylaws, I know from the first set, there were certain restrictions the board -- I mean, down to finances, every single detail. There is never any decision that's made, anything for the church and the well-being of the church as far as that without a board meeting or said right there.

It's a -- the board, yes, I am the president. But there is a board, and there are votes and everything else like anything.

Q So is there ever any reason that, say, your behavior or how you conduct yourself in your position, is there any time that the board could actually make a decision to remove you from that position?

A I'm sure there are areas that I could be removed from that position.

Q No. From the position of president, period. Can they remove you if you -- say, if you begin to operate outside the standards of the bylaws?

MR. COWARD: Objection. Relevancy, Your Honor.

THE COURT: Overruled.

THE WITNESS: Bylaws for churches and for our church and ministries are where you have board members for accountability. There are things that absolutely a pastor can be removed for.

BY MS. JOHNSON:

Q But your bylaws, the 2000 bylaws -- when you first started at New Destiny, now you mentioned that there were a new set of bylaws.

And that was in 2014?

A I didn't start in 2000, for clarification.

Q No. There were bylaws in place before you got there. They're under Zachery Tims. There were his bylaws.

When you took over, I guess maybe a year or two later, those bylaws were rewritten.

The bylaws that you produced in this action states that you cannot be removed from that position for any reason at all, that you have complete control. That's what those bylaws state.

A If I had a copy of the bylaws in front of me --

Q There's a copy of the bylaws in the --

A -- I'd be glad to review them.

I do know that because of the death of Dr. Zach, that there was no succession named and that the church board did not want that to happen again.

I do know that they wanted to make sure that

everything was doctrinally in alignment, so they updated the bylaws.

MS. JOHNSON: Okay. I have no other questions.

THE COURT: All right. Thank you, ma'am.

You can step down, Ms. White.

THE WITNESS: Thank you, sir.

THE COURT: Call your next witness.

MS. JOHNSON: I'm sorry, sir?

THE COURT: Call your next witness.

MS. JOHNSON: I have no further witnesses.

Oh, well, I guess Mr. Waugh will call me to the stand.

MR. WAUGH: Your Honor, Shirley Johnson would like to call herself to the stand.

THE COURT: All right. Ms. Johnson, if you'll come forward and be sworn.

THE DEPUTY CLERK: Ms. Johnson, if you'll just come down by the witness stand and raise your right hand.

(Witness sworn.)

THE DEPUTY CLERK: Ms. Johnson, once seated, if you'll state your first and last name and spell your name for the record.

THE WITNESS: My name is Shirley Johnson. S-H-I-R-L-E-Y. J-O-H-N-S-O-N.

THE DEPUTY CLERK: Thank you.

THE COURT: Ms. Johnson is going to be examined by her standby counsel, Mr. Waugh.

Mr. Waugh, you may inquire.

MR. WAUGH: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. WAUGH:

Q Ms. Johnson, have you ever testified in a trial before?

A No.

Q Are you nervous?

A A little bit.

Q Where do you currently reside?

A In Washington state.

Q Have you resided there for the duration of this case?

A Yes, I have.

Q Did you reside there during the duration of the underlying copyright infringement case?

A Yes, I did.

Q Do you own a residence?

A Pardon me?

Q Do you own a residence?

A No. My daughter owns the residence.

Q How long does it take for you to fly from there to here?

A About six hours.

Q And how many hearings have you had to attend in person during this case?
A Probably about four, I think.
Q What is the highest level of formal education that you have achieved?
A High school education and technical training.

THE COURT: Ms. Johnson, pull that microphone down a little bit closer to you, if you would, please.

It's pretty adjustable. You can scoot it forward.

You're soft-spoken. I'm having a hard time hearing you.

BY MR. WAUGH:
Q Ms. Johnson, have you been educated in other ways besides formal schooling?
A As in higher education, college? Is that what you mean?
Q Life?
Can I ask what your age is, Ms. Johnson?
A 67.
Q What is your approximate net worth?
A It's --

MR. COWARD: Object.

MR. WAUGH: Your Honor, it is relevant in that we take -- I think the objection is relevance. It's relevant because we have to take Ms. Johnson as she is, all her

circumstances, when considering how she had to deal with a lawsuit imposed on her in a faraway jurisdiction with no financial resources in which to combat it.

THE COURT: Well, I'll permit -- I'll permit some inquiry as to whether or not the involvement in the legal proceedings has been an economic burden to her.

But a general question about her net worth or access to wealth other than as it might be relevant to what resources she has available to help her as needed in terms of securing legal advice, that sort of thing. So I'll permit it, that general inquiry.

But I'm going to sustain the objection to the question about her net worth.

BY MR. WAUGH:

Q Ms. Johnson, when the copyright infringement lawsuit was instigated, did you have access to -- did you have ready access to substantial liquid funds from which to pay for a legal defense?

A I could have afforded, but --

Q Okay. And do you have any student debt?

A No.

Q Okay. What is your current occupation?

A I'm unemployed. I retired actually.

Q And how long have you been unemployed and/or retired?

A Since I accepted my calling. It's been about since

'98, '99.
Q Do you consider yourself a preacher?
A I do.
Q And do you seek compensation for your work as a preacher?
A No, I don't.
Q Do you accept compensation when offered for your preaching?
A Only if they insist, then I'll take it. And I'll just pass it on to a homeless person or somebody that's in need.
Q And how long have you been creating messages and/or preaching, since 1998?
A As in cassettes or paper documents or --
Q Whatever the media form.
A Probably since '95.
Q Why do you not accept money for that?
A Because I wasn't called to preach for money.
Q How long has it been since you last preached and/or created your messages?
A Since the copyright lawsuit. I just haven't had time.
Q Would that be about four years?
A Probably.
Q And when you say "the copyright lawsuit," you're referring to the lawsuit in this district, Case Number 6:14-cv-497, correct?

A Correct.

Q Presided over by Judge Presnell?

A Correct.

Q I'm going to call that the first lawsuit in other questions.

Before the first lawsuit started, how much time every week would you spend working creating messages and preaching?

A Oh, it just varies. At least 60 hours a week or more, you know.

Q And what form of work does it take in order to create these messages? In other words, are you working at a computer? Are you writing? What are you spending 60 hours doing?

A Reading the Scriptures, writing on the computer. And then if I'm making the videos or CDs, then that takes time as well.

Q How do you know who Paula White is?

A I saw her on television.

Q Do you know if it was on a televangelist -- like a channel or what channel that was?

A I believe it was on Trinity Broadcast Network.

Q Or TBN for short?

A Yes, TBN.

Q Do you see Ms. White in the courtroom?

A Yes, I do.

Q Do you recall the time when you first saw her?

A It was probably in about 2001 or 2002.

Q What caught your attention about her?

A She was -- I guess she was preaching. And she was on the Paula Today Show. And she misspoke. And that's what caught my attention. But I thought nothing of it at that time. But that's what caught my attention, was that she misspoke on something.

Q When did you start thinking of it, about the misstatements or the mistakes?

A Well, I saw her again the next day. And there was another misspeaking, I thought.

So I guess about two or three days after that, I just happened to be walking past the television again and there was that woman again. And this time I thought, well, I'm going to sit and listen to what she's saying and just listen to her message.

And she wasn't misspeaking. She was purposefully twisting the Scriptures. And that's what really prompted me to start warning people.

Q Did that bother you?

A Sure, it did.

Q And how did you start warning people?

A I started out with written documents.

Q By "written documents," what do you mean? Letters?
A Well, no. Just papers. Just articles.
Q Where would you send these letters?
A I didn't. I'd just go out on the highways and byways and pass them out.
Q When you say "highways and byways," only locally up in Washington or would you -- are you talking highways all across the United States or the world?
A All across the United States and Canada.
Q Would you do this specifically to spread the warnings about Paula White, or were there other warnings in there?
A It was not specifically about her. That's just how I distribute my messages. I preach as well. So my messages are a warning to just whoever wants to lend an ear to them.
And -- but, yes, Paula White was in that warning. But sometimes it would be specific to her.
Q And sometimes did you have warnings about other preachers?
A Yes.
Q On these letters, did you have your name and identifying information on them?
A Yes.
Q At what time did you stop doing letters?
A When I transitioned to the -- I still do sometimes. But when I transitioned to the CDs and DVDs.

Q And you mentioned cassettes. Did you ever make cassettes?
A Yes, I did.
Q How long did you make cassettes for?
A Probably for about four years, I guess.
Q And why did you stop making the cassettes?
A Because I was transitioning to the CDs and the DVDs.
Q Did you ever accept or request money in exchange for the letters or the cassettes?
A No.
Q How about the CDs or the DVDs that have been made?
A No.
Q Did you ever have advertisements on them, either for yourself or for other commercial entities of any type?
A No.
Q Have you ever had a commercial agent or a Hollywood agent or a booking agent of any kind?
A No.
Q After you stopped making CDs and DVDs, how did you start spreading your messages?
A I developed a website and a YouTube channel.
Q On your YouTube channel, did you ever have videos about persons other than Paula White?
A Yes.
Q Like who?

A T.D. Jakes, Zachery Tims, Shane Perry. There's several other preachers.

Q Did any of them ever instigate a lawsuit against you to take down those videos?

A No.

Q Did Ms. White?

A Yes.

Q Can you think of any motive that Ms. White would have that T.D. Jakes wouldn't?

MR. COWARD: Objection, Your Honor. Speculation.

THE COURT: If you know.

The question was, can you think of any that they might have? So if you know of any, you can answer the question, but you'll need to tell us how you know about them.

THE WITNESS: I think it was a personal vendetta.

MR. COWARD: Objection. That answer upholds the objection. She thinks.

THE COURT: Sustained.

BY MR. WAUGH:

Q When did you start your YouTube channel, Ms. Johnson?

A In 2011.

Q Did you create a website to link to your YouTube channel?

A No.

Q When did you create a website?
A In 2011.
Q Just to be clear, there's a difference between your personal website and the YouTube channel that you have, correct?
A As in difference as in --
Q There's two different web links to them?
A Oh, yes, uh-huh.
Q So is it your testimony you started your website and your YouTube channel around the same time?
A Yeah, a few months apart.
Q Which one came first?
A The website.
Q Do you know what kind of web traffic your website gets?
A The last I checked, which was during the copyright action, it wasn't very much. It was very little.
Q Do you know what its website ranking is on the internet?
A What I saw, it was like 17 million-something. So it doesn't get that much traffic.
Q Do you know of any way that anyone else would be able to tell what kind of website traffic you get besides you?
A Not that I know of except for that corporation that you just mentioned.

Q Okay. Do YouTube channels have subscribers?
A They do.
Q Does your YouTube channel have subscribers?
A Yes, it does.
Q Did it have subscribers at the time that the copyright infringement lawsuit was instigated?
A Yes, it did.
Q Do you remember how many subscribers you had at that time?
A I don't recall at that time.
Q How much does it have -- how many does it have right now?
A The last I checked, it was a little over 4,000.
Q Do you have any idea how many people watch Paula White on television?
A Not really.
Q Do you think it's more than 4,000?
A Oh, yes.
Q Do advertisements play during any of the videos on your YouTube channel?
A No.
Q Do advertisements exist on your website?
A No.
Q How do you know?
A Because I check my website. And I didn't put any

there.

Q Have you ever had any commercial advertisements on your website?

A No.

Q Have you ever had a donation link on your website?

A No.

Q Have you ever had a donation link on your YouTube channel?

A No.

Q Have you ever given people information on your YouTube channel website about how they could give you money?

A No.

Q Have you ever in any way monetized your videos of Paula White or any other preacher, for that matter?

A No.

Q Have you ever received income arising out of the display, upload, modification, or editing of any video that has Paula White in it?

A No.

Q Have you contacted the media about this trial seeking to monetize it at all?

A No.

Q Why is that?

A I just don't think it's appropriate.

Q Has your YouTube channel ever been taken down?

A Yes.
Q When?
A Once in February of 2012 and then again in May of 2014.
Q How did you become aware that your YouTube channel was first taken down in February of 2012?
A I went to check it, and there was just -- you get the notification that the channel had been removed. Disabled.
Q Did you get an email about it?
A No -- yes, I did. Yes, I did. In February.
Q And what did you do once you found out the channel was down?
A Well, I started researching about copyright to see if it actually was copyright infringement. And then I started trying to figure out how I could get my YouTube channel back up.
Q How did you end up fighting that first channel takedown?
A I finally got in touch with YouTube. And I filed a counter-notification by letter, a letter telling them of notification, not their standard form.
Q What were you feelings at the time that the first channel takedown occurred? In other words, were you suffering stress or anxiety just due to the channel takedown?

A No.

Q Okay. Were you worried about any penalties coming from YouTube?

A No.

Q Did you suffer any stress at that time that Paula White would do anything to you?

A No.

Q Did you get the videos back up?

A I did.

Q How long did it take?

A It took me approximately three months.

Q And were you informed by YouTube and/or any other letter as to why those videos were taken down?

A Email. They said it was due to a copyright infringement, complaint come forward.

Q After the channel went back up three months later, did you receive any other -- any correspondence from either Paula White, any of her corporate entities, or any of their agents?

A Not that I can recall, no.

Q Did you speak -- after you got your channel back up, did you speak with any lawyers about that?

A I'm not sure if it was after or before, but I did speak with an attorney.

Q Okay. Now, after the channel was back up, how long

was that between then and the instigation of the first lawsuit?

A The channel went back up in May of 2012. And then the lawsuit occurred in March of 2014.

Q How did you find out about the first lawsuit?

A Two attorneys contacted me.

Q Do you know who those attorneys are?

A I can't recall.

Q And what was the nature or the sub -- what was the nature of your conversation with those lawyers?

A With attorneys?

Q Yeah.

A Well, they were just informing me that a lawsuit had been filed against me, and they wanted to know if I wanted representation.

Q So you didn't know that you had a lawsuit against you until some lawyers solicited you as a client?

A Two lawyers from Florida, uh-huh.

Q And were you concerned by what they told you?

A At first I wasn't, no.

Q Why is that?

A Because I knew I hadn't infringed anyone's copyrights.

Q How did you know that you hadn't infringed?

A Because I had talked to an attorney previous when they took me down the first time. And they said, from what I

explained to them, they said, no, it wasn't copyright infringement.

Q Did you do any research on your own before the instigation of the lawsuit as to copyright infringement?

A Before the first lawsuit?

Q Before the first lawsuit was filed.

A A little bit, but I wasn't researching as in expecting a lawsuit. I was just researching on trying to get my channel.

Q So, again, after the conversations with these two attorneys, what did you feel?

A I wasn't really worried because I just didn't believe that she was really going to file -- I mean, she was really going to go through with it. Even though it had been filed, it hadn't registered with me yet. So I didn't really -- I wasn't worried.

Q When did you start to get worried?

A When I received the complaint and I read it.

Q What worried you about the text of the complaint?

A It was the allegations, the very serious nature of those allegations, and then the allegations that claim that I sold her videos and profited from the sale of those videos.

Q Do you have a legal education, a formal legal education of any kind?

A No.
Q What were your fears after reading the copyright lawsuit, first lawsuit?
A My main fear was I could go to prison for a copyright infringement.
Q Why was that a fear of yours?
A Because I don't want to go to prison. I don't want to be incarcerated.
Q What gave you the basis for feeling that that was a possibility?
A Well, after I got the complaint, then I began to research copyright infringement. And I came across some information that was showing the difference between civil copyright infringement and criminal copyright infringement.
So what the information stated was that once charges have been, allegations have been leveled that there was money involved or that you profited from the sale of whatever it is, videos, books, or whatever, then that becomes criminal. And then that carries a criminal sentence.
And that's how I -- why I was so afraid of going to prison, because that is what they did. They leveled those criminal charges against me.
Q Are you aware of any difference between the elements needed to show a case for civil infringement and the

elements needed to show a case for criminal infringement?
A No.
Q What was the basis for your fear about prison?
A That's not a place I want to be. It's not a place I want to be.
Q Have you ever been there before?
A No.
Q Has anyone told you what prison's like?
A No.
I've seen what it's like on television when they go in there and do those live reports. So I knew that's not where I wanted to be.
Q Has your reputation been harmed as a result of the first lawsuit?
A I believe so, yes, it has.
Q How?
A Well, just hearing people whispering and rumoring that I had sold someone's videos and profited from them, that I was being sued because I took Ms. White's videos and sold them for profit.
Q Are these whispers and things you heard only in person or also online?
A In person.
Q Was it humiliating?
A Yes, it was.

Q How?

A Because I preach my messages and I'm always preaching about not accepting money for the work of the Lord. And I preach against preachers who do preach for money.

And then to have this leveled against me, to say, well, you're doing the same thing that you preach against them about.

So people are hearing these things. They don't know any different, that these were false charges. They just know what they read and what they hear.

So, yes, it was. It was pretty humiliating.

Q Well, do you take your reputation seriously?

A Do I take it seriously? Yes, I do.

Q And is it important that your reputation be good in order for you to conduct the work of preaching that you do?

A I do.

Q Did you suffer mental anguish as a result of the first lawsuit?

A Yes.

Q Can you characterize for the Court what that mental anguish was like and what forms it took?

A Well, I never really had any peace of mind. My mind was always in turmoil. There was always thoughts of incarceration.

There were times when I would just be in tears if I --

I'd just go to bed in tears because I thought that I would not be able to make it out of this lawsuit because those -- those charges were very believable. And so I always had that fear.

And I never -- never -- I couldn't sleep. And when I did get a couple of hours of sleep, it was broken sleep. You know, you're asleep but you're in trouble. Your mind is always active. There's never -- there's never any rest. It's always in turmoil.

Q When did those -- just to clarify, is it your testimony that that mental anguish began upon service to you of that first lawsuit?

A Yes, pretty much, yes.

Q Do you know what -- when that was approximately, the date it was?

A I believe it was sometime in June, maybe around June 21st or thereabout.

Q That would be of 2014?

A Yes.

Q After June 21st, 2014, or thereabouts, was it difficult for you to eat meals?

A No.

Q You were still -- well, were you eating regularly?

A Yes. More than regularly. I --

Q Well --

A That was one of my problems. I began to emotionally eat, just eating nonstop. But at the time that that lawsuit was filed against me, I was a size four. And now I'm not a size four. You can see that.

And I still haven't been able to get that weight off. That's -- I just -- emotional eating. So I gained probably about 50 pounds.

Q Do you feel as healthy as a result of that first lawsuit?

A Yes, I do still, in spite of the weight.

Q Was it hard to -- how did the first lawsuit affect your sleep?

A I couldn't sleep. I was always worried. I was always troubled about going to prison and troubled about if I could be able to actually defend myself in this case.

I was worried that Ms. White had bought people off. And, I mean, I hate to say this and with all due respect to this Court, but I thought maybe she had bought the judge.

Because I knew she had bought the attorney off. And Ms. White's friend, who -- her preacher friend stated from Ms. White's pulpit with her sitting there, he stated that she had so much money she could buy and sell people.

So that just exacerbated the fear. So I didn't know. I had all of these thoughts around my head. They could have been just me thinking that. But I didn't know. I

don't know.

I just know what I'm hearing and what I'm going through.

Q How much is a good night's sleep worth to you?

A It's priceless.

Q Did the first lawsuit affect your personal relationships at all?

A Yes, it did.

Q How?

A Because I couldn't interact with people. I didn't have time. I didn't feel like interacting. All I could do is worry about going to prison, worry about trying to fight this lawsuit.

So I -- all of that changed.

Q Do you live with your daughter?

A Yes, I do.

Q Are you close with your daughter?

A Yes.

Q Did your relationship with your daughter change as a result of this lawsuit?

A Yes, it did.

Q How did that relationship change?

A Well, she and I are more like sisters than mother and daughter. We usually just go places. We do things. We always go on our road trips. That ended. I didn't have

time. I didn't even want to.

We normally go play tennis once or twice a week. And I just couldn't -- I couldn't stay focused. When she would speak to me, I'd be -- my mind would be somewhere else. I couldn't give her my undivided attention. Anything. It was just a whole -- I don't know how to explain it.

But, yes, it did. It took a toll on our relationship.

Q Do you have any hobbies or other things that are important to you that suffered as a result of the first lawsuit?

A Yes, I do.

Q Like what?

A I have several hobbies. I like to sew. I couldn't -- I didn't -- I haven't sewn anything since that lawsuit.

I love my carpentry work. I haven't built anything since that lawsuit. The very desk that I sit at and worked from is still unfinished. So it's just sitting there. I can't finish that.

I love to garden. I like gardening. I like yardwork. I haven't done that.

So I haven't really been able to do anything but just focus on this lawsuit.

Q After the first lawsuit was served on you, did you feel like you had control over your life?

A No.

Q Did you hire a lawyer?
A No.
Q Why?
A Well, there were several reasons I didn't. The main reason I didn't is because they didn't believe me. And I didn't feel like I would get good, fair representation if the attorney didn't, you know, even believe me.

Of course, I understand why they didn't believe me. Because it is unbelievable that someone would file a complaint and every single allegation is untrue. That is hard to believe.

So they didn't believe me. And so I figured that I would just represent myself. Because I know if you're going into it already not believing me, I'm not going to get the type of representation I should get.
Q Did you defend yourself in the first lawsuit?
A Yes, I did.
Q How? How did you do it?
A What do you mean, how?
Q Did you do legal research?
A Yes.
Q Are you a member of the Florida Bar?
A No.
Q Are you admitted to practice in this Middle District of Florida?

A No.

Q Have you ever represented anyone in a lawsuit before?

A No.

Q Before the first lawsuit, had you ever used Westlaw or Lexis?

A No.

Q Do you have a preference for one or the other?

A Westlaw.

Q And how many hours did you use those legal research tools for during the first lawsuit?

A Oh, I can't even begin to tell you. I was at the law library almost every day and almost from the time it opened to the time it closed.

I was there so often, the workers asked me if I was an attorney because I'd be there so often. So it's just anytime the law library was opened, I was there.

Q And where would you work if you couldn't do it in the law library?

A At home.

Q Did you ever have other persons draft the documents that you filed in the first lawsuit?

A No.

Q Have you ever had other people file or draft those documents in this lawsuit?

A No.

Q Have your skills in legal drafting improved over time?
A Yes, they have.
Q Was there ever a point when your anxiety and stress and anguish sort of halted as a result of the first lawsuit?
A Yes.
Q When was that?
A When they filed their first motion to dismiss.
Q And why would that relieve you of your anxiety?
A Because I knew then that they were abandoning their claims. And I knew I didn't have to worry about going to prison. So that was a big burden off me.
Q You actually opposed that motion to dismiss, didn't you?
A Yes.
Q Why?
A Because I had gone through all of this anguish and stress, and now they wanted to dismiss the case. And they were dismissing because they were trying to escape justice. And I wanted justice in that case. And that's why I opposed the motion.
Q And when was that -- when did you see that motion?
A The first motion to dismiss?
Q Yes.
A I believe they filed that motion -- I'm not exactly

sure. But I believe it was, it was 17 days after I filed my motion for summary judgment.

So I filed my motion on, I believe it was December the 14th or 16th, something like that. And on 17 days after that, they filed their motion to dismiss.

Q So according to your testimony, for about six or seven months, there's about a six- or seven-month window when you were suffering as a result of the first lawsuit, mentally, correct?

A You mean after it ended?

Q Let me -- that's a bad question.

A The window.

Q Can you tell us the time period in which you suffered the mental anguish which you've testified to here today?

A So for -- during that lawsuit, that lawsuit lasted for about nine to ten months.

Q But you did testify that the anguish ended when you saw the motion to dismiss?

A It did.

Q And came before the end of the lawsuit, correct?

A Right.

Q Would I be mischaracterizing your testimony to say that your anguish period lasted about seven months?

A Okay. Then --

Q By my words.

A I didn't do the math. Okay.
Q So whenever that is, are you relieved that this could soon be over?
A Yes, I am.
Q Why did you file this lawsuit for malicious prosecution?
A Because I wanted justice.
Q Are you concerned that Paula White could do this to the other people?
A Oh, yes, definitely.
Q Was there ever any doubt in your mind of the necessity of this lawsuit?
A Yes -- no, there was no doubt. There is a necessity for this lawsuit.
Q Now, you've become -- is it fair to say that you've become very familiar with the complaint that was filed in the first lawsuit?
A Yes, pretty familiar with it.
Q Have you ever seen any other complaints that look uncannily similar to that complaint?
A Yes.
Q What complaint?

MR. COWARD: Objection, Your Honor. It's hearsay. And no foundation.

THE COURT: Objection is overruled.

BY MR. WAUGH:

Q What complaint did you see that resembles the first lawsuit complaint?

A It's the complaint that they drafted their allegations from verbatim. I don't know the style or the title of the complaint.

Q Is it listed in your exhibit list?

A Yes, it is.

MR. WAUGH: Your Honor, I'd like to ask the Court to take judicial notice of a complaint filed in another lawsuit in the Middle District. It's Case Number 6:14-cv-337.

And, you know, it's a record filed in this district. I wouldn't see any reason why it wouldn't be admitted.

MR. COWARD: Same objection, Your Honor.

THE COURT: I'm sorry?

MR. COWARD: Same objection, Your Honor.

THE COURT: Was it disclosed?

MR. WAUGH: Oh, yes, Your Honor. It's Exhibit -- it's Plaintiff's Exhibit Number 3.

THE COURT: Plaintiff's 3 will be received over objection.

Objection is overruled.

(Plaintiff's Exhibit 3 was received

in evidence.)

BY MR. WAUGH:

Q Is there anything else that you want this Court to know about the damages that you suffered going through the first lawsuit?

MR. COWARD: Objection. Calls for a narrative.

THE COURT: Well, in light of the circumstances, Mr. Coward, I'm going to overrule your objection.

Ms. Johnson is still technically representing herself. I've permitted Mr. Waugh, with my thanks, to conduct the examination so there was no -- in a way that it was not a free-flow narrative.

So I'm going to permit the question.

You can answer it, if you have anything else you want to share, Ms. Johnson, that you've not been asked about.

THE WITNESS: Yes. I think -- I would like for the Court to really do justice in this case. I suffered -- I'm a strong person, I believe. But when this happened to me, I found out that there's this inner person, sort of like -- I think sort of like with Joe Powell.

He was a strong person. But when the thing that he feared came upon him, he was just undone. These things take a toll on you, no matter how strong a person may think they are or believe they are.

When you're faced with prison time or you're faced with -- you will go through something that -- it's hard to describe. It's hard to even explain.

But there were times when I just -- I just threw up my hands. Twice I gave up. I just said, Well, I can't take anymore. But I went to bed in tears. But I got strength, and I kept pressing forward, you know.

But these types of lawsuits and this type of behavior needs to stop. This should not happen to anyone.

There are people that are sitting in prison right today -- some are on death row; some have already been put to death -- because of false allegations that they, for whatever reason, didn't have the wherewithal or they couldn't defend themselves against these false allegations.

This type of stuff needs to stop. This type of behavior needs to stop. This should not be.

And then to take a complaint, someone else's complaint, and just put your name to it and present it right back to the very same court that they stole the complaint from and then present it back to that judge as truth, and they want the judge to make a ruling and to -- whatever the symptoms would have been.

Even though the defense claimed that they did not invoke a criminal statute, still in my mind -- and I still believe -- that the Court still has the authority to say,

you know, Hey, you stole $16 million from these people. That is breaking the law.

They could still have sent me to prison. I thought five years back then, because I was thinking one count of copyright infringement. But I had 108 videos. That could have easily been 108 counts. That could have easily sent me to prison for probably 20 or 30 years.

So this type of behavior needs to stop.

And you're really stressed when you're thinking like this. And I didn't know until after it was over, until they filed their motion to dismiss. Then I knew I didn't have anything to worry about.

But until then, that's all it was, was just worry, stress, not knowing from day to day what my life would be like and how long it would take to end the lawsuit.

So I just pray that the Court will do justice here.

BY MR. WAUGH:

Q I had originally anticipated that being the last question, Ms. Johnson, but I do have maybe one or two more.

Did you ever discover a reason why you were picked out or your videos were picked up? Was there anything special about your videos?

A I don't know, other than they were just exposing Ms. White. And it was showing that -- and showing how the

deception, how subtle the deception was.

And it was beginning to open the eyes of the people, and they could see. It was just connecting the dots for the people, and I assume that's why.

Q Was there any specific incident?

A As in?

Q That the videos showed that you think warranted Paula White's attention?

A Oh, I think all of my videos do. Well, all the ones that pertained to her.

MR. WAUGH: I have no further questions, Your Honor.

THE COURT: Thank you, Mr. Waugh.

Cross-examination, Mr. Coward?

**CROSS EXAMINATION**

BY MR. COWARD:

Q Ms. Johnson, good afternoon.

A Good afternoon.

Q Can you present to us the name of any person who's sitting in prison because of a copyright infringement action brought by Paula White?

A I didn't say because of a copyright infringement action. I said because of false allegations that were brought against them.

I don't know what the allegations are, but we do know

there are people who are sitting in prison. And you've seen -- even now with DNA testing, you see these people are being exonerated. They were there because of false allegations.

Q Is the answer to the question "no," ma'am? You do not know anyone that is sitting in prison because of a copyright allegation from Paula White?

A No.

Q Correct?

A Correct.

Q All right. In fact, you are aware that Paula White individually has never filed a copyright infringement action in her life, aren't you?

A Paula White is the president of Paula White Ministries. She has complete control over those corporations.

They do not speak except through a person. That person is Paula White. She has the authority --

MR. COWARD: Your Honor, could you direct the witness to answer the question yes or no, please?

THE COURT: Well, she's not required to answer the question exclusively yes or no.

You can answer yes if the answer is yes, no if the answer is no. If you want to provide a brief explanation, you can do that.

BY MR. COWARD:

Q Who was the plaintiff in the underlying case, Paula White Ministries, right?

A Paula White Ministries.

Q Paula White individually was not a plaintiff in the underlying copyright infringement action; isn't that true?

A That's true.

Q All right. And so let's talk about your trips to Orlando here. You are the plaintiff in this case, right?

A Yes.

Q And you sued Paula White individually, didn't you?

A Yes, I did.

Q Now, you have come from Seattle to Orlando, Florida, four or five times for hearings in this case, right?

A Right.

Q That you filed yourself, correct?

A Yes, that I filed.

Q The Court has required your presence here in person, true?

A True.

Q Now, in the underlying copyright infringement action, were you ever -- did you ever have to come to Orlando for any proceeding throughout that case?

A No.

Q You had -- you just mentioned this. You had 108

videos of Paula White on your website and YouTube channel, correct?
A No. Incorrect. I had 108 videos on my YouTube channel. All of them were not about Paula White.
Q At least a hundred were about Paula White, weren't they?
A Yes. She claimed copyright infringement on all 108 of them, even the ones that have nothing to do with her.
Q Let's just get clear, though. Of the 108 videos that you had on your website and YouTube channel, 100 of them at least were of Paula White, correct.
A Probably. Yes.

MR. COWARD: Okay. Your Honor, could I get some of the exhibit books out and Ms. Johnson's deposition for her and for the Court as well?

THE COURT: Sure. You may.

THE WITNESS: Can you get my reading glasses?

THE COURT: Okay. Mr. Coward?

MR. COWARD: Your Honor, let me just say I'm conscious of the Court's time frame. So I'm going to try to move along with some of the exhibits I believe the witness and the Court may be familiar with, without putting them up every single time.

But I'll do my best on that.

BY MR. COWARD:

Q So, Ms. Johnson, let's talk about the damages to your reputation.

If you'll go to that purple notebook there, Exhibit A-15.

Those are your interrogatory answers that you summoned under oath with regard to your claim for damage to your character and reputation; is that correct?

A Yes.

Q And you indicated that no one other than yourself has knowledge of that, right, in answer to number three?

A Knowledge of what?

Q Damage to your character and reputation.

A Well, yes, I testified that I had heard people talking in the law library and the stores. So, yes, there are -- there is some.

Q Ms. Johnson, let's look at your interrogatory answer, please, there.

We have the questions and the answers.

A Okay. Which question are we on?

Q Number three. Do you have it?

A I do.

Q Please identify each person other than yourself who has knowledge regarding the stress, mental pain and anguish, fear and anxiety, the loss of capacity for the daily pursuits and enjoyment of life, trouble sleeping,

bouts of confusion, short-term memory loss, and forgetfulness that you claim you have sustained and are seeking as an element of damage in this case.

And the answer was none, correct?

A Correct.

Q Okay. And so then let's talk about the issue with regard to damage to your character or reputation.

You live in Seattle, Washington, correct?

A Correct.

Q That's 3,000 miles away from Orlando, right?

A Right.

Q No newspaper articles about the underlying copyright infringement lawsuit, right?

A I don't know.

Q You don't have any, do you?

A Any what?

Q Newspaper --

A Newspaper? No, I don't.

Q -- articles about the underlying copyright infringement lawsuit, right?

A Yes.

Q There weren't any online stories about it that you were able to find, right?

A I don't know. I didn't check.

Q There weren't any media, were there?

A I don't know. But there were people who knew about the copyright infringement lawsuit. I don't know how they knew. Maybe it was through word of mouth. I don't know.
Q In this particular case, you tried -- you found other articles that you were trying to enter into evidence about Paula White, but you didn't look for any with regard to your damage to your own character and reputation?
A Well, all you have to do is just Google Paula White and you'll get a thousand hits.
You can Google me, and you probably won't get much of anything. So that's -- I mean, to Google my name.
Q And when you Google Paula White, did you find any media about the underlying copyright infringement case?
A No.
Q The people that you overheard discussing the copyright infringement lawsuit were at a grocery store in Washington state, correct?
A Right.
Q A Fred Meyer grocery store?
A Fred Meyer, Walmart, and the law library.
Q Okay. And you were just passing by, and you could hear them saying, "She's being sued for copyright infringement"?
A Uh-huh.
Q "Paula White is suing her for copyright infringement

and for selling her stuff"?
A Selling her stuff, yes.
Q That's what they said?
A That's what they said.
Q That's your testimony to this Court under oath?
A That's what they said.
Q Okay. Do you know the date when that occurred?
A No. Not off my head, no.
Q Did these people actually mention your name when they were discussing the lawsuit?
A No, they didn't mention my name.
Q Did you ever engage in any conversations with these people who were talking about the lawsuit?
A No.
Q Did you ever try to correct them and say that's not who's suing you?
A No.
Q Did you ever hear any conversations with people who were talking about the lawsuit after it had ended and been dismissed?
A No.
Q Would you be able to recognize any of these people who were talking about you being sued if you saw them again?
A Probably not.
Q You had a public forum available to you by way of your

website and YouTube channel, didn't you?
A I have a public forum, you said?
Q Yes.
A As in?
Q To be able to go out to the public, anyone who goes to your website or YouTube channel, right?
A Sure, yes.
Q Did you post anything on your website about the copyright infringement action being dismissed?
A No.
Q Let me talk about your claim for mental anguish.
A Uh-huh.
Q Let's start with your claim that you would get thrown in jail. And as we saw earlier, you have contended in your complaint, your verified complaint in this case, that you were worried you'd get thrown in jail, correct?
A Correct.
Q And you've testified about that here today and in your trial brief as well, correct?
A Correct.
Q Let me ask you to look at --
MR. COWARD: May I approach the witness, Your Honor?
THE COURT: You may.
MR. COWARD: You're going to have to put that over

there, Ms. Johnson. Let's get this one out of the way so the court reporter can hear you.

Page 11, please. This is Joint Exhibit 8.

BY MR. COWARD:

Q This is a letter you received from Paula White Ministries' attorney, Thomas Sadaka, before the copyright infringement was filed, right, October 7th, 2013?

A Correct. Correct.

Q And he asked you in that letter to stop using Paula White's videos on your website and YouTube channel, correct?

A Correct.

Q He did not threaten to throw you in jail, did he?

A No.

Q In fact, you had a conversation with Mr. Sadaka during the lawsuit in which he, again, asked you to stop using the videos. And he did not threaten to throw you in jail, did he?

A No.

Q Mr. Sadaka never threatened to throw you in jail, did he?

A No.

Q In fact, Ms. Johnson, with regard to your mental anguish and distress that you went through for being a defendant in that lawsuit, you could have prevented all of

that by agreeing to Mr. Sadaka's request to take off the Paula White videos from your website and YouTube channel, couldn't you?

A Well, I wasn't infringing her copyrights.

Q The question is, you could have prevented being a defendant in the lawsuit if you had decided to take off the web -- the Paula White videos from your YouTube channel and website, true?

A True. I could have.

Q Okay. And you decided -- you made the decision, the conscious decision yourself, not to do that, right?

A Right.

Q Because it was your considered judgment, also based on the advice of attorneys that you had received, that you were not infringing her copyright, true?

A True.

Q And you sent a letter in response to this in which you essentially said what you were doing was fair use, true?

A True.

Q And if we go back over time and look at the time frame of when this all began, in early February 2012, there was a takedown notice by Paula White Ministries to YouTube, which YouTube sent to you and basically indicated that they would have to take down the -- your videos from YouTube because of this takedown notice.

And you then had an opportunity to put a counter-notification in on that, right?

A Right.

Q And your defense to that one, again, was fair use, true?

A True.

Q And when you say, you repeated throughout time, that your defense was based on Section 105 of the copy -- excuse me, 107 of the Copyright Act and the doctrine of fair use.

Section 107 is the doctrine of fair use, right? You're aware of that, true?

A Maybe at that time I wasn't, but yes.

Q Okay. You looked at the complaint, the copyright infringement complaint that was sent to you?

A Uh-huh.

Q It did not seek criminal relief from you, true?

A No. It levels criminal charges against me.

Q The word "criminal" was in that complaint?

A No. The charges themselves were criminal.

Q The complaint itself never contained the word "criminal," true?

A True. That's true.

Q And they never -- that complaint never in its body sought criminal relief from you, right?

A Like I said, the charges were criminal.

Q You made that leap in logic on your own based on what you looked at and what you researched; isn't that true?

A Based on the law that I've researched, that -- I researched more from attorneys. So I assume they know what they're talking about.

Q Well, you --

A Show me the statute.

Q You never called either of those attorneys that offered to represent you in Florida and asked them whether the complaint was seeking criminal penalties against you, did you?

A No. They didn't say it was seeking criminal penalties. The charges were criminal. Even though if they didn't seek the criminal penalties, the Court itself could have made that decision.

If you're saying that I ripped off for $16 million, I mean, that's breaking the law. That's theft. Grand theft. So the Court itself could have said, you know, We're going to throw this woman --

Q Just so we're clear, your complaint here with regard to your worry and emotional distress over getting thrown in jail is based on your interpretation of the copyright law, right?

A No. It's based on an attorney's documentation that I researched online.

Q Okay. Based on your research.
A The statutes.
Q True?
A Yes, it was my research.
Q Okay. And you haven't brought that research here today for us to look at, have you?
A No. I'm saying that was years ago.
Q It's based on your own research. You had access to lawyers who you didn't ask about this, true?
A True.
Q In fact, the lawyers who did talk to you told you that the plaintiff, in that case Paula White Ministries, had no case against you, didn't they?
A Two of them, the ones in Washington state. But the ones here in Florida informed me that they have leveled serious charges against me.
Q Right, because they were soliciting you to try to get your business, right?
A Well, they were -- no. They were serious charges.
You're right. They may have been soliciting my business. But they did speak correctly. They were serious charges.
Q Let's talk, Ms. Johnson, about your emotional damages with regard to the underlying case.
THE COURT: Mr. Coward, this would be a good time

to take a short -- we're going to take a short recess. We're going to be in recess for ten minutes.

MR. COWARD: Yes, sir.

THE COURT: We'll be back at a quarter till.

(Recess at 2:33 p.m. to 2:46 p.m.)

THE COURT: We're back on the record in Johnson versus New Destiny, et al., 6:15-civil-1698.

The Court notes counsel and parties are present.

You may inquire, Mr. Coward.

MR. COWARD: Thank you, Your Honor.

BY MR. COWARD:

Q Ms. Johnson, with regard to your emotional damages claim, you have experienced what you would term garden-variety emotional distress and mental anguish, true?

A That's what I put in my affidavit, yes.

Q In fact, that's what you testified to in your deposition as well, right?

A Right.

Q And when we asked you about that, you didn't tell us about the personal relationship with your daughter suffering, did you?

A With my daughter suffering?

Q Yes, ma'am. You testified on direct that your personal relationship with your daughter suffered. You didn't tell us about that when we questioned you about it

in your deposition, did you?

A I don't recall if you even asked me about that in the deposition.

Q Well, there was a question -- in fact, let me ask it this way.

There are no witnesses or individuals who can testify regarding the change in your demeanor or the change in your personality or your anxiety pre-copyright infringement lawsuit and post-copyright infringement lawsuit, are there?

A You're asking me did I make that statement in the deposition?

Q You can put it that way.

A Yes, I did.

Q Okay.

A If that's what it says in the deposition.

Q Right.

You did not seek any medical treatment for any of your emotional problems, did you?

A No.

Q The sleeping issues, you didn't try to go to a walk-in clinic perhaps and talk to them about that?

A No.

Q Or even a MinuteClinic at a CVS or something like that?

A No.

Q We asked you about your emotional damages. You didn't tell us about your weight gain, did you?
A No. I was embarrassed to put that in there. So I didn't even mention it. But it did happen.
Q And you didn't tell us about your hobbies that suffered, did you, ma'am?
A Did you ask me that?
Q We asked you what your emotional damages were.
A Okay. So I omitted that inadvertently.
Q Did you seek any pastoral counseling at your church as a result of your emotional damages?
A No.
Q You don't belong to a church, do you?
A No, not an earthly church.
Q You've never taken any theology courses, have you?
A No, not any earthly theology courses.
Q Did you ask to take Paula White's deposition in this case to see what her finances were?
A No, I didn't.
Q You didn't ever seek to take a deposition of a New Destiny Christian Center representative to see what type of net worth or financial issues they had, did you?
A No, I didn't.
Q Did you think Ms. White owned a helicopter based on a picture you found on the internet?

A It's possible. She once owned a jet. And she said she was going to get another one. So she may have bought a helicopter instead of a jet. I don't know.

Q Okay. The joint exhibits that we have gone through and agreed upon in this case, Ms. Johnson, you have reviewed those carefully, right?

A Pretty much.

Q You spent a couple hours doing so yesterday, true?

A Yes. We went over them yesterday, uh-huh.

Q And the Joint Exhibits 27 through 73 comprise the defendant's financial discovery responses in this case; isn't that true?

A I'm not sure. If that's what you say the numbers are, then yeah.

Q Before this lawsuit, you never met Paula White, did you?

A No.

Q You never spoke with her on the telephone?

A No.

Q What's the purpose of your website?

A It's to educate the public on, to bring clarity to the Scriptures and to tell the truth of the Scriptures and to expose false preachers and teachers.

Q To wake up the sleeping lion of Judah?

A Right.

Q To wake up the remnant?
A Right.
Q And to expose false teachers and preachers?
A Correct.
Q And you believe that Pastor Paula White is a false teacher and preacher based on your own opinion; isn't that right?
A No, based on her teachings.
Q It takes you one to three hours to create one of your videos that you put on your website and YouTube channel; isn't that right?
A It depends on the size of the video, if it's a small one. Or if it's a larger, it may take a lot more time.
Q Let me ask you to look at page 37 of your deposition, please.
Do you see the question at line 8?
A I'll get there.
What was it?
Q Page 37.
A Okay. What line?
Q Line 8. The question was at line 8.
"How much time does it take you to create one of those videos?"
And you said, "It just depends. I don't know. It depends on how -- the length of the video and what's in it.

I don't know. Maybe -- I don't know. Maybe an hour, two hours, maybe three, longer. I don't know. I never really timed it so --"

Correct?

A So that's about right. It depends on the length of the video.

Q All right. Let's kind of go through the history again of the disputes with Paula White Ministries.

They sent a takedown notification. You sent a counter-notification. And YouTube -- this was in early 2012. And YouTube put your videos back up.

Right?

A Correct.

Q And then it was almost a year and a half before you received an email from Mr. Sadaka -- or, excuse me, you received a letter from Mr. Sadaka asking you to refrain from using the Paula White Ministries videos, true?

A True, correct.

Q And you, of course, refused to do that, right?

A Right.

Q At that point in time, you then in early 2014 received a complaint in this case ultimately, the complaint in the copyright infringement case, true?

A True. March 27th.

Q That we've seen already. And you then filed an answer

to the complaint, right?

A Correct.

Q Okay. Let's look at that. That's Exhibit 2 in your notebook, Joint Exhibit 2.

A Okay.

Q Do you have that, ma'am?

A I have it.

Q All right. And you drafted the answer that was filed in the underlying copyright infringement case, Joint Exhibit 2, correct?

A Correct.

MR. COWARD: Let us look at, if you can, Russ, page 12.

BY MR. COWARD:

Q You indicated in your answer you consulted with two attorneys, true?

On page 2 of the answer, ma'am.

A I thought you said page 12.

Q I did. I'm sorry. He has some numbers that just helped him find the document to bring it up.

It's page 2 of the answer.

A Oh, okay.

Q True? You consulted with a couple of lawyers.

A True, yes.

Q Okay. And the second paragraph from the bottom, you

wrote, "Because PWM has a global reach, I direct my videos toward a global audience, including Florida, by placing them on my website and YouTube channel."

Is that true? You directed your videos to a global audience?

A Yes. Because YouTube and my website, they reach globally.

Q All right. Page 3, let's go to the next page, please.

This is where you were answering line 13 to 18 of the complaint.

A Okay.

Q You indicated -- you wrote in your answer, "As stated in my introduction of videos, some contained photos that were produced from television, broadcasts, or internet and are for nonprofit educational purposes in accordance with Title 17, U.S. Code, Section 107 of the copyright law and the doctrine of fair usage."

A Uh-huh.

Q Correct?

A Correct.

Q You aren't affiliated with any educational programs, are you?

A I don't have to be affiliated with an educational program. I am educating the people on the Scriptures.

Q My question, ma'am, you are not affiliated with any

educational programs, are you?

A As in?

Q Are you affiliated with any educational programs, Ms. Johnson?

A You'll have to explain to me, programs as in --

Q A community college?

A No.

Q A university?

A No.

Q A theological college?

A No.

Q A public education program?

A No.

Q A library?

A No.

THE COURT: Mr. Coward, take a minute and educate me on the relevance of Ms. Johnson's view as to whether or not her publications constituted fair use.

MR. COWARD: Yes, sir, Your Honor.

Because ultimately at the end of the day in this case, she is claiming that it was malicious for the defendants to file this lawsuit.

THE COURT: What does her belief about fair use have to do with their motivation in terms of --

MR. COWARD: Because that was the basis of her,

the very basis and the heart of her claim that she was not infringing, was that it was fair use.

And from the standpoint of the defendant, Your Honor, that is a very complex analysis that really needs to be undertaken by attorneys. And it plays into the issue of whether it was malicious to file the lawsuit.

THE COURT: Okay. Well, you're bypassing my question. I don't argue the point as it relates to the advice perhaps that was given to Ms. White or her organizations from counsel or counsel's testimony who represented her as to what they considered in terms of whether the claim was meritorious.

But what difference does it make whether or not Ms. Johnson thought her publications were fair use? I mean, the underlying claim has been dismissed with prejudice.

So it's been -- it's been adjudicated. I mean, what difference does it make as to what her mindset was with respect to whether it was fair use?

MR. COWARD: Because that was her basis for claiming the suit never should have been filed in the first place.

THE COURT: Okay. Well, you've heard enough of my questions to know that I don't think it's particularly relevant to the question.

But you can -- I'll let you pursue it until I think it's wasting the Court's time.

MR. COWARD: Yes, sir, Your Honor.

THE COURT: I take your point.

I'm just sharing with you that what was in the mind of Ms. White and her organization when the underlying claim was filed is what, to me, is determinative of the question of whether or not it was done with deliberate indifference, malice, or wanton disregard, not what was in Ms. Johnson's mind.

So you can take that for what it's worth.

MR. COWARD: Thank you, Your Honor.

THE COURT: You're welcome.

BY MR. COWARD:

Q Ms. Johnson, let's move forward to page 6 of your answer.

Okay. You wrote there, "If plaintiff has been financially harmed" --

A Excuse me.

Q -- "I believe it is due to the fact that Paula White, PWM, has been exposed by many as a false preacher, con/scam artist, who is using the viewers and church members as merchandise, and they have made informed and educated decisions to part company with Paula White/PWM."

And then you wrote, "Praise Jesus," correct?

A That sounds about right.

But you're on page 6. Can you tell me what line you started reading on?

Q Sure. It's from page -- it's from line 150 through 156.

A Okay. Uh-huh.

Q And as a matter of fact, basically what you said in your answer was that if Paula White had been -- and her ministry had been financially harmed as a result of your videos, you'd actually be happy about that, wouldn't you?

A I'd be happy to see that people have come awake to know that they don't have to give all of their substance to a person in order to have a relationship with Jesus Christ. They don't have to give their mortgage money and go live on the street somewhere. They don't have to give every time they see the preacher, to shake his hand, put money in his hand, take food out of their children's mouth.

Yes, I would be very happy to see that people woke up. Praise Jesus.

Q All right. Let's look at page -- Exhibit A of the answer to your complaint in the underlying case.

A Exhibit A to the answer?

Q Exhibit A, page 20.

A Okay.

Q This is a page from your website, correct?

A Yes.
Q Indicating that people who visited could watch, listen, or download, true?
A True.
Q And you encouraged people to download, reproduce, and freely share the messages with others, true?
A True.
Q Let's flip over to Exhibit M of your answer.
A Exhibit M?
Q M. Okay.
These are featured videos that you offered for people to download. Right?
A If they choose to download a copy to their computer, they can.
Q One of them was entitled, "Paula White is a heathen"?
A Yes.
Q "Paula White, I saw a wicked hand over New Destiny"?
A Yes.
Q You got one that's called "Satan's Ministers," true?
A True.
Q Did you have one on there called "Paula White Sacrifices Chickens"?
A Yes.
Q And that was one in which you took about a 30-second clip of Paula White saying that they were going to have a

chicken dinner at the ministry and then put on about a 20-minute CNN exposé about the practice of Santeria.

Isn't that true?

A Possibly. But that clip was not about having a chicken dinner.

Ms. White says that they were trying to purchase a home. And so what she and her husband, Randy White, did was, in order to get the -- I believe she said $60,000, they went out and sacrificed chickens. And then they got the money somehow.

Randy White says the same thing, that he -- he knew the person who dealt in animal sacrificing. And they would do that and -- behind the Without Walls International Church. Those were her statements. She sacrificed the chickens.

Q You had a long clip on there from a CNN news story about Santeria, right?

A What's the relevance of that? If she didn't have copyrights to that --

THE COURT: You just answer questions, Ms. Johnson.

I decide the relevance.

You listen to the questions. You answer them.

BY MR. COWARD:

Q Correct?

A Correct.

Q And you know that the practice of Santeria is anathema and a bad thing in the Christian Church, isn't it?

A For a true Christian, yes.

Q Okay. And you implied in that video that Paula White was engaged in the practice of Santeria, didn't you?

MR. WAUGH: Objection, Your Honor.

THE WITNESS: I didn't --

MR. WAUGH: Mr. Coward is making the case for Ms. Johnson that her videos are transformative, but they have nothing to do with malice or damages.

THE COURT: Objection is overruled.

I think it goes to the state of the relationship between the parties. So I'm going to overrule the objection.

You can answer the question if you remember.

THE WITNESS: He'll have to ask me again. I can't recall the question.

BY MR. COWARD:

Q Yes, ma'am.

The question was that you implied in that video that Paula White was engaged in the practice of Santeria, didn't you?

A I don't know if she was or was not. But I know that Santeria, they do sacrifice chickens. And so it's possible

that she could be involved in that. That's where my mind went because that is what they do.

Q You have a reference in one of your videos here to Satan. You have a reference to Satan on your "about me" page on your website as well, true?

A Probably.

Q And you will admit that the use of the term "the enemy" is common to refer to Satan in the evangelical Christian Church, true?

A Sure, it is.

Q Let's go to Exhibit O to your answer to the complaint.

A Okay.

Q These are more videos that were available for download, right?

A If they choose to download a copy to their computer, yes.

Q And you have a video on there entitled "Boycott Paula White Ministries," correct?

A Yes.

Q One of your goals in putting your videos out there is to inform people that Paula White is a con artist, a scam artist, a pathological liar, and a deceiver, true?

A True.

Q In retrospect, you think maybe perhaps you shouldn't have used the term "boycott Paula White," right?

A No.

Q Okay. You don't think maybe that was wrong for you to use, that you shouldn't have said "Boycott Paula White" when naming that video?

A No.

Q All right.

A It has nothing to do with copyright infringement.

Q Let's look at your deposition, please.

Page 45.

A 45?

Q Page 45.

A Okay.

Q Starting with the question of line 17 and going through the answer on the first part of page 46.

The question was during your deposition that -- it was taken on November 21st, 2016.

"But you're hoping with your channel that they'd watch your version of what Paula White Ministries is or what Pastor Paula is and they wake up and they don't give you any money?

"Answer: No, I'm not hoping that. My job is just to present them the truth. I'm not hoping that they don't give or whatever, you know. I'm just saying that if -- I mean, I'm just trying to inform the people. And if they want to give after that -- maybe I shouldn't have said,

'Boycott Paula White.' Maybe that was wrong. I don't know. When I named these videos, I don't really know what to name them, you know, and I just call it whatever.

"So, yeah. They shouldn't give. They really shouldn't give their money to her because she's scamming them. But if they want to give after they know the truth, that's fine. So be it. That's all I'm saying."

That was the question and that was your answer back when your deposition was taken.

A Okay.

Q True?

A True.

Q And you contend, Ms. Johnson, that every one of Pastor Paula White's sermons is about money, true?

A I'd say 99 percent of them are, yes.

Q Don't all traditional churches have a section of their services where they ask for money so that they can support their church?

A Legitimate churches do take up offering and tithes, but they don't twist the scriptures to get that money, to get the people to give.

Tithes and offering is legitimate.

Q During the -- excuse me.

Let me ask you to turn over to Exhibit T of your answer to the complaint, copyright infringement case.

A Okay.

Q That is a screenshot that you took of one of your YouTube videos entitled "Paula White and Benny Hinn Affair Proof."

Right?

A Right.

Q And it shows that at that time it had 516,411 views.

True?

A No. At that -- yes. Five hundred sixteen thousand --

Q Four hundred eleven.

A -- four hundred eleven, right.

Q More than half a million, correct?

A Correct.

Q That's more than a few views, isn't it?

A Sure.

Q Your point of contact throughout the underlying copyright infringement case was Thomas Sadaka all along, correct?

A Pardon me?

Q Your point of contact was Paula White Ministries' lawyer, Mr. Sadaka, true?

A True.

MR. COWARD: I'm sorry, Your Honor. May I approach the witness?

THE COURT: Yes.

BY MR. COWARD:

Q I've handed you Exhibit 80, Ms. Johnson, which is your complaint in this case, current case.

A Okay.

Q Let me ask you to look at page 13 of your complaint in this case.

MR. COWARD: Page 1700, Russ.

THE WITNESS: Okay.

BY MR. COWARD:

Q The allegation in paragraph 70, you've alleged that the corporate defendant, PMMI/PWM, fraudulently attempted to gain control over plaintiff's videos by applying for a copyright certificate with the United States Copyright Office, correct?

A Correct.

Q In fact, the copyright registration that we have seen in this case is for the 177 disks that were sent in for Paula White Ministries 2010 and 2011; isn't that true?

MR. WAUGH: Objection, Your Honor. Relevance to this allegation for the claim at hand.

THE WITNESS: I'd like to answer the question.

THE COURT: Hang on a minute, Ms. Johnson.

Do you want to be heard on the relevance argument objection, Mr. Coward?

MR. COWARD: Well, yes, sir. Actually, all of

this goes to Ms. Johnson's credibility in this case.

THE COURT: Well --

MR. COWARD: She's making a number of allegations in this case that are just flatly incorrect. And the Court needs to be able to weigh her credibility.

THE COURT: Perhaps I missed something or -- in the question and the answer. But go back and tell me, what's the connection between the disk that you just referenced and the claim that was made in her complaint?

Because I apologize. I missed that.

MR. COWARD: Ms. Johnson has alleged in her complaint and also testified in her deposition that Paula White Ministries attempted to register her videos, the videos that she had on YouTube.

THE COURT: Okay. And this disk is what? This disk that you referenced of 177 --

MR. COWARD: Those are the ones that Paula White Ministries received copyright registration on in 2012.

THE COURT: I'm going to overrule the objection.

The witness' answer will help me understand the connection.

THE WITNESS: May I clarify why I stated this?

THE COURT: You can answer the question, Ms. Johnson.

THE WITNESS: Oh, okay.

Well, this is because if you look at the complaint that the defendants filed, with that complaint, they were attempting to register my videos.

They -- when they sent the application in to the United States Copyright Office, they sent a list of my videos that I had on YouTube, claiming that those were their videos.

They didn't sign the form, though. But you check your complaint and you look at the -- look at the exhibit, and you'll see the application form there.

And they attached my videos to that, claiming those were the videos that they want copyrighted. And you notice that the Copyright Office never did respond to it.

BY MR. COWARD:

Q In fact, Ms. Johnson, you know, don't you, that that is a document that the Court sent to the copyright infringement office because the Court is required to do that when a copyright infringement case is filed?

A Well, that was attached to the defendant's complaint. So I'm assuming that -- and they had a list of my videos there.

Q And --

A So why did they attach my videos?

Q Because the Court is required to send that to the copyright infringement office when a copyright infringement

complaint is filed. The defendants did not send it.

A Well, it was attached to their complaint. So they didn't attach that to their own complaint?

Q No.

A Okay. Well, that's my mistake. I apologize.

But that's why I answered my -- I put that allegation in there, because that was my understanding of what was going on.

So if I was wrong, I apologize.

Q Let me ask you to take the purple book, please.

And look at Defendant's Exhibit A-12, please. It's page 1984.

You've seen this before, haven't you, Ms. Johnson?

A Yes, I have.

Q You went online to the copyright -- United States Copyright Office and determined that Paula White Ministries had registered its sermons for the calendar years 2010 and 2011, correct?

A Correct.

Q Put that to the side.

You don't want anyone to know what kind of editing software you use for your videos, to create your videos because you don't want anyone to take one of your videos, do you?

A I don't want them to alter my videos and to take -- to

alter and edit them down to where it changes the meaning. That is -- if you're implying that that is what I've done with Ms. White's, that is not the case. There's nothing being taken out of context.

Q Well, as a matter of fact, when you filed a motion for summary judgment in the underlying case, you based it on the fair use defense, true?

A True.

Q And cited a number of case law in which the courts had to go through the various factors and weigh all four of them applied to the particular facts of each of those cases to determine whether there had been fair use or not, right?

A Right.

Q You can put that to the side, Ms. Johnson.

MR. COWARD: May I approach the witness, Your Honor?

THE COURT: Yes, you may.

BY MR. COWARD:

Q Ms. Johnson, Mr. Sadaka sent you an email to see if you would agree to the dismissal of the complaint by Paula White Ministries without prejudice, true?

A True.

Q And you would not agree to that, right?

A No, I didn't.

Q Now, in this particular case, you've done some

research with regard to things that Mr. Sadaka was going through in his life back at that time, haven't you?

A During the copyright?

Q Yes.

A Yes, I did.

Q And as a matter of fact, Exhibit 75, Joint Exhibit 75, 76, 77, 78, and 79 all relate to issues that Mr. Sadaka has had with the Florida Bar and a criminal lawsuit -- I mean, a criminal charge filed against him since that time.

True?

MR. WAUGH: Objection. Relevance, Your Honor, insofar as they made an affirmative defense on relying on legal counsel. But we're far beyond that at this point.

THE COURT: Well, those documents are in evidence. I assume they were put in evidence for some purpose by stipulation. So I'm going to permit the inquiry.

Objection is overruled.

BY MR. COWARD:

Q Okay. Ms. Johnson, you are aware, based on those documents, that back in late 2014 when you were negotiating with Mr. Sadaka, as a matter of fact, he was undergoing issues with his law firm with regard to stealing money from them, true?

A I didn't know it at the time. I just learned this about maybe a month ago or less than a month ago.

Q Based on these documents, that's the case, right?
A Yes. He reached a --
Q That's about the time he reached an agreement with you, right?
A Based on those documents, yes.
Q And you don't know what conversations he had, if any, with Paula White Ministries with regard to your refusal to agree to a motion to dismiss without prejudice, do you?
A No.
Q You don't know whether Mr. Sadaka talked with them and counseled with them with regard to the issue of what the implications would be of a motion to dismiss with prejudice, do you?
A No, I don't.
Q And as a matter of fact, he filed the motion to dismiss with prejudice over the letterhead of the NeJame law firm in January of 2015, true?
A True.
Q And his own affidavit indicates that he had left the NeJame law firm by the end of 2014, true?
A That's what his affidavit says.
Q You don't know how much it would cost for Paula White Ministries to consider to -- to continue to pursue the underlying copyright litigation through the end of trial, do you?

A No, I don't.
Q How many hours of Paula White videos do you think you've watched?
A How many hours? I have no idea.
Q Thousands?
A Possibly.
Q You have never seen her speak your name in any of those videos, have you?
A No. She has other names for me.
Q There are a lot of people you're aware of, a lot of people in the United States who criticize Paula White, right?
A Oh, yes.
Q You're not the only one, true?
A True.
Q Have you ever sought to take Pastor Paula's deposition in this case to ask her if she was talking about you or to test your theories, did you?
A No, I didn't. Because I knew what the answer would be. And to take a deposition would be a waste of time and energy to fly all the way to Florida. So no need.
Q The dismissal in the underlying case did not indicate that the case was dismissed based on false claims, did it?
A The copyright?
Q Yes.

A No.

Q Besides putting videos of Paula White's out on YouTube and on your website, you've also passed out disks to people in the public where you live in the Seattle area with her videos on there, right?

A Correct.

Q And you preach sermons yourself, right?

A Correct.

Q Many of yours last for several hours, true?

A Correct.

Q And you give your disks that you pass out to people with Pastor Paula on them because she preaches a good sermon and you don't think that people really understand what she's saying.

True?

A No. She preaches a false sermon.

Q But you feel that the way that she presents it, a lot of people listen to it and think it's good, true?

A False.

Q Okay. Let's look at your deposition, page 162.

Look at your deposition, please.

A Okay.

Q Let's start at page 162, line 2, with a question for a little background.

"And these videos that you give out, about how many

would you estimate you've given out since your website was launched?

"Answer: Wow. I don't know. Hundreds, you know.

"Question: How do you pay for all of these videos -- or these CDs?

"Answer: Well --

"Question: They're CDs and you give them out, right?

"Answer: Uh-huh. Well, I have --

"Question: Yes? For -- 'uh-huh,' she can't get that down.

"Answer: Oh, I'm sorry. Yes, CDs. Yes, CDs.

"And then sometimes I'd pass out if I type just paper documents, but usually I'd try to give them something they can see her saying it, because they didn't -- they don't believe a lot of times.

"They'll say, No, because they're so -- I don't know -- mesmerized by her sermons, because she preaches a sermon that -- I mean -- and that's good. I mean, everything, everything -- everybody wants to hear something good.

"Nobody wants to hear, you know, like they say that I preach, hellfire and brimstone. Nobody wants to hear that they're going to hell.

"We already know we're going to hell, you know. They don't want to hear that. So they want to hear all of this

fluffy stuff and anything you do is okay.

"So they like her because of that, and that's why they open their purse to her because, like the Scripture says, they have itching ears. They hire teachers to tell them what they want to hear. And so everybody wants to hear something good.

"I mean, but a lot of times, you know, me, myself, you know, you've got to give me the -- the good and the bad. I want to know what's coming to hit me. If there's a truck coming, I want to know it's coming.

"Don't tell me, Oh, it's okay. You know, there's no semi going to hit me. You know, you're okay. And then -- I don't want that. I want to know. And it's up to me to make my decision.

"But most people are not that way. They want the good. They want the -- and that's the -- is how she -- and not only her, but that's how most con people are. They'd play on people's senses. They play on these things and so --"

That was a question and answer back when we took your deposition in November 2016.

A It was. Let me clarify that for you.

Q Well, Ms. Johnson --

A That's true. May I clarify?

Q You may clarify if you first answer: That was the

question and the answer you gave back at the time your deposition was taken in November of 2016?

A Correct.

Q Okay. Go ahead, please.

A Now, yes, this is true. A lot of people do believe what she's saying.

But when I made my rounds around the United States, when I talked to these people, they say they believed her because they were forced to believe her.

When I explained the Scriptures to them, they would say, Yeah, I thought that's what it meant. But she told us that, you know, if we thought otherwise, then God would punish them or whatever.

So that's why they were there still believing. They knew that something was wrong. But because they were afraid to touch God's anointing, as Paula always threatens, "Touch not God's anointing. Don't you question the pastor."

So they didn't. But they knew all along in their hearts and what they read in the Scriptures. When I explained it to them, they said, Well, that's what we thought it meant.

But, yes, they did like her. But they knew what they were hearing could have -- you know, but she -- they couldn't be truthful because she told them God would get

them. She put the fear in them for them to open their purses.

So, yeah, there are a lot of people out here. But there are a lot that do not. They know better, but they feel like they have to attend some church and listen to some preacher. And so that's what they do.

Q The videos that you put up on your website, on YouTube, should impact the sales of Paula White Ministry, shouldn't it?

A I don't think it should. I mean, maybe it might.

But, no, it shouldn't. It shouldn't impact her sales because these videos aren't for sale.

I mean, if it does impact her sales, well, I mean, so be it. It does.

Q If --

A If they are -- if they are drinking the Kool-Aid, then they're going to drink it. And it's not going to impact her sales. They're going to listen to it anyway. So --

Q If your videos that you have on your YouTube channel and on your website impact people who follow Paula White Ministries and impact her views on YouTube, you would be glad because now people are waking up and not giving them their tithes, true?

A Yes, I would be glad that the people have come awake. Yes.

And then they could take their tithes and give it to where it belongs, to the poor and the needy.

MR. COWARD: Thank you, Ms. Johnson.

THE WITNESS: You're welcome.

MR. COWARD: Thank you, Your Honor.

THE COURT: Mr. Waugh, redirect?

MR. WAUGH: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MR. WAUGH:

Q Ms. Johnson, your testimony was that at least 100 of the videos featured portions that had Paula White in them; is that correct?

A Approximately, yes.

Q Did the copyright infringement complaint list any potential penalties for copyright infringement in the complaint that you recall?

A Not that I recall.

Q And just on cross-examination there, you testified that you would distribute Paula White's videos by hand. But I wanted to clarify.

Do you mean her videos or portions of her videos in your videos? What do you mean?

A No. When I say "her videos," they're clips that are contained within my videos. But, yes, they are hers because she made them.

But I'm not taking her entire sermon of her, if that's what you mean, and saying, here's -- no. They're clips just like you see on YouTube. That's how they are down there. That's the way they are on my website as well, except the message is much longer.

Q Have you ever distributed a video that Paula White created or received copyright registration for unedited or not transformed in some way by your work?

A No.

Q Also on cross-examination, you testified that I believe you were not familiar with any newspaper articles about copyright infringement lawsuit; is that correct?

A Other than the newspaper article that I researched that was talking about the -- my website. I mean -- okay.

Give me the question again. I want to make sure I'm understanding what you're asking me.

Q Well, are you -- on cross-examination -- I just want to make sure I get your testimony right.

You testified that you were unaware of any newspaper articles about the actual copyright infringement lawsuit; is that correct?

A Correct.

Q Are you aware of any newspaper articles about your Paula White videos?

A Yes.

Q Okay. What articles are you aware of?
A One is the "Florida Courier" newspaper.
Q And how did you find that article?
A I was --

MR. COWARD: Objection, Your Honor. It's hearsay. The newspaper article is hearsay.

THE COURT: Well, the question pending is, "How did you find that article," which does not call for hearsay.

So I'm going to permit it to be answered.

Overrule the objection.

BY MR. WAUGH:
Q How did you find that newspaper article?
A I was researching online. And I just happened to come up -- to come across a website. On this website they were discussing one of my videos and how it had been taken down.

And so I then went to and just followed the link to the newspaper article. And that's how I found out.
Q Is that the same article that's listed on your exhibit list as Number 7?
A I don't have it in front of me. Is it the "Florida Courier"?
Q Yes.
A Yes, that's the one.

MR. WAUGH: Your Honor, I actually would seek to

publish this and introduce this into evidence over a hearsay objection pursuant to two Federal Rules of Evidence.

First, Federal Rule of Evidence 902, Subsection 6, as a self-authenticating newspaper article.

Alternatively, 803, Subsection 21, as an exception to hearsay based on it being about Ms. White's reputation.

THE COURT: Do you want to be heard, Mr. Coward?

MR. COWARD: Yes, sir.

They're offering it to prove the truth of the matter asserted. Certainly the first rule will not carry through. And give me just a moment.

THE COURT: What's the exhibit number, Mr. Waugh?

MR. WAUGH: I believe it's Plaintiff's Number 7, Your Honor.

MR. COWARD: So, Your Honor, with regard to the character evidence exception in this particular case, the courts have basically stated -- Loughan versus Firestone Tire, 749 F.2d 1519 at 1524, Eleventh Circuit, 1985 -- that you have to look at a person's regular past practice of meeting a particular kind of situation with a specific type of conduct. It depends on the right degree of regularity of the practice and its coincidence.

That article that they're talking about -- obviously this is a bench trial. The Court can look at it.

It has nothing to do with copyright infringement whatsoever. And, therefore, it's -- not only does not meet the hearsay exception, it's also irrelevant.

THE COURT: Okay. Let me have a minute to look at it.

MR. COWARD: Christian, what number is that?

MR. WAUGH: It's 7.

MR. COWARD: Thank you.

THE COURT: So for what purpose is this being offered, Mr. Waugh?

MR. WAUGH: The same relationship that Your Honor was interested in between the two that shows Ms. White's motive for pursuing a -- excuse me, the copyright infringement lawsuit and trying to take down the videos that showed she lied about what she said about being wrapped in a Torah.

THE COURT: How does that relate to Ms. Johnson's claim?

MR. WAUGH: Well, I'm -- it shows it was malicious, Your Honor. And there was no basis for copyright infringement. She was just trying to get rid of the evidence. And Ms. Johnson's video is the only one that really showed it.

MR. COWARD: Your Honor, could I ask to be heard on that?

THE COURT: Okay, Mr. Coward.

MR. COWARD: There's no foundation as well --

THE COURT: I can't hear you. I'm sorry.

MR. COWARD: I'm sorry, Your Honor.

There's no foundation as well, that her website and YouTube channel is not mentioned in this article.

MR. WAUGH: And that's why I'd like to ask --

THE COURT: Well, it was represented to me that this was a published newspaper. Is that the case?

MR. WAUGH: Your Honor, it says it's a statewide paper that's distributed and also printed.

However, Your Honor, pursuant to 902, Sub 6, and the prevalence of evidence, it doesn't matter whether it's actually distributed by hand or not. If it's online, that's also acceptable pursuant to White v. City of Birmingham.

THE COURT: Well, it is -- Counsel, as you know from reading White v. Birmingham, if, in fact, it is a recognized publication as opposed to some other unverifiable, potentially unreliable piece of information that might be contained on the internet, of which there are many, which is what prompted my question: Is this a recognized newsworthy publication?

I'm not familiar with it. So if it was the "Daytona Beach News-Journal" or the "Orlando Sentinel" or

something I was familiar with, then I could take judicial notice of that.

I'm not familiar with this publication. So that's what prompted my question.

MR. WAUGH: And, Your Honor, to be honest, I'm not a daily reader of the "Florida Courier" either. However, perhaps the Court would consider reserving ruling on it after further authentication questions to Ms. Johnson regarding the publication.

THE COURT: I will reserve ruling on it. I'm going to do some looking at it myself as well.

So if you can -- if you want to ask some other foundational questions, you can do that. But I'll take a look at it myself when we take a recess or when I have an opportunity to take a look.

MR. WAUGH: Thank you, Your Honor.

BY MR. WAUGH:

Q Ms. Johnson, what is the "Florida Courier"?

A It's a local newspaper in Florida. I'm not exactly sure what city because I'm not from Florida so --

Q How did you find it?

A I just went online and it was -- just looking, researching, and I came across that. When I typed in whatever I was looking for, that newspaper article came up.

Q Do you become familiar with the controversy that the

article talks about?

A Yes, uh-huh.

Q Well, what does the article talk about?

A Well, the article was centered around --

MR. COWARD: Objection. Hearsay.

THE COURT: Objection is sustained at this juncture.

So, Mr. Waugh, I'm going to take a look at this myself. But I confess that I'm a little confused about the proffer for which the article is being offered.

If the article is being offered to establish that Ms. Johnson became aware that there was some controversy, that's one thing. That's not the truth or falsity of the contents of the newspaper article.

It goes simply to establish that Ms. Johnson was aware that there was some ongoing controversy with respect to the bona fides of Ms. White and/or the filing of copyright claims.

If the proffer of the article is to establish that these facts that are described by whoever it is that wrote this article are, in fact, true and that they did, in fact, occur, that's a horse of a different color.

And so it's probably admissible under a category one. It's probably not admissible under category two.

So Mr. Coward seems to think you're offering it in

order to establish that these facts described in the article are true. And he makes an appropriate objection to that.

So anyway, I have your proffer as to what is being offered. I'll take it under advisement.

But I don't think, at least based on what you've asked Ms. Johnson, that she's going to be able to shed much light on the nature of the publication or what its distribution is or whether or not it constitutes a regular and reliable newsworthy source of information so that it might be considered under the portion of the evidence that you're relying on as it relates to newsworthy publications.

MR. WAUGH: Thank you, Your Honor.

THE COURT: You're welcome.

BY MR. WAUGH:

Q Ms. Johnson, does one of the videos that were subject to the takedown notice have Paula White being wrapped in a Torah?

A Yes.

Q And was that taken down once or twice?

A That video?

Q Yes.

A Well, that was the main video that had my channel taken down. That was the subject of it.

But, yes, the channel was taken down twice: once when

the YouTube reinstated my channel; then again in May, during the copyright infringement lawsuit, they made more false complaints to YouTube. And that video was amongst those --

Q Ms. Johnson --

A And my channel was taken down.

Q I didn't mean to interrupt you, Ms. Johnson.

You in the cross-exam indicated that one of your concerns with Ms. White, I believe, was that you did not agree with her teachings; is that right?

A That's correct.

Q And the video where she's being wrapped in a Torah, what do you disagree with in that?

A Well, the point I was making with that is Ms. White has no respect for anything that is sacred to anyone or even to the Christian religion.

And Ms. White even takes the Bible that she claims to believe in, tosses it to the floor, takes her foot, kicks it aside. And then I was showing -- on that same video was that incident.

And now I'm showing that whoever believes in whatever is sacred to their religion, she has no respect for her religion, period.

Q Ms. Johnson, did you ever receive a settlement offer from Paula White Ministries in the underlying complaint, in

the first lawsuit?

A In the copyright?

Q Yeah.

A No.

Q Did Thomas Sadaka ever call you and make a financial offer of any kind?

A No.

Q Do you remember how long it was -- well, strike that.

You were asked how many -- if it's common for churches to pass, you know, plates around for donations.

Do you remember that?

A I asked if it was common?

Q No. Is it common for churches to take donations?

A Yes, they do take donations.

Q Is it common for pastors to drive Lamborghinis?

A No.

MR. WAUGH: No further questions, Your Honor.

THE COURT: Thank you, Ms. Johnson.

You can step down.

MS. JOHNSON: Thank you.

THE COURT: Call your next witness, Ms. Johnson.

MS. JOHNSON: Oh, no, sir.

THE COURT: You have no further witnesses? Do you rest?

MS. JOHNSON: Pardon?

THE COURT: Do you rest your case?

MS. JOHNSON: Yes.

THE COURT: Do you have motions, counsel?

MR. COWARD: Yes, sir, Your Honor.

**RULE 50 MOTION**

MR. COWARD: Your Honor, the defendants would move for judgment as a matter of law under Federal Rule of Civil Procedure 50 on two bases.

First is that the evidence in the plaintiff's case has already established that Paula White Ministries could make out a prima facie case of copyright infringement in the underlying copyright infringement case.

Therefore, under those circumstances, as a matter of law, there could be no malicious intent in bringing that lawsuit.

Secondly, in this case, the plaintiff has pled conclusory allegations to be in a situation of a default under the case of Cotton versus Massachusetts Mutual Life Insurance Company, 402 F.3d 1267, Eleventh Circuit, 2005. Even in a default situation, conclusory allegations are not considered to be proof. The plaintiff still has to put on proof.

In this particular case, Your Honor, we believe the proof would show that the plaintiff has failed to produce evidence to show the defendant's conduct was

sufficient to support an award of punitive damages.

THE COURT: All right. Thank you.

I'm going to reserve ruling on the Rule 50 motion.

What is your -- what's your roster look like in terms of your live witnesses, Mr. Coward?

MR. COWARD: So, Judge, I have at least three. If the Court -- I have taken it from what the Court told us at the pretrial and today that you would like to get everything done today. And we're of a mind to try to do that as well.

Obviously I'm conscious of the fact that we're involved in a case with punitive damages. So I want to make sure they have a claim for punitive damages. I want to make sure I have time to do it.

But I do think that I actually might be able to accomplish it in an hour. I'd certainly do my best.

THE COURT: Well, first of all, I appreciate the offer. I want to make sure that the parties have all the time within reason that they need in order to make their presentation.

I suspect that there's going to be a request for some summation when we're finished. I don't know whether Ms. Johnson is going to have any rebuttal evidence once your case is concluded.

So why don't we do this? I have some time

tomorrow. Why don't we adjourn for the evening today. Give you an opportunity to get your ducks in a row for tomorrow. We'll come in tomorrow morning and start at 9:00 and get your -- you say you think your case is maybe an hour, hour and a half?

MR. COWARD: Probably, Your Honor.

I'm wondering -- I have a couple people, particularly the accountant. Could I consult with them and see what their schedule is for tomorrow and make sure? Because we might be able to get someone like him in and out pretty quick.

THE COURT: Okay. Yeah, if it's something that can be done relatively quickly. What I don't want to do is I don't want to -- I'm mindful of the fact that my court reporter and my courtroom deputy have been in here since before we started, you know, on other matters. So I don't want to run them too late into the evening.

MR. COWARD: Yes, sir.

THE COURT: So why don't you check with your accountant and see what -- how long do you think that testimony will take?

MR. COWARD: Fifteen minutes or less.

THE COURT: Okay. Well, there's no reason we can't go ahead and get that accomplished today rather than have him have to come back tomorrow.

MR. COWARD: Right.

THE COURT: I don't want to inconvenience him. But I also don't want either you or Ms. Johnson to feel like that you're given such a compressed time frame that you can't make your case to the best of your ability.

So why don't we call -- let's go ahead and put your accountant on. And we'll get that testimony done. Then we'll take a break for the night. We'll come back and let you finish your case in the morning.

MR. COWARD: Yes, sir.

Could I also go talk to my other witnesses and let them know what the Court's schedule is?

THE COURT: Yes.

MR. COWARD: Give me two minutes, please.

THE COURT: Everybody can stand at ease for a few minutes.

(Pause in proceedings.)

MR. COWARD: So, Your Honor, the defendants would call Jeff Hardin.

THE COURT: All right. Mr. Hardin, if you'll come up adjacent, beside the witness stand there. Raise your right hand and be sworn.

THE DEPUTY CLERK: Raise your right hand.

(Witness sworn.)

THE DEPUTY CLERK: Thank you, sir.

If you'll have a seat in that witness stand and adjust that microphone so you're speaking directly into it.

Once seated, if you'll state your first and last name and spell your name for the record.

THE WITNESS: Jeffrey Hardin, J-E-F-F-R-E-Y. H-A-R-D-I-N.

THE DEPUTY CLERK: Thank you.

THE COURT: You may inquire.

MR. COWARD: Thank you, Your Honor.

**DIRECT EXAMINATION**

BY MR. COWARD:

Q Tell us your name, please.

A Jeff Hardin.

Q What's your profession, sir?

A I'm a CPA.

Q And where do you work?

A I work for RSM in the United States.

Q All right. And a CPA for the record?

A Certified public accountant.

Q All right. Thank you, sir.

Give us the benefit of your education, please.

A My education is in accounting. I got my undergrad degree in accounting. I got a master's and MBA.

I passed the CPA exam, which means I'm licensed to practice in the state of Florida. And that just means that

I can opine on financial statements. I can -- I'm eligible to render an opinion on financial statements in the state of Florida.

Q Given the late hour, Mr. Hardin, could you give us a thumbnail sketch of your professional career, please, in accounting?

A Yes. I started in private accounting, couple of years, working for a real estate company doing -- preparing financial statements for partnerships.

And then I entered public accounting. I got my CPA degree -- I got my CPA certification in 2002, and I've been performing audits of entities since then.

And I also do consulting for certain clients and all around financial reporting.

Q All right. And the company RSM, did that used to have a full name?

A RSM does not have a full name. We were previously known as McGladrey & Pullen. Or previously before that, it was RSM McGladrey.

Q Tell us about the RSM accounting firm.

A RSM is a full-service public accounting firm. We offer services in audit, tax, and consulting.

We're the fifth-largest firm in the United States, I believe sixth internationally, through our affiliation with RSM International.

RSM U.S. is the United States division of RSM International, affiliate of RSM International.

Q Give us some sense of your particular practice at RSM over the last couple of years.

A My practice at RSM, I work in two general areas. One is nonprofit -- with nonprofit clients. And the second area I work in is what we call consumer products, which is a pretty wide variety of different types of clients.

And my area in consumer products is primarily in agriculture. But nonprofit is a big part of my practice as well. And that's primarily in the audit realm, assurance realm.

Q Have you worked with churches before New Destiny Christian Center?

A Yes, I have.

Q How is it that -- at some point in time in the calendar year 2017, did New Destiny Christian Center come to hire RSM as its outside accountants?

A Yes.

Q And what -- were you involved in that work?

A Yes, I was.

Q What was the purpose of the work that RSM was doing for New Destiny Christian Center in 2017?

A New Destiny Christian Center, we were hired to assist in evaluating the financial reporting, looking at internal

controls, and determining if there were any areas that needed focus in terms of gathering financial data and reporting any financial statements or internal controls.

Q All right. And so did you -- did RSM prepare a financial report for New Destiny Christian Center and subsidiaries at the -- as of the end of the calendar year 2017?

A Yes, we do. We prepared a compilation report.

Q All right. And let me direct you -- I know you brought a copy of it with you, right?

A Yes.

Q But let me direct you to the exhibit as well.

MR. COWARD: This is Joint Exhibit 41, Your Honor.

THE COURT: All right.

BY MR. COWARD:

Q Just put it over there so you can continue to talk into the microphone.

Mr. Hardin, I'm going to give you a little preliminary. If you could, please, because of some confidentiality issues, we're not going to talk about the actual numbers. We'll just ask you to verify the particular lines.

A Understood.

Q All right.

A Yes.

Q Were you involved in preparing this financial report?
A Yes, I was.
Q And tell us -- tell the Court what your involvement in that regard -- let me ask the question again.
Explain what your involvement was in preparing this financial report.
A My involvement was reviewing work of other firm -- other folks that worked at the firm. My involvement was preparing the report that you see on page 1.
And my involvement was verifying the numbers that you see on the following pages, including the consolidating schedule in the back, the schedules in the back.
Q This is not an audit?
A This is not an audit, correct.
Q Why isn't it -- let me ask you this: When do churches typically have audits performed?
A It varies by choice of the particular church. In many cases audits are required by a debt agreement. When there is no debt, sometimes audits are required of churches by their governance. So it just varies in terms of the need for an audit.
Q All right. Why isn't this one audited?
A We were not engaged to perform an audit of these -- of these financial statements.
And due to my involvement in looking at the internal

controls and making recommendations to management and to the financial reporting in this entity, we would not be independent to be able to perform an audit.

Q Was this prepared in accordance with generally accepted accounting principles in the United States?

A Yes, it was.

Q What does that mean?

A Generally accepted accounting principles stipulate how things are to be recorded in financial statements. It provides guidance on any number you would see in a set of financial statements, how it should be recorded, how transactions should be interpreted.

And its intent is to keep everybody on the same playing field when it comes to reporting transactions.

Q Let me also take a quick sidestep, Mr. Hardin, and ask you: Have you ever testified in a court of law before?

A I have not.

Q And initially was the intent to have one of your partners who assisted you on this who has that experience testify?

A Yes.

Q And what is her name?

A Terri Burdine.

Q Why is she not here?

A She's attending firm training out of the state and

could not reschedule that. So it's really a once-a-year shot for her.

Q I understand. But you understand the seriousness of your oath here?

A I do.

Q All right. So it looks like this financial statement is kind of broken down into two parts; is that right?

A (Nods head.)

Q We have the two-page accountant's compilation report first?

A Well, the compilation report is just a single page. It's page 1.

Q Okay.

A What we refer as the financial statements, which is the statement of financial position, is page 2.

Followed by the statement of activities, changes in net assets on page 3.

And then the last two pages are consolidating information that consolidates up the subsidiary, the divisions within New Destiny. And that's on page 4 and 5.

Q All right. And can you discuss what the supplement of the -- page 4 and 5, explain why you did that.

A So when there's -- when an organization looks at themselves in using multiple divisions, it's not uncommon to present consolidating information to give the user

additional information about each division.

Similarly, when you have a subsidiary, showing the subsidiary separate along with the elimination entries, as you see on page 4, it gives the user a better picture of what each individual division or company is contributing to the overall picture of the consolidated financial statement.

So if you notice, far to the right on page 4 and page 5, the heading "Consolidated Destiny Christian Center, Inc." will agree to page 2 and 3 in the same report.

Q All right. Let me ask you to look at page 2 of the report, statement of financial position.

If you could go through that for us without mentioning the numbers.

There is a category there for, under assets for property and equipment?

A Correct.

Q What does the land and land improvements consist of?

A So in accordance with generally accepted accounting principles, property and equipment are carried over -- recorded and carried at historical cost.

So these numbers that you'll see here in each of these categories represent a historical cost that New Destiny Christian Center incurred to acquire those particular

assets.

So that land and land improvements is the land that is owned, again, carried at its historical cost plus any improvements that were made to that land from the time it was owned through December 31st, 2017.

Q What about the buildings? What does that consist of?

A Similar. The buildings are the -- all the costs that went into constructing the buildings that are at the church location in Apopka, which I believe consist of two buildings.

And different from the land and land improvements, buildings are depreciated. But, again, those numbers that you see there are historical costs. Depreciation is taken out a few lines below, which you'll see there in that same category.

Q All right. And so the total assets that are listed under that and under the bold heading "Total Assets," those are the total assets of New Destiny Christian Center and its subsidiaries?

A At historical costs, that's correct.

Q And, again, without naming the numbers, we can see that a significant part of that is land and land improvements and buildings, right?

A That's correct.

Q Okay. And heading down the page there, there is a

line for net assets as well, right?

A Correct.

Q Would that be the equivalent to the net worth of New Destiny?

A That's a way to look at it, yes. That is correct. It is the sum total of all the activities from inception, all -- the impact of all of the earnings and losses cumulative, showing where the -- what the financial position is as of December 31st, 2017.

Q All right. Thank you, sir.

Let's turn over to the next exhibit, which will be the next page there.

The next exhibit there, that's Exhibit 42, sir. Joint Exhibit 42.

A I'm there.

Q What is this, sir?

A This is another compilation report that we prepared at RSM. It's a financial condition report.

And this is a report that reflects the financial condition as of December 31st of Paula White.

Q All right. And were you engaged in helping prepare this?

A Yes, I was.

Q All right. And what did you do to gather the information necessary to prepare this?

A So we worked with -- myself and Terri and her group worked with Pastor Paula and some of her folks and gathered the total of all of the assets that she owned with fair values attributable to them.

We reviewed them and assembled them on this statement.

We additionally, as you see down there towards the bottom of page 2, we calculated an estimated income tax on the difference between current values and historical basis in those assets to record the appropriate liability that you see listed there, which comes down to a net worth number.

Q Okay. Did you take into account the assets that she jointly held with her husband as well?

A Yes. If you notice -- or if I can refer you to one of the notes on page 3. It's note 2. Discusses jointly held property.

That articulates the way these were factored into the numbers that you see earlier on page 2. And it discusses that jointly held property is valued at 50 percent in this statement.

Q On page 2, under assets, real estate and personal residence, that takes into account several pieces of real estate that Paula White is an owner or co-owner of throughout the United States?

A That's correct.

Q You looked at those to make sure that those were on here?

A Yes.

Q And the line that we have under, on page 2 under net worth, is set forth on page 2?

A Correct.

Q Okay. Is that accurate within generally accepted accounting principles as of the end of year 2017?

A Yes. In the realm of preparing it in accordance with generally accepted accounting principles, this report is correct. And, of course, it is a compilation report, as you'll notice on page 1.

Q In your review of the finances of Paula White, did you find whether she owned a helicopter?

A I did not.

Q Did she own a plane?

A No.

MR. COWARD: Nothing else, Your Honor.

THE COURT: Thank you.

Cross-examination, Ms. Johnson or Mr. Waugh?

MR. WAUGH: I will, Your Honor.

MR. COWARD: So, Your Honor, I object to Mr. Waugh being engaged in actually helping to try the case other than his examination of the plaintiff, which was necessary, obviously, because of the clumsy nature that would be

involved.

But the Court's order specifically said that he was to be involved in assisting Ms. Johnson with the rules of evidence, the rules of the Court, and so on, not to be here to help her try the case.

She certainly is in a situation where she has a default in a case that has got punitive damages involved. She has already testified that she could hire lawyers in the underlying case if she wanted to.

She could have hired lawyers. There must have been many lawyers out there that she could have hired to come in and help her try the case. She chose not to.

I don't think Mr. Waugh should be able to help her with trying the case.

THE COURT: Objection is overruled.

You may proceed, Mr. Waugh.

**CROSS EXAMINATION**

BY MR. WAUGH:

Q Good afternoon.

A Hello.

Q I noticed in your report -- I don't know. Can I call it your report or RSM's report?

A Either is fine.

Q At the very bottom of page 1 there's a sentence, "We are not independent with respect to New Destiny Christian

Center, Inc., and subsidiary."

Could you explain what that means?

A Yes, I can. So initially when we were hired, we were engaged to perform certain services for New Destiny, making recommendations around internal controls, discussing -- looking at certain reconciliations of account balances.

And in that process, we assisted with some of those reconciliations. And we assisted their controller, and we reviewed quite a few number of those reconciliations. And in doing that, we declare our independence.

So that's the reason why we're required to list that in the report, to tell the user we're not independent in relation to this -- this set of financial statements.

Q Meaning that your own work would be under scrutiny? You'd be scrutinizing your own work?

A In an audit scenario, that's correct. We cannot audit our own work in a compilation. It's different.

Q What are the advantages or different characteristics of an audited financial report versus this one?

A An audited financial report requires us to follow general accepted auditing standards, which employs statistical sampling where we would pull invoices, dig into balances, send third-party confirmation letters.

There's a host of auditing procedure that are required under generally accepted auditing standards that are not

required in a compilation.

Q It would cost more and take longer; is that correct?

A That's exactly correct.

Q In this report, if I can direct your attention to page 2, is it your testimony, then, that you reviewed individual documents that go towards the aggregate values shown in the land and land improvements, the buildings, furniture and equipment, and vehicles?

A Some of them, yes.

Q Which ones did you not?

A We looked at certain land acquisitions that were in recent years, validated those to closing documents. Similarly with vehicle numbers.

You know, certain additions in, let's say, 2016 and 2017, when we were looking at our work and looking at some of the reconciliations, I did look at actual source documentation of those -- of those amounts that are in those numbers.

Q So there's no risk here that looking at one category, you don't -- you haven't accounted for each and every number that aggregates into the numbers in that column, correct?

A That's correct, nor would I do that in an audit.

Q Now, when you mentioned historical costs, does that mean we're talking like cost basis? We don't know -- it's

not fair market value of the land?

A That's correct. It's historical costs, means what -- essentially what an entity paid for it.

Q And have you personally -- you mentioned that you reviewed the work of others in compiling this report or at least producing it.

Do you personally know where all the documentation is that goes to show these aggregate numbers?

A Depends on the documentation. I mean, I have seen all of the general ledgers. I've seen obviously the trial balances that are supported by those ledgers. I looked at subsidiary ledgers.

Can I attest for every single dollar? No.

Q And the last sentence of the first paragraph on page 1 is that you do not express an opinion, a conclusion, nor provide any form of assurance on these financial statements; is that correct?

A That's correct.

Q Without any assurances, what value is that? What value are these numbers, then?

A When an accountant is hired in practice, and what I do, one of the things that we're required to do when we're engaged for a compilation is look at financial statements, look at the numbers that we're handed.

And when we -- if we were to see anything that looks

unusual or outside the bounds of generally accepted accounting principles, we're required to stop and investigate further.

So there's -- there's value in that.

Q And typical financial controls for entities like New Destiny that you mentioned developing financial controls for, is there ever a time when audited statements are a good idea?

MR. COWARD: Objection, Your Honor. Irrelevant.

THE COURT: Objection is overruled.

THE WITNESS: Repeat the question, please.

BY MR. WAUGH:

Q Is there ever a time when audited statements are a good idea as a part of a corporation's financial controls?

A It's really at the request of governance of the entity. As an auditor, I like audits.

MR. WAUGH: All right. Thank you.

THE COURT: Any redirect, Mr. Coward?

MR. COWARD: Just briefly, Your Honor.

**REDIRECT EXAMINATION**

BY MR. COWARD:

Q In your experience, Mr. Hardin, with requests for audits has been that they are frequently involved when there is a loan involved and the lender requires it?

A Yes. That's correct. In my experience, most places

do not enjoy being audited because it is a lengthy process with a lot of requests, a lot of requirements. It's an expensive process.

So I don't -- I have maybe in my experience one or two companies that do it out of governance. That's usually when there's an absentee owner, a wealthy individual who owns a couple of companies and wants them reviewed, wants them looked at a little bit deeper.

But generally entities do not get audits when there's not a requirement for an audit.

Q And with regard to the work that you prepared on these financial statements, if there was any question that came up, you looked into it?

A That's correct. I did.

MR. COWARD: Thank you, sir.

THE COURT: May this witness be excused?

MR. COWARD: Yes, sir.

THE COURT: Yes, Counsel?

MR. WAUGH: Yes, Your Honor.

THE COURT: All right. Sir, you can step down.

If you're here under subpoena, you're released from it. You can go on about your business.

THE WITNESS: Thank you.

THE COURT: All right. We'll be in recess until 9:00 tomorrow morning.

Did you have a chance to confer with your witnesses, Mr. Coward? Do we have a logistical problem?

MR. COWARD: I did. They'll be here.

THE COURT: Great. Thank you, all.

I'll see you in the morning.

(Proceedings adjourned at 4:15 p.m. until Thursday, May 10, 2018, at 9:00 a.m.)

*****

C E R T I F I C A T E

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

May 21, 2018

s\ Amie R. First

Amie R. First, RDR, CRR, CRC, CPE
Federal Official Court Reporter
United States District Court
Middle District of Florida