UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

SHIRLEY JN JOHNSON,

      Plaintiff,

v.                                        Case No. 6:15-cv-1698-Orl-37GJK

NEW DESTINY CHRISTIAN CENTER
CHURCH, INC.; PAULA MICHELLE
MINISTRIES, INC.; and PAULA
MICHELLE WHITE,

      Defendants.
_____

## MEMORANDUM OPINION AND ORDER

This cause is before the Court following a two-day bench trial. (*See* Docs. 248, 249, 256, 257.) Having considered the pleadings, evidence, argument, and relevant legal authority, and having made determinations on the credibility of the witnesses, the Court hereby renders its decision on the merits of this case pursuant to Federal Rule of Civil Procedure 52.

### I.    BACKGROUND

Plaintiff Shirley Jn Johnson ("**Johnson**") initiated this action against Defendants for, *inter alia*, malicious prosecution under Florida law related to a 2013 copyright infringement suit filed against Johnson by Paula White Ministries. (*See* Doc. 1); *see also Paula White Ministries v. Shirley Jn Johnson*, 6:14-cv-497-GAP-DAB (Mar. 27, 2014), Doc. 1 ("**Copyright Infringement Action**"). Following contentious discovery, the Court entered

default judgment against Defendants on Johnson's malicious prosecution claims. (*See* Doc. 183.) The matter then proceeded to trial for Johnson's damages. (*See* Doc. 192.)

## II.    JURISDICTION

The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The parties are diverse, and the Court previously accepted Johnson's assertion that the amount-in-controversy exceeds $ 75,000. (*See* Doc. 131, pp. 12–16.)

## III.    FINDINGS OF FACT

### A.    Agreed Findings of Fact[1]

1.    Plaintiff operates the YouTube channel "theremnantsjnj."

2.    Plaintiff is the registered owner of the YouTube channel "theremnantsjnj."

3.    Plaintiff is responsible for the content on the YouTube channel "theremnantsjnj."

4.    Plaintiff started her YouTube channel on November 1, 2011.

5.    Plaintiff created the website http://www.theremnantsjnj.com/.

6.    Plaintiff's website was "built and ready for public consumption" on September 11, 2011.

7.    Paula White Ministries sent an initial take-down notification to YouTube on February 2, 2012.

8.    On February 6, 2012, YouTube sent Paula White Ministries and Plaintiff a notification that certain content was removed.

---

[1] The parties stipulated to these facts, as provided by their Joint Pre-Trial Statement. (*See* Doc. 222, pp. 12–13.)

9.     On February 22, 2012, Plaintiff filed a counter-notification with YouTube requesting her content be reinstated.

10.    Plaintiff's YouTube channel was restored on May 14, 2012.

11.    Mr. Sadaka sent Plaintiff a Cease & Desist letter on October 7, 2013.

12.    The Copyright Infringement Action was filed by attorneys of the NeJame Law Firm on behalf of Paula White Ministries (d/b/a of Paula Michelle Ministries, Inc.) on March 27, 2014.

13.    YouTube removed certain content on Plaintiff's YouTube channel as a result of another notification by Paula White Ministries on May 2, 2014.

14.    Plaintiff filed a counter-notification with YouTube requesting her content be reinstated on May 14, 2014.

15.    Paula White Ministries notified YouTube that the Copyright Infringement Action was filed on May 15, 2014.

16.    YouTube declined Plaintiff's request to reinstate content as Copyright Infringement Action was pending on June 4, 2014.

17.    The Copyright Infringement Action was dismissed on January 22, 2015.

18.    Plaintiff's YouTube channel was restored on February 10, 2015.

19.    This Malicious Prosecution Action was filed on October 8, 2015.

20.    Plaintiff's economic damages are limited to monetary damages that she sustained as result of defending against the underlying copyright action. These damages total $1,207.93.

21.    Plaintiff has no other economic damages related to her defense of the underlying copyright action, but Plaintiff also seeks her costs of prosecuting this suit.

22.    Plaintiff has not suffered any monetary loss as a result of her YouTube channel being taken down. However, Plaintiff contends she sustained economic damages in getting her YouTube channel restored. Plaintiff is not seeking to recover such damages in this action, but is seeking those damages in a separate action, styled *Shirley Jn Johnson v. New Destiny Christian Center Church, Inc. et al*, 6:17-cv-710-Orl-37GJK.

23.    Plaintiff's claim for mental pain and anguish involves the "garden variety" emotional injuries she sustained during the underlying copyright action, which concluded on January 22, 2015.

24.    Plaintiff has recovered from her past mental and emotional injuries.

25.    Plaintiff did not seek psychological or psychiatric treatment for injuries, nor was she examined, diagnosed or treated for a specific mental/psychiatric disorder or injury as a result of Defendants' conduct.

26.    Defendant White has not specifically referred to Plaintiff by name in any of the sermons or videos Plaintiff has produced in this action or intends to utilize at trial.

**B.    Court's Additional Findings of Fact**[2]

---

[2] The following facts have been established by a preponderance of credible evidence. To the extent that any of these facts may represent conclusions of law, the Court

### i.  Initiation of copyright infringement action

1.  Paula White-Cain ("**White**") is Senior Pastor at New Destiny Christian Center. She preaches sermons to her congregation, which she personally crafts and writes. (Doc. 256, p. 44:1–19.) Her sermons are recorded, and she sometimes uses parables or discusses her personal life when preaching.

2.  Beyond preaching, White is the president of New Destiny Christian Center. (*Id.* at 109:3–6.) She delegates various responsibilities to others involved in her organization, including day-to-day operations, day-to-day management, and working with attorneys. (*Id.* at 107:6–15.) White's son, Brad Knight ("**Knight**"), served as Operations Manager of the Paula White Ministries ("**PWM**"), and is now employed on a contract basis with New Destiny Christian Center. (*Id.* at 108:11–18; Doc. 257, p. 8:5–18.) Knight handles issues involving YouTube and the online presentation and distribution of White's sermons. (*See* Doc. 257, pp. 10–12.)

3.  Between 2012 and 2015, Knight was responsible for growing PWM's internet program, which included placing ads on videos of White's sermons. (*Id.* at 12–15.) Part of this process included sending YouTube takedown notices for videos believed to be violating the Digital Millennium Copyright Act ("**DMCA**") by "re-uploading [PWM's] content or using [PWM's] content." (*Id.* at 16:2–5.) To that end, Knight and another employee

---

adopts them as such.

would search YouTube for White and PWM to "see what videos were using [their] content." (*Id.* at 17:6–11.) In doing this, Knight discovered Johnson's page, which had high video counts on videos that included clips from White's sermons. (*Id.* at 17:12–17.) Johnson was then sent a DMCA takedown notice by PWM. (*Id.* at 16:13–15.) In response, Johnson filed a counter-notification and her videos were restored. (*Id.* at 16–18.)

4. About a year and a half later, Knight consulted with attorney Tom Sadaka about Johnson's videos to see if PWM had a valid basis for a copyright infringement claim against Johnson. (*Id.* at 21:3–18.) Knight was the "only person that dealt directly with [Sadaka]" concerning Johnson's suit. (*Id.* at 22:22–25.) On review, Sadaka affirmed that PWM "had a reasonable basis for a lawsuit." (*Id.* at 22:10–12.) PWM's "primary intention was the removal of [Johnson's] videos and the concentration of [its] platform on YouTube." (*Id.* at 22:15–17; *see also id.* at 23:1–14.) Knight acted based on his understanding that Johnson was using PWM's content. (*Id.* at 25:5–17.) Knight believed that Johnson's videos did not constitute "fair use," based on his own understanding and based on the advice of Sadaka that there was a reasonable basis for the claim. (*Id.* at 29–30.) Ultimately, as the lawsuit progressed, Knight decided that the costs of litigation and legal fees outweighed the benefits of continuing suit to receive income from YouTube. (*Id.* at 26–27.) So he suggested to Sadaka that they drop the suit. (*Id.* at 27:7–15; *see also id.* at 28.) The Copyright Infringement Action was

ultimately dismissed by PWM. (*Id.* at 38.) The Court finds Knight's testimony credible.

5.      White's involvement in the Copyright Infringement Action was limited. (*See id.* at 27:16–22.) On being told by her son that a lawsuit against Johnson was "the only way we could pursue what we wanted to do with YouTube," White "gave [Knight] the authority to do what [he] thought was best, and [he] proceeded." (*Id.*; *see also id.* at 37–38.) The Court accepts Knight's testimony that White had minimal involvement in the Copyright Infringement Action, but that he sought her authorization before initiating suit.

**ii.      This action**

6.      After the Copyright Infringement Action was dismissed, Johnson initiated this action for malicious prosecution against Defendants. (Doc. 1.) She claims White and Defendants had "malice and evil motive" in instigating the Copyright Infringement Action, and sought to injure her personally. (*See id.* ¶¶ 38, 56, 59.) Johnson believes that White knew about her videos and used her sermons to personally attack her, even though White did not mention her by name. (*See id.* ¶¶ 59–65.) At trial, Johnson offered several clips from sermons as support. (Pl. Exs. 9D–9G.)

7.      One of Johnson's clips came from White's sermon on May 1, 2016, where White discussed loving people despite personal issues you might face with them. (Pl. Ex. 9G.) White focused on John 13:34–35, which says, "A new

commandment I give unto you, That ye love another; as I have loved you, that ye also love another. By this shall all men know that ye are my disciples, if ye have love to one another." (*Id.;.*)

8.  At some point in the sermon, White gave examples of personal strife she's faced and people who she's had difficulties with. (Defs. Ex. B-79; *see also* Pl. Ex. 9G.) She used these examples to show that it's not easy to love such people, but because God commands it, it must be done. (Defs. Ex. B-79; Pl. Ex. 9G.)

9.  Excerpted, she preached:

> I see great things happen. Then, that means, Rachel, that I'm going to have to really learn how to love, because love is not just something that comes so naturally to all of us. I mean, we've been hurt. Am I the only person that's ever been hurt in life? Am I the only person that's ever been offended in life? Am I the only person that's ever wanted to knock someone out in a New York second in life? Am I only person that wanted to say, you are saying this about me but let me tell about your—am I the only person that wanted to hire a detective, get some stuff, put it out and publish it and start a blog? Now I know, see, uh, please don't get into the dirty side of my mind—am I the only person that ever wanted to be ruthless and—ok, praise the Lord—wanted somebody who was saved but not sanctified come after you in Jesus' name? But He says, Paula that's not my disciple. You will know— you will, you will love, you will know that you're a disciple by the love you have for one another. Not just in your tribe, Paula. Not just at New Destiny Christian Center. Not just within your denomination. Not just within your—your personality frame. But within—in every single person who is a born-again believer. You know how many people say you can't preach cuz you're a woman? . . .
> You will know—this is the new command—Paula are you my disciple? Do you still love? Do you want me to start calling out names? . . . Do you love all the people that put the junk

out on the internet? Do you love—I can't call one out because I'm in a present case right now—do you love the one that says this about you? See this is a reality. I'm just telling—you have a story, too—do you love the one that slept with your husband? In church? I'm sorry, I'm just getting real with you right now. OK, she's going, "That's too much love." Not if you're going to be a disci—[laughing]—she's going that's too much love. That's reality. Guys, those aren't something I'm fabricating, I'm just talking to you about my story. Because if I'm going to be a disciple, could you have given me some other new commandment, God? Could you have told me if I love, I'd just work ninety hours a week for you? That I'd be known as a disciple if I fasted and I prayed a lot? No, I'll be known as a disciple by loving. And loving's not always easy. Loving doesn't always feel good to my flesh. In fact, to whom much is forgiven, they love much/myself [unintelligible]. God didn't say I have to like you all the time."

   (Pl. Ex. 9G.)

10.   Johnson presented this clip (and others) as evidence of White's "malice" against her. (Doc. 256, p. 31:21–24.)

11.   At that time, the only lawsuit White was involved in was this action with Johnson. Without specifically remembering, White admitted that she could have been speaking about Johnson when she was giving examples of situations to still love in and said, "I can't call one out because I'm in a present case right now." (*See id.* at 64–75.)

12.   The Court finds credible Johnson's assertion that White was referring to her in the May 1, 2016 sermon. But the Court does not find this reference indicates any malice from White directed at Johnson. Rather, this sermon focused on God's command to love others, even those who work against you or bring you difficult situations. (*Id.* at 103:17–25, 104:1–25, 105:1–4.)

This was White's interpretation of John 13:34-35 from the Bible, and the Court finds no animosity or ill will in this mention. (*Id.* at 103:17–24, 104:1–2; Defs. Ex. B-79.)

13.   Beyond this May 1, 2016 sermon, Johnson provided other clips from White's sermons where White does not mention Johnson by name, but Johnson contends reference her in a negative light. (*See* Pl. Exs. 9D, 9E, 9F.) On review, the Court finds no such reference to Johnson in White's other sermons presented, so rejects Johnson's contentions. In so doing, the Court finds credible White's testimony that she was not referring to Johnson in these clips. (Doc. 256, pp. 105–07.)

iii.   **Johnson's testimony**

14.   Johnson testified about her version of the Copyright Infringement Action and its effects on her life. (*See* Doc. 256.)

15.   Johnson first became aware of White when she saw her on television back in 2001 or 2002. (Doc. 256, pp. 117–18.) Johnson believed that White was purposefully twisting the Scriptures in her preaching, which prompted her to start speaking out against White. (*Id.* at 118–20.) This began by distributing written documents, but then Johnson began "spreading her message" by developing a website and YouTube channel. (*Id.* at 119–20.) Her videos on YouTube did not contain advertisements or seek revenue. (*Id.* at 123–34.) Johnson has never tried to monetize her videos or receive income from these activities. (*Id.* at 124.)

-10-

16.  In February 2012, Johnson received notification from YouTube that her channel had been taken down based on a complaint of copyright infringement, which prompted her to start researching copyright infringement and how she could restore her channel. (*Id.* at 125–26.) She then contacted YouTube to file a counter-notification and restore her channel. (*Id.*) The channel was restored in May 2012. (*Id.* at 127.)

17.  Almost two years later, in March 2014, Johnson received word from two attorneys of the filing of the Copyright Infringement Action. (*Id.*) They sought to represent her, but Johnson did not feel pressurized or worried at the time because she believed there was no infringement claim. (*Id.* at 127–28.)

18.  Once Johnson received the Complaint from the Copyright Infringement Action and read through the allegations, she began to worry. (*Id.* at 128.) Specifically, she was alarmed by "the very serious nature" of the allegations and the claims that she "sold [White's] videos and profited from the sale of those videos." (*Id.*) Johnson has no legal education, and testified that she thought the Copyright Infringement Action could lead to prison. (*Id.* at 128–29.) She formed this belief after doing her own research into civil and criminal copyright infringement, but Johnson did not seek guidance from an attorney to verify the accuracy of her beliefs. (*Id.* at 129, 157–58.)

19.  Johnson testified that the Copyright Infringement Action caused her reputational harm. (*Id.* at 130-31.) Specifically, she claims to have heard

"people whispering and rumoring" about the lawsuit, but she was unable to name these people or provide further details. (*Id.* at 130–31; 149–52.) Furthermore, none of these individuals named her when they were apparently discussing her lawsuit. (*Id.* at 149–52.)

20. Johnson also claims she suffered mental anguish and emotional harm from the Copyright Infringement Action. (*Id.* at 131–32.) Specifically, she claims that she "never really had any peace of mind," that her "mind was always in turmoil," she "couldn't sleep," and when she could, "it was broken sleep" because her mind was "always active." (*Id.*) Sometimes, she would "go to bed in tears because [she] thought that [she] would not be able to make it out of this lawsuit because [the] charges were very believable." (*Id.* at 132.) She also "began to emotionally eat, just eating nonstop," which caused her to "gain[] probably about 50 pounds." (*Id.* at 133:1–7.) Furthermore, her personal relationships were affected—she reported that she "couldn't interact with people," because "[a]ll [she] could do [was] worry about going to prison, worry about trying to fight this lawsuit." (*Id.* at 134:6–14.) Her close relationship with her daughter deteriorated—before the Copyright Infringement Action, they went places and did things together. (*Id.* at 135:23–25.) "That ended" with the suit, as Johnson "didn't have time" and lost interest." *Id.* at 134:25, 135:1–7.) And Johnson's hobbies took the backseat: She used to sew, do carpentry work, and garden; but hasn't "really been able to do anything but just focus on this lawsuit." (*Id.*

at 136:8–22.) But her anxiety and stress diminished when the motion to dismiss was filed. (*Id.* at 138: 3–12.) She did not seek medical attention for any of these injuries. (*Id.* at 160–61.)

21. Johnson chose not to hire a lawyer to represent her. (*Id.* at 136.) This was because "they didn't believe [her]," and "[she] didn't feel like [she] would get good, fair representation if the attorney didn't . . . even believe [her]." (*Id.* at 136:4–7.) Thus, she chose to represent herself, for which she used the local law library's resources. (*Id.* at 136–37.) "[She] was at the law library almost every day and almost from the time it opened to the time it closed." (*Id.* at 137:11–13.)

22. Johnson then initiated this malicious prosecution action "[b]ecause [she] wanted justice." (*Id.* at 140:7.)

23. The Court finds credible Johnson's testimony about mental anguish and emotional harm she suffered as a result of the Copyright Infringement Action, as someone unfamiliar with the legal process faced with a daunting situation.

24. The Court does not find credible Johnson's testimony that her reputation and character were damaged from the Copyright Infringement Action, as she was unable to provide any details about this and no one uttered her name in their supposed "whispers" about her.

**iv. Expert's testimony**

25.   Expert Samuel A. Lewis, a board certified intellectual specialist attorney also testified. (Doc. 257, pp. 44–71.) He was asked to evaluate the manner in which the Copyright Infringement Action was brought, the basis of the case, and whether it was brought in good or bad faith. (*Id.* at 47:15–20.) Based on his review, Lewis concluded that at the time the Copyright Infringement Complaint was filed, PWM could make out a prima facie case of copyright infringement. (*Id.* at 51:7–10.) This was because PWM "had a registration on the videos," it "own[ed] the videos," and "because [Johnson] was copying those videos and using them and republishing them." (*Id.* at 51: 11–14.) Despite Johnson's claim of "fair use" in publishing her videos, Lewis concluded that PWM still had a valid basis for bringing suit — as fair use is a defense, not a right, and its validity turns on a highly factual analysis. (*Id.* at 51–52.) What is more, that Johnson took only pieces of White's sermons did not prevent a finding of copyright infringement, since copyright includes the right to make derivative works. (*Id.* at 52–53.)

26.   Lewis concluded "[t]hat there was a reasonable basis for" the Copyright Infringement Action, and based on his analysis of the fair use factors, particularly regarding Johnson's motivation for the copying, he found "there's certainly a good basis for finding that [fair use] wouldn't have applied." (*Id.* at 54–55.)

27.   Lewis also testified that it seemed as though PWM relied on its attorney, Tom Sadaka, for his determination about whether there was a good faith

basis for the lawsuit, (*id.* at 54:4–10), and he found no evidence that PWM acted recklessly in filing the Copyright Infringement Action (*id.* at 56:5–10).

28.     The Court finds Lewis's testimony credible.

29.     Defendants also presented evidence of their financial statements. (Doc. 256, pp. 208–24.)

## IV.    CONCLUSIONS OF LAW

As the Court entered default judgment for Defendants' liability on the malicious prosecution claims, the legal conclusions remaining are Johnson's damages. (*See* Docs. 183, 192.) Johnson seeks economic damages for her costs associated with the Copyright Infringement Action; nominal damages, non-economic damages; punitive damages; costs of this action; and sanctions. (Doc. 222, p. 11.)

**A.     Economic and Nominal Damages**

1.     The parties have agreed that Johnson will receive $1,207.93 in economic damages for her costs from the Copyright Infringement Action. (Doc. 222, p. 2; Doc. 256, p. 10:3–6.) Thus, the Court will award Plaintiff these damages.

2.     Nominal damages are appropriate where proof of actual injury is absent. *See Dykes v. Hosemann*, 743 F.2d 1488, 1500 (11th Cir. 1984). This is not the case here, as Plaintiff's economic injuries could be proven, were stipulated to, and will be awarded. Thus, the Court will not award Plaintiff nominal damages.

**B.     Non-Economic Damages**

3.    In an action for malicious prosecution, "the plaintiff may recover all damages that are the natural and probable consequences of the action complained of." *Ware v. United States*, 971 F. Supp. 1442, 1471 (M.D. Fla. 1997) (citing *Florida Jur. 2d*, False Imprisonment § 39 (1995)) But "[t]he damages must be certain and proximate and not uncertain, contingent, or speculative." *Id.* (alteration in original).

4.    The Court finds that Johnson is not entitled to non-economic damages for her claimed injury to character and reputation. Johnson's testimony here was not credible, and the Court finds these claimed damages speculative.

5.    Johnson's testimony about the mental anguish she suffered from the Copyright Infringement Action was credible. Specifically, Johnson testified about the lack of sleep, diminished enjoyment in various hobbies, and overall worry about the litigation and its consequences on her life. The Court finds that Johnson, as an individual unfamiliar with the legal process, credibly suffered emotional harm from the Copyright Infringement Action. But as Johnson did not seek medical treatment and her symptoms have abated, the Court finds a minimal award for these damages appropriate. Thus, the Court awards Johnson $12,500.00 for these damages.

## C.    Punitive Damages

6.    Although the default judgment entered against Defendants entitles Johnson to punitive damages, sufficient evidence must have been presented to determine the amount against each defaulted defendant, if any. *See, e.g., B-*

*K Cypress Log Homes Inc. v. Auto-Owners Ins. Co.*, No. 1:09-cv-211-GRJ, 2012 WL 13018500, at *1 (N.D. Fla. May 10, 2012); *Bankers Multiple Line Ins. Co. v. Farish*, 464 So. 2d 530, 532 (Fla. 1985). This determination considers the egregiousness of each Defendant's conduct, the degree of harm to Johnson by Defendants' conduct in the Copyright Infringement Action, and each Defendant's net worth. *See Belle Glade Chevrolet-Cadillac Buick Pontiac Oldmobile, Inc. v. Figgie*, 54 So. 3d 991, 997–98 (Fla. 4th DCA 2010) (citing Fla. Stat. § 768.72(2) (2009) and *Humana Health Ins. Co. of Fla., Inc. v. Chipps*, 802 So. 2d 492, 495–96 (Fla. 4th DCA 2001)).

7. On review, the Court finds there is insufficient evidence to award Johnson punitive damages. Specifically, the Court finds that while pursuit of the Copyright Infringement Action may have been motivated, in some part, by ill will toward Johnson, nonetheless, PWM relied on its counsel to investigate whether a good faith basis existed to support the copyright infringement claim. Based on Lewis's testimony, the Court finds credible that PWM had a good faith basis to sue Johnson for copyright infringement, and its primary purpose for initiating the Copyright Infringement Action was to prevent such infringement. Thus, Plaintiff is not entitled to punitive damages here. *Cf. Lawson v. Kroger Co.*, 997 F.2d 214, 217 (6th Cir. 1993) (finding no malice where the defendant sought criminal sanctions against plaintiff for passing bad checks even though the defendant "might have collected on the checks as a corollary to criminal prosecution").

-17-

**D.     Additional Costs**

30.     As to Johnson's claim for costs associated with prosecuting this action, no evidence was presented at trial regarding these costs. But as the prevailing party here, she may seek to recover these costs from the Clerk by filing a Bill of Costs. *See* Fed. R. Civ. P. 54(d)(1); *see also* http://www.uscourts.gov /forms/other-forms/bill-costs-district-court.

**E.     Sanctions**

31.     The Court finds additional monetary sanctions are not necessary for Defendants' non-compliance with discovery, as the Court already imposed the harshest sanction of default judgment. (*See* Doc. 183.)

In sum, the Court finds that Johnson is entitled to $1,207.93 in economic damages and $12,500.00 in non-economic compensatory damages, totaling $13,707.93 in damages. In so doing, the Court denies Defendants' oral motion for judgment as a matter of law (Doc. 253) and renewed motion (Doc. 254).

### IV.     CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.     Plaintiff Shirley Jn Johnson shall recover from Defendants New Destiny Christian Center Church, Inc.; Paula Michelle Ministries, Inc., and Paula Michelle White $13,707.93 total in damages.

2.     Defendants' ore tenus motion for judgment as a matter of law (Doc. 253) and ore tenus renewed motion for judgment as a matter of law (Doc. 254) are **DENIED**.

-18-

3.      The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff and

close the file.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on July 30, 2018.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record
*Pro se* party